**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

| | | |
|---|---|---|
| ———————————————————x | : | |
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S. | : | |
| Plaintiff, | : | |
| | : | |
| and | : | |
| | : | |
| COLAKOGLU DIS TICARET A.S., *et al.*, | : | |
| | : | |
| Plaintiff-Intervenors, | : | Court No. 21-00565 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| and | : | |
| | : | |
| REBAR TRADE ACTION COALITION, *et al.*, | : | |
| | : | |
| Defendant-Intervenors. | : | |
| ———————————————————x | | |

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff

Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan"), respectfully moves for judgment on

the administrative record. For the reasons set forth in the accompanying Memorandum of Law in

support of its motion, Kaptan requests that the Court determine that the U.S. Department of

Commerce's results in *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final*

*Results of Countervailing Duty Administrative Review and Rescission, in Part; 2018,* 86 Fed.

Reg. 53,279 (September 27, 2021) and the accompanying Issues and Decision Memorandum is

not supported by substantial evidence on the record and is otherwise not in accordance with law.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP


*/s/ Andrew T. Schutz*
Andrew T. Schutz
Kavita Mohan

1201 New York Ave., NW
Suite 650
Washington, DC 20005
(202) 783-6881



Dated: April 5, 2022

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

```
_____x
                                       :
KAPTAN DEMIR CELIK ENDUSTRISI VE       :
TICARET A.S.,                          :
                    Plaintiff,         :
                                       :
          and                          :
                                       :
COLAKOGLU DIS TICARET A.S., et al.,    :
                                       :
                    Plaintiff-Intervenors,  :    Court No. 21-00565
          v.                           :
                                       :
UNITED STATES,                         :
                                       :
                    Defendant,         :
          and                          :
                                       :
REBAR TRADE ACTION COALITION, et al.,  :
                                       :
                    Defendant-Intervenors.  :
_____x
```

**ORDER**

Upon consideration of the Motion for Judgment on the Administrative Record filed by Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan"), and upon all other papers and proceedings herein, the Court

ORDERS that Kaptan's Motion is granted; and further

FINDS that the contested results of the U.S. Department of Commerce ("Commerce") in *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2018,* 86 Fed. Reg. 53,279 (September 27, 2021) and the accompanying Issues and Decision Memorandum (collectively, "Final Results"),

was not supported by substantial evidence on the record, and was otherwise not in accordance with law; and further

ORDERS that this matter is remanded to Commerce for reconsideration of the Final Results in accordance with the decision of this Court.

SO ORDERED.

_____
Gary S. Katzman, Judge


Dated: _____, 2022
       New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

——————————————————————————x
:
KAPTAN DEMIR CELIK ENDUSTRISI VE         :
TICARET A.S.,                            :
         Plaintiff,              :
                                 :
    and                          :
                                 :
COLAKOGLU DIS TICARET A.S., *et al.*,    :
                                 :
         Plaintiff-Intervenors,  :     Court No. 21-00565
    v.                           :
                                 :
UNITED STATES,                           :     **PUBLIC VERSION**
                                 :
         Defendant,              :
    and                          :
                                 :
REBAR TRADE ACTION COALITION, *et al.*,  :
                                 :
         Defendant-Intervenors.  :
——————————————————————————x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Andrew T. Schutz
Kavita Mohan
GRUNFELD, DESIDERIO,
LEBOWITZ, SILVERMAN &
KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(212) 783-6881

Dated: April 5, 2022

# TABLE OF CONTENTS

**STATEMENT PURSANT TO RULE 56.2**.................................................................... 1

    **A.**    **ADMINISTRATIVE DECISION UNDER APPEAL**....................................... 1

    **B.**    **REASONS FOR CONTESTING THE ADMINISTRATIVE DECISION** .... 1

    **C.**    **ISSUES PRESENTED AND SUMMARY OF ARGUMENT** ......................... 1

**STATEMENT OF FACTS**........................................................................................... 4

**STANDARD OF REVIEW** ......................................................................................... 7

**ARGUMENT** ................................................................................................................ 8

    **A.**    **COMMERCE'S FINDING THAT NUR WAS A CROSS-OWNED INPUT SUPPLIER PURSUANT TO 19 C.F.R. § 351.525(B)(6)(IV) WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW** ...................................................................... 8

        **1.**    **NUR DOES NOT SATISFY THE INPUT SUPPLIER ATTRIBUTION CRITERIA AS SET FORTH IN THE DEPARTMENT'S REGULATIONS, THE PREAMBLE, AND PRIOR COMMERCE CASES**............................................................... 8

        **2.**    **COMMERCE'S PREVIOUS DETERMINATIONS THAT SCRAP CAN BE A PRIMARILY DEDICATED INPUT IN THESE PROCEEDINGS DOES NOT NECESSITATE A SIMILAR FINDING UNDER THE FACTS OF THIS CASE** ........ 18

        **3.**    **COMMERCE'S OTHER ARGUMENTS JUSTIFYING ITS DETERMINATION THAT NUR IS A CROSS-OWNED INPUT SUPPLIER ARE WITHOUT MERIT AND SHOULD BE DISREGARDED** ................................................................. 21

    **B.**    **COMMERCE'S DETERMINATION FINDING NUR'S LAND RENT EXEMPTION COUNTERVAILABLE WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW** ................................................................................................... 23

        **1.**    **SUBSTANTIAL EVIDENCE DOES NOT SUPPORT COMMERCE'S DETERMINATION THAT THE LAND FOR LTAR UNDER LAW 5084 PROGRAM WAS REGIONALLY SPECIFIC PURSUANT TO SECTION 771(5A)(D)(IV) OF THE ACT** .......................................................................................... 24

        **2.**    **COMMERCE'S CALCULATION OF THE BENEFIT FOR KAPTAN'S RENT FREE LAND AS A GOOD FOR LESS THAN ADEQUATE REMUNERATION RATHER THAN AS REVENUE FOREGONE WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW** ............................... 27

        **a. Any Benefit from the Exemption from Payment Under the Land Use Agreement Must be Calculated as Revenue Forgone** ................................ 29

        **b. Nur's Land Use Agreement is a Lease as it Meets Every Element that Defines a Lease**............................................................................. 31

i

      c. Commerce Unlawfully Concluded that Nur's Land Use Agreement was a "Conditional Easement" .................................................................. 32

      d. The Contingent Nature of any Payment Due Under the Land Use Agreement Does not Make it a Provision of Goods at Less Than Adequate Remuneration ................................................................................. 35

      e. The Resort to a Benchmark in this Case was Unsupported by Record Evidence and Contrary to Law ...................................................... 36

    3. THE DEPARTMENT'S SELECTION OF AN INDUSTRIAL RENT BENCHMARK WITHOUT ADJUSTING THE BENCHMARK TO REMOVE RENT ATTRIBUTED TO BUILDING RATHER THAN LAND ONLY WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW ............................... 38

CONCLUSION ................................................................................................ 43

# TABLE OF AUTHORITIES

**Cases**

*ATC Tires Pvt. Ltd.v. U.S.*, 322 F.Supp.3d 1365 (Ct. Int'l Trade 2018).......................................36

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, Inc., 419 U.S. 281 (1974)........................30

*Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ...........................................43

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ..........................................................................7

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ......................................30

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997)..............................................7

*Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ..........................................................................................................................19

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984)................................7

*Micron Technology, Inc. v. United States*, 117 F.3d. 1386 (Fed Cir. 1997)..................................33

*Nucor v. United States*, 927 F.3d 1243 (Fed. Cir. 2019) ..........................................................31, 32

*Ozdemir Boru San. Ve Tic. Ltd. Sti. v. United* States, 273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017) ....................................................................................................................................................41

*Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278 (Fed. Cir. 2004) .....................................7

*SKF USA, Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001).....................................................7

*SKF USA, Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011).....................................................7

*Timken U.S. Corp. v. United States*, 421 F.3d 1350 (Fed. Cir. 2005) ...........................................43

*WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d 1340 (Ct. Int'l Trade 2012).....................7

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ............30

*Zhaoqing New Zhongya Aluminum Co. v. United States*, 37 C.I.T. 1003 (2013), as amended (July 19, 2013),................................................................................................................................39, 40

*Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 471 F. Supp. 3d 1313 (Ct. Int'l Trade 2020) ....................................................................................................................................................43

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...........................................................................................................7

19 U.S.C. § 1677 ................................................................................................ 31, 36

19 U.S.C. § 1677(5)(D)(ii) ............................................................................ 2, 27, 36

19 U.S.C. § 1677(5)(D)(iii) ................................................................................ 3, 28

19 U.S.C. § 1677(5A)(D)(iv) .................................................................................. 25

19 U.S.C. § 1677f(i)(3)(B) ..................................................................................... 43

**Other Authorities**

Black's Law Dictionary (10th Edition, 2020) ........................................................ 32

Merriam-Webster.com Dictionary ................................................................... 31, 32

Section 7751(5A)(D)(iv) of the Tariff Act .......................................................... 2, 24

**Regulations**

19 C.F.R. § 351.509 ........................................................................................ 29, 37

19 C.F.R. § 351.510 ............................................................................................... 29

19 C.F.R. § 351.511 .............................................................................. 3, 27, 37, 39

19 C.F.R. § 351.511(2) .......................................................................................... 40

19 C.F.R. § 351.525(b)(5)(i) .................................................................................. 26

19 C.F.R. § 351.525(b)(6) ................................................................................... 8, 9

19 C.F.R. § 351.525(b)(6)(iv) ......................................................................... passim

19 C.F.R. § 351.525(b)(6)(vi) .................................................................................. 9

19 U.S.C. § 1677(5)(D) ......................................................................................... 29

19 U.S.C. § 1677(5)(E)(iv) ............................................................................... 37, 39

**Administrative Decisions**

*Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review*, 2018, 86 Fed. Reg. 15,184 (Mar. 22, 2021) ............................................................................. 12, 13

*Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review, and Intent to Rescind Review, in Part*; *2018*, 85 Fed. Reg. 45,185 (Jul. 27, 2020) .................................................. 14, 22

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 38361 (June 22, 2020) 14, 15, 22

*Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Preliminary Countervailing Duty Determination*, 78 Fed. Reg. 33,342 (June 4, 2013) .............................. 37

*Certain Glass Containers From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 31,141 (May 22, 2020) ................. 15, 16, 22

*Common Alloy Aluminum Sheet From Bahrain: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 13,333 (Mar. 8, 2021) .................................................................. 40

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348 (Nov. 25, 1998) ........................... passim

*Forged Steel Fluid End Blocks From the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 80,011 (Dec. 11, 2020) ..................... passim

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 85 Fed. Reg. 3014 (Jan. 17, 2020) ...................................................................................................................... 4

*Laminated Woven Sacks From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*, 84 Fed. Reg. 14,647 (April 11, 2019) ........................... 29

*Non-Oriented Electrical Steel From Taiwan: Final Affirmative Countervailing Duty Determination*, 79 Fed. Reg. 61,602 (Oct. 14, 2014) ......................................................... 30, 37

*Steel Concrete Reinforcing Bar from the Republic of Turkey: Countervailing Duty Order,* 79 Fed. Reg. 65,926 (Nov. 6, 2014) ................................................................................................. 4

*Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2016*, 84 Fed. Reg. 36,051 (Jul. 26, 2019) ...................................................................................................................................... 18

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2018*, 86 Fed. Reg. 53,279 (September 27, 2021) ..................................................................................................................................... 1

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind in Part; 2018,* 86 Fed. Reg. 15,921 (Mar. 25, 2021) ...................................................................................................... 5

PUBLIC VERSION

Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan") submits this Memorandum of Law to support its Rule 56.2 Motion for Judgment on the Agency Record.

## STATEMENT PURSANT TO RULE 56.2

### A.  ADMINISTRATIVE DECISION UNDER APPEAL

Kaptan seeks review of the U.S. Department of Commerce's ("Commerce" or the "Department") results published in *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2018*, 86 Fed. Reg. 53,279 (September 27, 2021). ("Final Results") (**PR 288**), and the accompanying Issues and Decision Memorandum ("IDM") (**PR 283**) (collectively, "Final Results").

### B.  REASONS FOR CONTESTING THE ADMINISTRATIVE DECISION

Kaptan's reasons for contesting the administrative decision are set forth in the Summary of Arguments below, and in more detail in the Argument section of this Memorandum.

### C.  ISSUES PRESENTED AND SUMMARY OF ARGUMENT

   1. **Was Commerce's finding that Nur Gemicilik ve Tic. A.S. ("Nur") was a cross-owned input supplier pursuant to 19 C.F.R. § 351.525(b)(6)(iv) supported by substantial evidence and in accordance with the law?**

**No.** The Department's Regulations, the *Preamble* to the CVD Regulations, and multiple prior decisions of the Department demonstrate that when deciding whether to attribute subsidies received by an affiliated input supplier, the Department must (1) make its decisions on a case-by-case basis depending on the particular input, the downstream product, and the production process; (2) consider the primary business activity of the affiliated company that is providing the input and whether that primary business activity relates to the production of the downstream product at issue in the case; and (3) determine whether it is "reasonable" to conclude that the

1

purpose of the subsidy to that company would have been to benefit the production of the downstream product. It is not reasonable to conclude based on the evidence on the record that the purpose of a subsidy to Nur, which is a shipbuilder, was to benefit Kaptan's commodity steel production. The Department should find that Nur is not a cross-owned input supplier within the meaning of 19 C.F.R. § 351.525(b)(6)(iv).

**2. <u>Was Commerce's finding that Nur's rent free land was regionally specific pursuant to Section 7751(5A)(D)(iv) of the Tariff Act, because Nur's land was located in one of the areas that qualifies for the exemption in Law 5084, supported by substantial evidence and in accordance with the law?</u>**

**No.** Record evidence does not support a finding that Nur's rental exemptions were given pursuant to Law 5084 for the following reasons: (1) Kaptan did not report that it received rent-free land pursuant to Law 5084, only that it "may have" received such benefits; and (2) Nur entered into its land agreement in 2014, after Law 5084 had already been repealed. Thus, if rental exemptions were not issued pursuant to Law 5084, then the regional limitations of this law are not applicable, and there is no basis for the Department's specificity finding. Furthermore, there are no facts on the record to support a finding of specificity on a *de facto* basis. The record demonstrates that the subsidy is, at most, tied to non-subject merchandise, as the land was provided to Nur specifically for the development of a shipyard.

**3. <u>Was Commerce's calculation of the benefit for Kaptan's rent free land as a good for less than adequate remuneration ("LTAR") rather than as revenue foregone supported by substantial evidence and in accordance with the law?</u>**

**No**. The Department's normal practice for the calculation of government assistance received in the form of wholly exempted rental amounts is to treat such assistance as revenue forgone under 19 U.S.C. § 1677(5)(D)(ii), rather than as a good for LTAR. In such an instance,

the benefit is the exempted amount from the contract or a listed government rental price rather than a comparison to a rental "benchmark" the Department's creates for the purposes of the proceeding.  In this case, the record establishes that Nur used and occupied land for the development of a shipyard. Nur entered into an agreement with the government, which owns the land, for a fixed term of 49 years and for an ascertainable charge over the term. The Department's conclusion in the Final Results that this land agreement was not a lease within the common definition and use of that term, and that conditionality for the waiver of the charges somehow renders any benefit under this agreement as a financial contribution in the form of the provision of goods under 19 U.S.C. § 1677(5)(D)(iii) was unsupported by record evidence and contrary to consistent agency practice and law.

4. **In calculating the benefit for the land rent program pursuant to 19 C.F.R. § 351.511, was the Department's selection of an industrial rent benchmark without adjusting the benchmark to remove rent attributed to buildings rather than land only, supported by substantial evidence and in accordance with the law?**

**No**. If the Court finds that Commerce appropriately treated the benefit for Kaptan's land as an LTAR program rather than a revenue foregone program, the Court should nonetheless remand this issue back to Commerce to adjust the benchmark calculation to remove rent attributed to buildings rather than land only, in accordance with the Department's Regulations and prior case law. In its administrative case brief, Kaptan provided the Department with three alternatives to make this adjustment to the calculation. The Department did not sufficiently justify its dismissal of these alternatives, and the Department's failure to adjust the benchmark was unsupported by substantial evidence and not in accordance with the law.

3

## **STATEMENT OF FACTS**

The Department issued a countervailing duty order on rebar from Turkey on November 6, 2014. *See Steel Concrete Reinforcing Bar from the Republic of Turkey: Countervailing Duty Order,* 79 Fed. Reg. 65,926 (Nov. 6, 2014) ("Order").  On January 17, 2020, the Department initiated an administrative review of the countervailing duty order on rebar from China, covering countervailable subsidy benefits received by Kaptan and other Turkish producers/exporters during the period of review ("POR") of January 1, 2018, through December 31, 2018. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 85 Fed. Reg. 3014, 3022 (Jan. 17, 2020) ("Initiation Notice") (**PR 26**).

Subsequent to the initiation of the proceeding, the Department selected Kaptan and Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. ("Icdas"), as the only two mandatory respondents in the review and issued initial countervailing duty questionnaires to each company (and the Government of Turkey), accordingly. (**PR 31**; **CR 4**). On June 5, 2020, Kaptan filed a timely response to the Affiliation Section of the Department's initial CVD questionnaire. In this questionnaire response, as required, Kaptan identified all its affiliates including the affiliates the company believed fell within the meaning of cross-owned input suppliers under 19 C.F.R. § 351.525(b)(6)(iv). (**PR 47**; **CR 6**). One of the affiliates identified was Nur, a ship building company that sold the scrap it generated from its production to Kaptan, which Kaptan used as an input in its production of subject and non-subject merchandise. The generation of scrap is a very insignificant portion of Nur's business and this amount of scrap was extremely miniscule compared to the scrap Kaptan purchased from other sources:

4

CONTAINS BUSINESS PROPRIETARY INFORMATION

**Kaptan Major Input Purchases**

| | Name of Major Input | Total Volume Purchased (tons) | Total Value Purchased (TL) | Average Price (TL/Ton) |
|---|---|---|---|---|
| [ | ] Scrap | | | |
| [ | ] Scrap | | | |
| [ | ] Scrap | | | |
| [ | ] Scrap | | | |
| [ | ] Scrap | | | |
| [ | ] Scrap | | | |
| [ | ] Scrap | | | |
| Total | | | | |

*Id*. As a result, Kaptan stated that it should not be required to report the subsidies, if any, or provide a full questionnaire response for Nur as a "cross-owned input supplier" since the company's scrap production was not "primarily dedicated to the production of the downstream product" within the meaning of 19 C.F.R. § 351.525(b)(6)(iv). *Id*.

On November 13, 2020, the Department issued a supplemental questionnaire requesting that Kaptan provide a full questionnaire response for Nur notwithstanding Kaptan's protestations. (**PR 129**; **CR 82**). On December 15, 2020, Kaptan provided a full initial CVD questionnaire response for Nur reporting that Nur possibly used certain alleged "Regional Development Subsidies." Specifically, Kaptan reported that Nur entered into a Lease and Investment agreement with the local government whereby Nur was permitted to use land rent free in exchange for meeting certain investment and employment criteria. (**PR 173**; **CR 126-136**).

The Department published its Preliminary Results of the administrative review on March 25, 2021. *Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind in Part; 2018,* 86 Fed. Reg.15,921 (Mar. 25, 2021) ("Preliminary Results") (**PR 233**). In its Preliminary Results, the Department preliminarily found that (1) Nur was a cross-owned input supplier of Kaptan within the meaning of 19 C.F.R. § 351.525(b)(6)(iv); (2) Nur's receipt of rent-free land represented a

5

countervailable subsidy within the meaning of section 771(5) of the Act.; (3) Nur's non-payment

of rent during the POR resulted in a subsidy benefit attributable to Kaptan at an *ad valorem* rate

of 2.37 percent. (**PR 233**). Without this determination regarding Nur's land agreement, Kaptan's

rate would have been *de minimis*.

On July 28, 2021, Kaptan filed its administrative case brief challenging certain decisions

and findings the Department made in the Preliminary Results. **PR 264**; **CR 211**. Specifically,

Kaptan challenged (1) the Department's determination that Nur was a cross-owned input supplier

under 19 C.F.R. § 351.525(b)(6)(iv); (2) the Department's determination that Nur's rent-free

land was given pursuant to Turkish Law 5084; (3) the Department's determination to analyze

this program as goods for less than adequate remuneration rather than revenue foregone; and (4)

the benchmark used to calculate the land rent benefit.

On September 27, 2021, the Department published its Final Results assigning a final

CVD rate of 1.82% to Kaptan. (**PR 288**). In the unpublished IDM accompanying the

Department's Final Results, the Department rejected Kaptan's arguments with regard to (1)

Nur's status as an input supplier, (2) that Nur's rent-free land was not countervailable, (3) that, if

countervailable, the Department should treat the benefit as revenue foregone rather than a good

for less than adequate remuneration and (4) benchmark adjustments. (**PR 283**). While the

Department rejected some arguments Kaptan made regarding the land benchmark used to

calculate the benefit, it agreed with others. The Department in the Final Results removed certain

rental prices in Turkey from the benchmark. This reduced the rate applied for this program to

1.64%.

Additional relevant facts are discussed under each of the arguments below.

6

## <u>STANDARD OF REVIEW</u>

This Court must hold unlawful any aspect of Commerce's decision-making that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Substantial evidence requires more than mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted).

"Despite Commerce's statutory discretion, . . . if Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004). "When an agency changes its practice, it is obligated to provide an adequate explanation for the change." *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (quotation omitted). "If the Department provides 'no reasonable explanation' for changing a practice that it has 'consistently followed,' such a change is an unacceptable agency practice." *WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d 1340, 1344 (Ct. Int'l Trade 2012).

7

## <u>ARGUMENT</u>

**A.   COMMERCE'S FINDING THAT NUR WAS A CROSS-OWNED INPUT SUPPLIER PURSUANT TO 19 C.F.R. § 351.525(B)(6)(IV) WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW**

In the Final Results, Commerce disregarded Kaptan's arguments that Nur was not a cross-owned input supplier, and found that "{r}egardless of the amount of steel scrap manufactured by Nur and regardless of the fact that it was manufactured as a byproduct rather than as Nur's primary production activity, as previously stated, steel scrap has been found, in previous segments of this proceeding to be a product that is primarily dedicated to the production of downstream steel products."[1] Commerce's determination was unsupported by substantial evidence and not in accordance with the law for the reasons discussed below.

**1.   NUR DOES NOT SATISFY THE INPUT SUPPLIER ATTRIBUTION CRITERIA AS SET FORTH IN THE DEPARTMENT'S REGULATIONS, THE PREAMBLE, AND PRIOR COMMERCE CASES**

When a producer/exporter is selected as a mandatory respondent in a CVD case, Commerce's CVD questionnaire requires, in accordance with the Regulations, the respondent to identify any cross-owned affiliates. The regulations outline four different categories of companies that fall within the regulatory definition of "cross-ownership." 19 C.F.R. § 351.525(b)(6):

(1)   Corporations producing the same product;

(2)   Holding or parent companies;

(3)   Input suppliers; and

---

[1] IDM at Cmt. 5.

    (4)      Transfer of subsidy between corporations with cross-ownership producing different products.

*Id.* at § 351.525(b)(6)(ii)-(v). If a company falls within one of these categories and falls within the definition of cross-ownership,[2] then the affiliate must report whether it used any of the alleged subsidies in the case. If subsidies are used, then the benefits from those subsidies are attributed to the producer of subject merchandise. *Id.* at § 351.525(b)(6)(i).

There is no dispute here that Nur fell within the definition of cross-ownership under section 351.525(b)(6)(vi). The sole issue here is whether Nur can be considered an input supplier under section 351.525(b)(6)(iv), thereby necessitating a reporting of the company's subsidies and an attribution of benefits. For the reasons outlined below, we believe substantial evidence and the law demonstrates that the answer to that question is no.

The Regulations are clear that not all input suppliers that fall within the definition of cross-ownership under section 351.525(b)(6)(vi) are required to report subsidies. The requirement is limited to input suppliers where the production of the input is "primarily dedicated to the production of the downstream product":

> If there is cross-ownership between an input supplier and a downstream producer, and production of the input product ***is primarily dedicated to production of the downstream product***, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).[3]

---

[2] Cross-ownership is defined as "where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets.  Normally, this standard will be met where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporation." 19 C.F.R. 351.525(b)(6)(vi).

[3] 19 C.F.R. § 351.525(b)(6)(iv) (emphasis added).

PUBLIC VERSION

As can be seen, the "primarily dedicated" language is key to the input supplier attribution analysis. The *Preamble* to the Department's CVD regulations[4] further explains:

> The main concern we have tried to address is the situation *where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value added product— the type of input product that is merely a link in the overall production chain*. This was the case with *stumpage subsidies on timber that was primarily dedicated to lumber production and subsidies to semolina primarily dedicated to pasta production*. (See Certain Softwood Lumber Products from Canada, 57 FR 22570, 22578 (May 28, 1992) and Certain Pasta from Italy, 61 FR 30287-309 (June 14, 1996).) We believe that in situations such as these, the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products. Accordingly, where the input and downstream production takes place in separately incorporated companies with cross-ownership (see discussion below defining cross-ownership) *and the production of the input product is primarily dedicated to the production of the downstream product*, paragraph (b)(6)(iv) requires the Department to attribute the subsidies received by the input producer to the combined sales of the input and downstream products (excluding the sales between the two corporations).
>
> Where we are dealing with input products *that are not primarily dedicated to the downstream products, however, it is not reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product*. For example, *it would not be appropriate to attribute subsidies to a plastics company to the production of cross-owned corporations producing appliances and automobiles*. Where we are investigating products such as appliances and automobiles, we will rely on the upstream subsidy provision of the statute to capture any plastics benefits which are passed to the downstream producer. Moreover, we believe that the upstream subsidy provision is still applicable when dealing with lower levels of affiliation. Therefore, if the relationship between the input and downstream producers meets the affiliation standard but falls short of cross-ownership, even if the input product is primarily dedicated to the downstream product, we will only consider subsidies to the input producer in the context of an upstream subsidy investigation.

---

[4] *Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348 (Nov. 25, 1998) ("Preamble").

*Preamble*, 63 Fed. Reg. at 65,401 (emphases added). Thus, both the regulations and the *Preamble* require that it is only appropriate to attribute subsidies when the input producer's "production is dedicated almost exclusively to the production of a higher value-added product— the type of input product that is merely a link in the overall production chain." *Id.*

In *Forged Steel Fluid End Blocks from Germany* ("FEBs"), the Department determined under analogous circumstances that it would not be appropriate to attribute the subsidies of two of the respondent's affiliates when those companies produced non-subject steel products and sold only small amounts of ingot and scrap to the respondent. The Department explained:

> in deciding whether to attribute subsidies received by BGH Freital and BGH Lippendorf to BGH Siegen, Commerce examined BGH Freital's and BGH Lippendorf's business activities on the record, followed the guidelines mentioned above, and concluded that these companies' production are not "dedicated almost exclusively to the production subject merchandise." While our use of the phrase "subject merchandise" is perhaps misplaced, we find that replacing "subject merchandise" with "downstream product" is equally applicable. As noted in the Preliminary Determination, ***BGH Freital and BGH Lippendorf manufacture non-subject merchandise including semi-finished steel products, round and flat bar, and wire. Further, we found that BGH Freital and BGH Lippendorf supplied BGH Siegen with very small quantities of ingots, of a kind not used in the production of subject merchandise, and very small quantities of scrap. Because the quantities of ingots and scrap are so miniscule, they have a very small impact on BGH Siegen's production costs.*** . . .

> The issue of whether production of the input product is primarily dedicated to production of the downstream product depends on the specific factual situations presented to Commerce, because the nature of input and downstream products and production processes vary among cases. . .

> The record demonstrates that BGH Freital and BGH Lippendorf supplied very small quantities of ingots and scrap to BGH Siegen. Analogous to the plastic as an input to an automobile example in the CVD Preamble, ***one cannot reasonably conclude that these inputs are dedicated almost exclusively to the production of downstream products or that these are***

11

> *the type of input products that are merely a link in the overall production chain*. . . .

> Therefore, irrespective of whether BGH Freital and BGH Lippendorf are cross-owned with BGH Siegen under Commerce's regulations and practice, we find that BGH Freital and BGH Lippendorf are not input suppliers to BGH Siegen, based on our regulations because record evidence establishes that the quantities and types of materials that BGH Freital and BGH Lippendorf supplied to BGH Siegen during the POI are not primarily dedicated to the production of the downstream product.[5]

The Department has also arrived at the same conclusion in multiple other cases under similar circumstances. In *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review, 2018*, 86 Fed. Reg. 15,184 (Mar. 22, 2021) ("CTL Plate from Korea 2018"), and accompanying IDM, the Department found that Plantec was not POSCO's cross-owned input supplier and that attributing subsidies received by Plantec was not appropriate. The Department explained:

> The issue of whether production of the input product is primarily dedicated to production of the downstream product *depends on the specific factual situations presented to Commerce because the nature of input and downstream products and production processes vary among cases.* Thus, Commerce determines cross-ownership on a *case-by-case basis by examining the facts of each case*. In this case, as discussed in the Preliminary Results, and consistent with the previous determination regarding Plantec in Cold-Rolled Steel from Korea 2017, 134 we examined both factors that could determine if Plantec was an input supplier to POSCO; *whether Plantec's production was primarily dedicated to the production of downstream product, and whether the inputs provided by Plantec were inputs primarily dedicated to the production of subject merchandise.*

---

[5] *See Forged Steel Fluid End Blocks From the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 80,011 (Dec. 11, 2020), and accompanying IDM at Cmt. 14 (emphases added).

PUBLIC VERSION

*Id*. at Cmt. 2. With regard to whether Plantec's production was primarily dedicated to the production of downstream product, the Department explained it "did not require Plantec's inputs to be 'exclusively dedicated' to the production of subject merchandise to be considered an input supplier". *Id*. However, the Department noted:

> in deciding whether to attribute subsidies received by Plantec to POSCO, Commerce examined Plantec's business activities as reflected in information on the record of this review, followed the guidelines mentioned above, and concluded that Plantec's production is not "dedicated almost exclusively to the production of a higher value product" (i.e., POSCO's steel production) and that ***it is not reasonable to assume the purpose of a subsidy to Plantec is to benefit POSCO's products***. As we stated in the Preliminary Results, ***the record shows that Plantec's primary function is the "construction of industrial plant{s}."***

*Id*. (emphasis added). The Department also noted that the inputs provided to POSCO were not exclusively or primarily dedicated to the production of the downstream product: "like the plastic to automobile example set out in the CVD Final Rule, inputs that Plantec provided to POSCO are used in a typical manufacturing process and not in a way that they are primarily and/or exclusively dedicated to the production of the downstream product." *Id*. The Department concluded:

> Therefore, consistent with our regulations, we find that Plantec is not POSCO's input supplier because record evidence establishes that the types of materials and services that Plantec supplied to POSCO during the POR are not primarily dedicated to the production of the downstream product. Furthermore, ***we cannot conclude from the information provided that the purpose of a subsidy provided to Plantec is to benefit the production of POSCO's steel product.***

*Id*.

> In its Preliminary Results of the same case, the Department had explained:

> For the reasons described below, we preliminarily determine that record evidence shows that the production of POSCO Plantec's input is not primarily dedicated to the production of the downstream product,

13

PUBLIC VERSION

including the subject merchandise. ***POSCO's financial statements describe POSCO Plantec's category of business as "construction of industrial plant."*** POSCO's purchases of fixed assets and services from POSCO Plantec during the POR were for maintenance, repair and operation of pre-existing machinery. Further, the record shows that the types of services that POSCO Plantec performed for POSCO are not a part of steel production that is dedicated primarily to the production of a higher value-added product. . . . As the record indicates, POSCO Plantec's fixed assets and the services provided to POSCO during the POR were not primarily dedicated to the steel production process. We, therefore, preliminarily determine that the production of POSCO Plantec's "input" is not primarily dedicated to the production of the downstream product, including the subject merchandise. ***Accordingly, we preliminary find that regardless of whether POSCO and POSCO Plantec are cross-owned, POSCO Plantec does not meet the criteria for a cross-owned input supplier under 19 CFR 352.525(b)(6)(iv).*** Consistent with Commerce precedent, we preliminarily will not attribute subsidies received by POSCO Plantec to the combined sales of POSCO and POSCO Plantec.[6]

Similarly, in *Certain Cold-rolled Steel Flat Products from Korea*, another proceeding involving POSCO and Plantec, Commerce similarly found that it was not appropriate to attribute subsidies received by Plantec to POSCO. In this case, the Department again explained that the issue of whether production of the input is "primarily dedicated to the production of the downstream product depends on the specific factual situations presented to Commerce." It also rejected arguments made by Nucor that it was setting an "exclusivity" standard in deciding whether a particular input is dedicated to the production of the downstream product. Commerce explained:

> The petitioners' arguments that the so-called "exclusivity" standard does not appear in the regulation itself and that Commerce did not cite

---

[6] *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review, and Intent to Rescind Review, in Part; 2018*, 85 Fed. Reg. 45,185 (Jul. 27, 2020), and accompanying IDM at "Attribution of Subsidies."

anything to support this standard are misplaced. We also disagree that the alleged "exclusivity" standard would encourage potential manipulation and make it impossible for Commerce to attribute subsidies to cross-owned input suppliers.

To be clear, Commerce did not set an "exclusivity" standard or requirement in the post-preliminary results. ***Rather, in deciding whether to attribute subsidies received by POSCO Plantec to POSCO, Commerce examined POSCO Plantec's business activities on the record***, followed the guidelines mentioned above, and concluded that POSCO Plantec's production is not "dedicated almost exclusively to the production of a higher value product" (*i.e.* POSCO's steel production) and that it is not reasonable to assume the purpose of a subsidy to POSCO Plantec is to benefit POSCO's products. ***If the record shows the sole purpose of POSCO Plantec's production activities is to provide inputs to POSCO's steel production, one might reasonably conclude that the purpose of a subsidy to POSCO Plantec is to benefit POSCO's steel production. However, on the contrary, the record shows that POSCO Plantec's productions include construction of a refinery, a cargo terminal in Taiwan, a storage tank in an LNG terminal in Korea, and a luggage processing facility in Korea, etc.***[7]

The Department's decision in *Certain Glass Containers From the People's Republic of China* also addressed the "primarily dedicated" requirement under the regulation. The Department explained in that case that a particular cross-owned affiliate ("Company A") had not been required to submit a Section III questionnaire response because its business activities were not "primarily dedicated" to the production of the input:

> {I}n the instant case, the record evidence does not support a finding that the glass machinery provided by Company A should be considered a primarily dedicated input such that it would meet the attribution criteria set forth in 19 CFR 351.525(b)(6)(iv). Therefore, we did not request a complete Section III questionnaire response from Company A. ***Specifically, Company A's business license indicates that the range of its business activities are broad, explaining that Company A is engaged in "{p}roduction and sales: glass machinery; import and export of goods***

---

[7] *Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 38361 (June 22, 2020), and accompanying IDM at Cmt. 2.

15

PUBLIC VERSION

*and technology permitted by the state; assembly and sales: glass machinery, rubber machinery, winery equipment, reducers, other mechanical equipment and parts and related technical consulting services; software development." Thus, the legal scope for Company A as noted in its business license details several kinds of business activities beyond merely glass equipment manufacturing, such as rubber machinery and winery equipment. . . .*

As noted above, Company A's business license details a variety of production activities *other than glass equipment manufacturing*. Thus, record evidence in the instant case *does not indicate that Company A's production is "dedicated almost exclusively to the production of a higher value added product*" in the manner suggested by the Preamble or that the purpose of any subsidy provided to Company A would be "to benefit the production of both the input and downstream products." Therefore, Commerce did not specifically request or require a complete Section III questionnaire response from Company A.[8]

Taken together, these cases confirm that the Department's practice, when deciding whether to attribute subsidies received by an affiliated input supplier, it must (1) make its decisions on a case-by-case basis depending on the particular input, the downstream product, and the production process; (2) consider the primary business activity of the affiliated company that is providing the input and whether that primary business activity relates to the production of the downstream product at issue in the case; and (3) determine whether it is "reasonable" to conclude that the purpose of the subsidy to that company would have been to benefit the production of the downstream product.[9] While it is true, as the Department noted in the Final

---

[8] *Certain Glass Containers From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 31,141 (May 22, 2020), and accompanying IDM at Cmt. 12.

[9] Commerce states in its Final Results that it disagrees "with the three-step analysis that Kaptan derived from these cases," IDM at Cmt. 5, but presents no legal arguments or examples of cases that detract from the factors that it has consistently considered in other proceedings. Kaptan addresses Commerce's arguments on this issue in greater detail below.

Results, that " the issue of whether production of the input product is primarily dedicated to the

production of downstream product depends on the specific factual situations presented to

Commerce, because the nature of input and downstream products and production processes vary

among cases,"[10] the criteria established by the regulations, the *Preamble*, and the cases discussed

above provide a necessary framework when considering the "specific factual situation" of any

given case.

Following that framework here, record evidence does not support a finding – as required

by the *Preamble* - that Nur is "merely a link in the overall production chain"[11] for Kaptan's

production of subject merchandise (or production in general). As explained by Kaptan in its

submissions to the Department, Nur is a shipbuilder whose indisputable primary business

activity is entirely unrelated to the downstream product at issue in this case. Nur sold only a *de*

*minimis* quantity of scrap of the total steel scrap Kaptan purchased during the POR:



Kaptan Affiliation Response at Exh. 3 (June 5, 2020) (**PR 47, CR 6**). As this chart

demonstrates, Kaptan purchased [        ] of the total scrap it purchased for its production in the

POR from Nur. Similarly, this sale of scrap by Nur represents a *de minimis* portion of that

--------------------------

[10] IDM at Cmt. 5.

[11] *Preamble*, 63 Fed. Reg. at 65,401.

company's sales – [                              ] – whose main production is the production and

sales of ships and vessels. Given that scrap sales are an infinitesimal portion of Nur's overall

business activity and Nur's production is not dedicated to Kaptan's production, the company is a

miniscule scrap supplier for Kaptan.

   Furthermore, the record demonstrates that Nur's sales of scrap are used by Kaptan to

produce both subject and non-subject merchandise. Kaptan explained in its initial response that it

produces "steel billets, reinforcing bars, angles, square bars, flat bars, and round bars" all from

scrap. Kaptan Initial Questionnaire Response at 8 (July 6, 2020) (**PR 88, CR 37**). Thus, Nur is

much like the plastics company referenced in the *Preamble*. It is not an input producer, it is a

shipbuilder, and the fact that it supplied a miniscule amount of scrap, an incidental byproduct of

its production of non-subject merchandise, does not make it an "input supplier" under 19 C.F.R.

§ 351.525(b)(6)(iv). There is no evidence on the record suggesting otherwise.

### 2.   COMMERCE'S PREVIOUS DETERMINATIONS THAT SCRAP CAN BE A PRIMARILY DEDICATED INPUT IN THESE PROCEEDINGS DOES NOT NECESSITATE A SIMILAR FINDING UNDER THE FACTS OF THIS CASE

   Commerce argues that "{i}n previous segments of this proceeding, we considered scrap

to be a type of input that is primarily dedicated to the production of the downstream steel

production, regardless of the amount of scrap purchased from a cross-owned company," and

notes that the CIT affirmed its decision in the 2016 administrative review.[12]

---

[12] IDM at Cmt. 5, *citing Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2016*, 84 Fed. Reg. 36,051 (Jul. 26, 2019), and accompanying IDM ("2016 Final Results"); *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1364 (Ct. Int'l Trade 2021).

PUBLIC VERSION

While Kaptan recognizes that the Department has found previously that scrap can be a primarily dedicated input, these previous findings do not necessitate the same finding in this case given the very specific facts on the record in this review. That decision related to a different set of facts, a different respondent, and a different input supplier. Indeed, Commerce itself notes that it evaluates the "the issue of whether production of the input product is primarily dedicated to the production of downstream product depends on the specific factual situations presented to Commerce, because the nature of input and downstream products and production processes vary among cases."[13] Circumstances can change from proceeding to proceeding that necessitate a new evaluation in each. The prior proceeding involved a different record and a distinct set of arguments as compared to the record of the instant proceeding.

In the 2016 proceeding, Plaintiff Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. ("Içdaş") argued only that "Içdaş Elektrik only sold a small amount of scrap to Içdaş," which Commerce found, and the Court upheld, was not a sufficient reason on its own.[14] Icdas did not present any additional arguments, case law, or regulations to support its position. As the Court stated, "{n}or do Plaintiffs identify any case or statute that requires Commerce to consider the quantity of scrap provided to a downstream producer. . . . While the final quantity may be low, the regulations do not obligate Commerce to measure the impact of an input supplier's contributions when weighing whether to attribute its subsidies to the downstream producer."[15]

_____

[13] IDM at Cmt. 5.

[14] *See Icdas*, 498 F. Supp. 3d at 1364.

[15] *Id*.

19

PUBLIC VERSION

In contrast, in the instant case, Kaptan has provided substantial and unrefuted record evidence that Nur is not a cross-owned input supplier under the Department's regulations, as supported by the *Preamble* and prior Department cases that support its position. Thus, Commerce's decision in the 2016 review, and the Court's holding based on the specific record of that case, does not necessitate an identical outcome in this case. The facts of the Kaptan – Nur relationship are unique, and therefore finding that Nur is not a cross-owned input supplier in this review is not a reversal of the previous findings regarding scrap in other reviews.

The following facts establish the unique circumstances of this review:

- Nur's scrap generation and sale is not "the type of input product that is merely a link in the overall production chain."[16] Rather, Nur's production is focused on products that are significantly more downstream (i.e., ships) than Kaptan's rebar, which is a commodity steel product. Unlike the scrap inputs provided to Icdas in 2016, Nur's production is the end of production chain, not the beginning;

- Nur "produces and sells fishing vessels and other ships"[17]. This industry is completely distinct from and has no connection to subject merchandise or steel production in general;

- Nur sold [      ] of the scrap Kaptan purchased during the POR. This miniscule amount of scrap was used for both subject and non-subject merchandise and therefore could not be "primarily dedicated" to the downstream product;

- This sale of scrap represented [      ] of Nur's sales of all products during the POR;

- With the miniscule amount involved, whether or not Nur does or does not sell scrap to Kaptan has a "very small impact" on Kaptan's "production costs."[18] Indeed, at this amount it has no measurable impact.

- Nur is not a constant supplier of scrap to Kaptan year over year demonstrated by the fact that this is the first review in which Nur has been involved.

---

[16] *Preamble*, 63 Fed. Reg. at 65,401.

[17] Kaptan First Supp Response at 6 (**PR 173; CR 126**).

[18] *FEBs from Germany,* IDM at Cmt. 14.

20

Given these unique circumstances, it cannot be said that Nur's production is "dedicated almost exclusively to the production of a higher value-added product." *Id*. Nur's production is the higher value-added product. And given these circumstances, which are distinct from the 2016 proceeding, it certainly cannot be said that one can reasonably conclude that the purpose of a subsidy to Nur (*i.e.*, land rent exemptions for its shipbuilding production) is to benefit *Kaptan's* commodity steel production.

### 3. COMMERCE'S OTHER ARGUMENTS JUSTIFYING ITS DETERMINATION THAT NUR IS A CROSS-OWNED INPUT SUPPLIER ARE WITHOUT MERIT AND SHOULD BE DISREGARDED

Commerce's other arguments in support of its position that Nur is a cross-owned input supplier are entirely without merit and should be disregarded.

Commerce claims that it disagrees that the "primary business activity of the affiliated company that is providing the input is a relevant factor in this case, or even most cases."[19] Commerce provides no legal basis or citation supporting its disagreement, and its position directly contradicts the *Preamble* and the prior cases on this issue, as summarized above. Specifically, the *Preamble* explained that the primary purpose of attribution is "where a subsidy is provided to an input producer **whose production is dedicated almost exclusively to the production of a higher value-added product—the type of input product that is merely a link in the overall production chain**. This was the case with stumpage subsidies on timber that was primarily dedicated to lumber production and subsidies to semolina primarily dedicated to pasta

---

[19] IDM at Cmt. 5.

21

production."[20] The *Preamble* further explained here that: "the purpose of a subsidy provided to the input producer ***is to benefit the production of both the input and downstream products***."[21] Further, the example provided in the *Preamble* confirms that the Department must consider the primary business activities of the affiliated company should be a part of the Department's analysis: "it would not be appropriate to attribute subsidies to a plastics company to the production of cross-owned corporations producing appliances and automobiles."[22] Similarly, in *FEBs from Germany*, Commerce specifically explained: "BGH Freital's and BGH Lippendorf's business activities on the record, followed the guidelines mentioned above, and concluded that these companies' production are not "dedicated almost exclusively to the production subject merchandise." While our use of the phrase "subject merchandise" is perhaps misplaced, we find that replacing "subject merchandise" with "downstream product" is equally applicable."[23] Similarly, as discussed above in *CTL Plate from Korea 2018*, *Certain Cold-rolled Steel Flat Products from Korea*, and *Certain Glass Containers,* among others, Commerce examined the primary business activities of the affiliated company in making its determination. Thus, there is no basis to Commerce's conclusion that the primary business activity is not a relevant factor to consider when deciding on attribution of subsidies.

Commerce also argues in *FEBs from Germany*, that Commerce specifically stated that it did not set a *de minimis* standard or requirement in determining whether subsidies that the input

---

[20] *Preamble*, 63 Fed. Reg. at 65,401 (emphasis added).

[21] *Id*.

[22] *Id*.

[23] *FEBs from Germany*, IDM at Cmt. 14.

suppliers received were attributable to the subject merchandise producer. Thus, Commerce argues the fact that Nur sold a *de minimis* quantity of the total steel scrap Kaptan purchased during the POR is material.

Kaptan recognizes that in *FEBs from Germany*, Commerce stated that it was not applying a *de minimis* standard. However, as Commerce went on to explain that in deciding whether the production of the companies in that case was "dedicated almost exclusively to the production of subject merchandise," Commerce considered multiple factors on a case-specific basis, explaining:

> BGH Freital and BGH Lippendorf manufacture non-subject merchandise including semi-finished steel products, round and flat bar, and wire. Further, we found that BGH Freital and BGH Lippendorf supplied BGH Siegen with very small quantities of ingots, of a kind not used in the production of subject merchandise, and very small quantities of scrap. Because the quantities of ingots and scrap are so miniscule, they have a very small impact on BGH Siegen's production costs.[24]

Analogous circumstances exist in this case. Nur manufactures non-subject merchandise, supplied very small quantities of scrap – of a kind applied to both subject and non-subject merchandise, and because the quantities were miniscule, they had no measurable impact on production costs. Commerce has pointed to no distinguishing circumstances as to why its reasoning in *FEBs* would not apply in the instant case.

**B.      COMMERCE'S DETERMINATION FINDING NUR'S LAND RENT EXEMPTION COUNTERVAILABLE WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW**

In its Final Results, the Department countervailed Nur's land rental exemption agreement under the program entitled "Land for Less Than Adequate Remuneration (LTAR)

---

[24] *FEBs from Germany*, IDM at Cmt. 14.

under Law 5084." If the Department continues to find Nur to be a cross-owned input supplier, it should correct the legal and factual errors made in its analysis of this program for the Final Results.

### 1.   SUBSTANTIAL EVIDENCE DOES NOT SUPPORT COMMERCE'S DETERMINATION THAT THE LAND FOR LTAR UNDER LAW 5084 PROGRAM WAS REGIONALLY SPECIFIC PURSUANT TO SECTION 771(5A)(D)(IV) OF THE ACT

In the Final Results, the Department rejected Kaptan's arguments that the Department should reverse its decision in the Preliminary Results that the Land for LTAR under Law 5084 was regionally specific. This decision was unsupported by record evidence.

In the Preliminary Results, Commerce found that "Kaptan reported that it's cross-owned affiliate Nur entered into an agreement whereby it received rent-free land pursuant to Law 5084." PDM at 13 (**PR 222**). Then, citing to the Government of Turkey's ("GOT") questionnaire response, the Department explained that "The law provides support to entities operating in certain provinces, and will allocate land for free use for 49 years for entities who make investments on the property." *Id*. The Department then concluded that this program was regionally specific pursuant to 771(5A)(D)(iv) because Nur's land is located in one of the areas that qualifies for the exemption in Law 5084. There were several errors with this analysis.

First, Kaptan did not report that it received rent-free land pursuant to Law 5084. Kaptan stated in its response that it "***may have*** received benefits under this program pursuant to Law 5084." Kaptan Supp. Response at 28 (emphasis added) (**PR 173; CR 126**). As Kaptan explained in its case brief to Commerce, the reason that Kaptan did not state that it unequivocally received land rent exemptions under this program was because Kaptan was unclear on the specific legal authority under which it entered into its land agreement with the local authority. (**PR 264; CR**

**211**). The land agreement provided in Exhibit 19 of that supplemental response does not identify the applicable Turkish law or regulation. (**PR 173; CR 134-135**).

Second, the Government of Turkey indicated in its supplemental response that while land rent exemptions had been historically available in the area in which Nur is located pursuant to Article 5 of Law 5084, this provision was *repealed* on February 18, 2009 with Law 5838. GOT Second Supp. Response at 4 and Exh. 2 (Feb. 17, 2021) (**PR 189, 191; CR 153, 155**). Since Nur entered into this land agreement in *2014*, after the repeal of Article 5 of Law 5084, that provision could not have applied.

Whether or not Nur's rental exemption was given pursuant to Article 5 of Law 5084 is a critical factual and legal issue. This is because the Department's preliminary specificity finding was a regional specificity determination based on the identification of specific areas in Turkey in Article 2 of Law 5084. PDM at 13 (**PR 222**). However, if the rental exemption was not issued pursuant to, or governed by, Law 5084 then the regional limitations in this law are not applicable and cannot serve as the basis for the Department's specificity finding. Thus, there is no factual support for this rent exemption "being limited to an enterprise or industry located within a designated geographical region within the jurisdiction of the authority providing the subsidy." 19 U.S.C. § 1677(5A)(D)(iv).

If Law 5084 does not apply, then the Department must find this program countervailable under some other specificity provisions within section 1677(5A). With no applicable law outlining limitations tied to this particular program, this specificity finding can only be made on a *de facto* basis, for which there are no facts on the record.

The facts of this case show instead that the subsidy, at most, is tied to non-subject merchandise. Commerce's practice when analyzing attribution under 19 C.F.R § 351.525(b)(5)(i)

25

is not to rely on how a recipient uses a subsidy, but rather on the stated purpose of the subsidy and terms of agreement under which the administering authority bestows a subsidy. *Preamble*, 63 Fed. Reg. at 65,402. Based upon the terms of the agreement, this land was provided specifically for the development of a shipyard and related solely to non-subject merchandise. The agreement states that "The work covers the grant of an independent and continuous right to use at no charge with respect to the construction and utilization of Shipyard Loading, Unloading and Logistic Operations Facilities." Kaptan Second Supp. at 2 (**PR 188; CR 152**). Thus, this land was specifically provided for the production of non-subject merchandise. Given these facts, the land does not result in a countervailable event in this rebar proceeding.

In the Final Results, the Department did not sufficiently address any of the arguments raised by Kaptan on this issue. Rather, the Department incorrectly argues that (1) "the GOT reported that Nur entered into the rent-free land agreement with the GOT based on Law 5084";[25] and, (2) "it appears that approval of the agreement with Nur occurred prior to the law being repealed."[26] The Department has mischaracterized record evidence. First, while the GOT noted that Nur had benefited from the program, it explained that this was "during the POR ***and/or the preceding 15 years***, ***but not for the production of subject merchandise***."[27] Furthermore, as noted above, it also explained that "Article 5 of Law No. 5084 was abolished on February 28, 2009 with Law No 5838."[28] There is no record evidence to the Department's claim that "the

---

[25] IDM at Cmt. 6.

[26] *Id*.

[27] GOT Second Supp. Response at 5 (**PR 189; CR 153**).

[28] *Id*. at 4.

PUBLIC VERSION

agreement with Nur occurred prior to the law being repealed."[29] Rather, the GOT explained that

Nur's "[

].["30] Thus, there is irrefutable record evidence that Law

5084 was abolished in 2009 and Nur's permit for the land was granted more than [

] for the production of non-subject merchandise. As Law 5084 could not have

applied, the Department's determination on this issue is entirely unsupported by substantial

evidence.

    **2.**    **COMMERCE'S CALCULATION OF THE BENEFIT FOR KAPTAN'S RENT FREE LAND AS A GOOD FOR LESS THAN ADEQUATE REMUNERATION RATHER THAN AS REVENUE FOREGONE WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW**

In determining whether the rental exemption for Nur's land provided a benefit, the

Department considered the exemption to provide a good for LTAR under 19 U.S.C. §

1677(5)(D)(ii) and thereby calculated the benefit using a land rental "benchmark" pursuant to

19 C.F.R. § 351.511. The Department's normal practice, however, for the calculation of

government assistance received in the form of wholly exempted rental amounts is to treat such

assistance as revenue forgone under 19 U.S.C. § 1677(5)(D)(ii), rather than as a good for

LTAR. In such an instance, the benefit is the exempted amount from the contract or a listed

government rental price rather than a comparison to a rental "benchmark" the Department

creates for the purposes of the proceeding.  The failure to follow this practice is unreasonable

and unsupported by substantial evidence.

---

[29] IDM at Cmt. 6.

[30] GOT Second Supp. Response at 5-6 ) (**PR 189; CR 153**).

In this case, as explained more fully below, the record establishes that Nur used and occupied land for the development of a shipyard. Nur entered into an agreement with the government, which owns the land, for a fixed term of 49 years and for an ascertainable charge over the term. *See* Kaptan Second Supp. at Exh. SS-1 (**PR 188; CR 152**). As per the contract, this amount was [          ] per year. Kaptan Second Supp. at 2 (**PR 188; CR 152**). Pursuant to this agreement, those charges were waived in lieu of Nur meeting agreed investment and employment targets. The Department however ignored these contractual provisions and instead found that this agreement was not a lease and that this agreement instead provided a good for LTAR, calculating a rental benchmark of [          ] per year to serve as the exempted amount; this resulted in a CVD rate of 1.64%.[31] The Department's conclusion in the Final Results that this land agreement was not a lease within the common definition and use of that term, and that conditionality for the waiver of the charges somehow renders any benefit under this agreement as a financial contribution in the form of the provision of goods under 19 U.S.C. § 1677(5)(D)(iii) was unsupported by record evidence and contrary to consistent agency practice and law.[32]

---

[31] *See* the Final Calc Memo Worksheets at "Law 5084 Land LTAR" Tab (**CR 219**). Using a per square meter benchmark price the Department multiplied its benchmark to the total square meter size of Nur's land and derived benchmark rental amount for each month. [          ] is the sum of the twelve months of the benchmark rental amount.

[32] The difference in the treatment of this program as revenue forgone or goods for LTAR changes how the benefit is calculated, and ultimately the CVD rate for the program. Under revenue forgone, the benefit is the exempted amount, i.e., the amount identified in the lease agreement. In this case the CVD rate would have been 0.01% under this method. Under goods for LTAR, the Department takes the difference between what was paid (here, zero) and a benchmark price. This resulted in a rate of 1.62%.

### a.   <u>Any Benefit from the Exemption from Payment Under the Land Use Agreement Must be Calculated as Revenue Forgone</u>

The exemption from payment to the government for the usage of land owned by the government is not a provision of goods at LTAR, and the Department has generally not treated it as such in previous cases. The Department itself acknowledged in the underlying proceeding that it has found "discounts and exemptions from lease terms to be revenue forgone pursuant to section 771 (5)(D)(ii) of the Act . . . " IDM at Cmt. 6. Indeed, as the Department explained, "rent exemptions are normally treated as revenue not collected by the government and therefore are treated as revenue forgone", not goods for LTAR. *Id.* The record in this case establishes that the government set a price for the usage of the land under the agreement at issue. *See* Article 16 of the Agreement (**PR 173; CR 134-135**). As such, the exemption from paying this amount is no different than the exemption for paying other amounts to the government such as taxes, duties or fees under 19 C.F.R. § 351.509, 351.510 (providing for the treatment of income tax exemptions, VAT exemptions, import duty exemptions). In other words, land rental exemptions result in "foregoing or not collecting revenue that is otherwise due", rather than "providing goods or services" within the meaning of 19 U.S.C. § 1677(5)(D). *See Laminated Woven Sacks From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*, 84 Fed. Reg. 14,647 (April 11, 2019), IDM at 2. Land and LTAR Programs (stating "this program constitutes a financial contribution pursuant to section 771(5)(D)(ii) of the Act in the form of revenue foregone because the GOV provides land rent reductions and exemptions."). This is consistent with the Department's practice in other cases.

In the CVD investigation on *Non-Oriented Electrical Steel from Taiwan*,[33] the Department investigated a "Major Infrastructure Projects --Land Lease Program" (Land Lease Program)" which provided for "a 40 percent discount off standard lease rates" set by the government. *Id.* The Department concluded that the program constituted "a financial contribution in the form of foregone revenue and confer{ed} a benefit within the meaning of sections 771(5)(D)(ii) and 771(5)(E) of the Act." *Id.* The Department went on to explain that "{t}o calculate the benefit from this program, we calculated the difference between what DSC would have paid at the standard lease rate and what it actually paid." *Id.*

The land use agreement in this case is clearly a lease for which a rental amount was determined. That the Department departed from its normal practice, which it acknowledged here, and which it applied in *Non-Oriented Electrical Steel from Taiwan*, it must provide an explanation that is adequate to enable the court to determine whether doing so is reasonable. *See CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1376–77 (Fed. Cir. 2016). It must "examine the record and articulate a satisfactory explanation for its action." *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013). Nothing in the Department's determination in this case explains how the department determined that the land use agreement was a provision of goods at LTAR. It is axiomatic that the court will uphold an agency determination only where "{} the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, Inc., 419 U.S. 281, 286 (1974).

---

[33] *Non-Oriented Electrical Steel From Taiwan: Final Affirmative Countervailing Duty Determination*, 79 Fed. Reg. 61,602 (Oct. 14, 2014) ("Non-Oriented Electrical Steel from Taiwan").

### b.     Nur's Land Use Agreement is a Lease as it Meets Every Element that Defines a Lease

Despite the clear past precedent that rental exemptions are historically treated as revenue foregone rather than as goods at LTAR, the Department nevertheless determined in this case that the revenue foregone provisions (and resultant calculation differences) do not apply because "the record shows that the agreement between Nur and the local authority is not a lease, and does not outline a lease term, but instead is a right to use land conditioned on fulfillment of obligations." IDM at Cmt. 6. There is inadequate support for this finding in the record. Record evidence indisputably shows in this case that the land use program under which Nur may have received benefits involved the grant of the right to use a specific plot for a period of 49 years for an ascertainable fee, an exemption for which would be granted on the condition that specified investment and employment commitments have been met.[34] This creates a lease under any normal definition of the term, as described below.

Nowhere in the countervailing duty laws is the term "lease" defined. *See generally,* 19 U.S.C. § 1677 *et seq.* In such instances, the court will look to the ordinary meaning of the language at issue. *Nucor v. United States,* 927 F.3d 1243, 1249 (Fed. Cir. 2019) (using common definitions of words used in the context of countervailing duty determinations). The Merriam-Webster Dictionary defines a lease as "a contract by which one conveys real estate, equipment, or facilities for a specified term and for a specified rent." Merriam-Webster.com Dictionary, Merriam-Webster, (available at https://www.merriam-webster.com/dictionary) (last accessed Apr. 2, 2022). We can also look to the definition of the word rent, which Merriam-Webster

---

[34] GOT Second Supp at 4 (**PR 189; CR 153**).

defines as "a usually fixed periodical return made by a tenant or occupant of property to the owner for the possession and use thereof." *See id.* Consistent with Merriam-Webster, Black's Law Dictionary defines a lease as a "contract by which the rightful possessor of real property conveys the right to use and occupy that property in exchange for consideration . . ." *See* Lease, Black's Law Dictionary (10th Edition, 2020). Rent is defined by Black's as "consideration paid, usually periodically, for the use or occupancy of property." *Id.*

What is salient from each of the common definitions of the terms "lease" and "rent" is that consideration is paid for the right to use and occupy real property. In the instant case, the Department has acknowledged that Nur entered into an agreement that provided for consideration in exchange for the use of the land in question. IDM at Cmnt. 6. Notably, nowhere in the common definitions of the words "lease" or "rent" are there qualifiers or requirements that they be referred to as such or that they be given special titles accordingly. *See Nucor* 927 F.3d at 1250 (taking note of what common definitions do not include in rejecting a definition offered by Commerce).

The record evidence is clear that the usage agreement entered into by Nur is, by any definition, a lease. As such, there is no basis in the record or in law for the Department to conclude that Nur's land use agreement is not a lease such that it justified the departure from its acknowledged practice of treating discounts or waivers from lease terms as revenue forgone.

     c.    **Commerce Unlawfully Concluded that Nur's Land Use Agreement was a "Conditional Easement"**

Much has been made in this case by both the Department, in its determination, and Defendant-Intervenors, in their administrative rebuttal brief, that the Government of Turkey ("GOT") described this land use program as "a temporary easement or usage permit." *See* GOT

32

Second Supp at 4 (**PR 189; CR 153**). The use of this term neither changes the substantive nature of the arrangement, nor is it legally significant in the content of the countervailing duty laws. That the GOT used these phrases does not mean that the revenue forgone provisions do not apply and the Department never provided any legal or factual basis for this interpretation. Indeed, whether characterized as a waiver of an easement fee or a waiver of rental free from a lease should not legally or factually impact whether revenue foregone or the good for LTAR provisions apply.

In responding to the Department's questions reading this program, the GOT described the land use program at issue as an "easement" or a "usage permit" in order to distinguish this program from a land grant or sale transaction.[35] In its Second Supplemental Questionnaire, the Department asked the GOT several questions concerning the land benefit program in question. *See generally*, GOT Second Supp. (**PR 189; CR 153**). Specifically, the Department's questions to the Government of Turkey attempted to characterize the land benefit program under GOT Law 5084 as a grant, allocation or sale transaction. The Departments questions on this point include:

> 2. For each land transaction, please respond to the following:
> a. Date of acquisition;
> b. Identity of seller;
> . . .
> e. Price paid for the land (specify whether payment was in a lump sum or in installments);
> . . .

---

[35] In another case where the Federal Circuit Court of Appeals referred to common definitions in a case involving countervailing duty determinations by the Department, the court relied most heavily on the context in which the word or term in question was used. *See Micron Technology, Inc. v. United States*, 117 F.3d. 1386 (Fed Cir. 1997). In *Micron,* the court stated that "although the dictionary definition . . . provides some guidance as to the interpretation of the term, we find further, more pointed guidance from the context in which the term appears. *Id* at 1398. In the instant case, the court need not make such a distinction as both the common definitions and the context in which potentially competing terms are used, provide consistent clarity.

> j. Provide the land certificate(s) issued to the company for the land.
> 3. For benchmark purposes, please provide information concerning land prices in Turkey for the period examined.

GOT Second Supp. at 5-7 (**PR 189; CR 153**).

In its response to these questions from the Department, the GOT made a particular point to clarify that this is not a grant or allocation of property. *Id.* at 4. In fact, the GOT specifically stated "{i}t has to be noted that this support ***can be seen*** as a temporary easement or usage rather than an allocation." *Id.* (emphasis added). The phrase used by the GOT that the support in question "can be seen as . . ." is plainly an attempt to describe the program as distinguishable from a land allocation, grant, or sale and is clearly not a legal definition offered by the GOT.

The Department cites the description of any payment to be made pursuant to the land use agreement as an "easement fee" as somehow dispositive of how to value any benefits under the program. IDM at Cmt. 6. Rather than base its determination upon the record evidence, which establishes the qualitative and substantive nature of the land use agreement as that of an ordinary lease, the Department has instead based its determination on semantics. That the Department further extrapolated from the GOT's clarification that the land benefit program at issue here is wholly distinguishable from an ordinary lease was unsupported by the evidence on the record.

Finally, the Department's conclusion that the land use agreement here was structured as a "conditional easement" rather than a discount or exemption from ordinary lease terms was the basis for its departure from its acknowledged practice of treating exempted lease terms as forgone revenue. IDM at Cmt. 6. We are unaware of any case where the Department addressed the countervailing treatment of a "conditional easement," nor did the Department cite to any such cases to support its position in the *Final Results*. In fact, we are unaware of any source that defines such a land use structure in order to effectively demonstrate that the land use agreement

34

here is not such a creation. What is further unclear is how describing this contract as a conditional easement as compared to a lease agreement changes the financial contribution arrangement and renders, as the Department believed, the cases cited above inapplicable. Whether the money charged is referred to as rent or an easement fee, they are functionally equivalent; they are both money obligations that would be otherwise owed to the government but for the agreement/program. Under either a normal lease agreement or Nur's current usage agreement, there is a set term of use (here, 49 years), an exclusive possessory interest (i.e., no other party, including the owner, can use the land), set obligations/restrictions, and the usage or rental amount. When parties sign a lease agreement with a government authority with a zero dollar annual rent, it, again, is functionally equivalent to the use agreement Nur signed for "free-of-charge" usage or an exemption of the easement fee. Consequently, the Department's conclusion that a "conditional easement" constitutes a financial contribution in the form of a provision of goods has no support in law, no support in the record, and no basis in the Department's own administrative practices.

d.      **The Contingent Nature of any Payment Due Under the Land Use Agreement Does not Make it a Provision of Goods at Less Than Adequate Remuneration**

The record indicates that any payments that may be due under the instant land use agreement accrues only where the beneficiary fails to meet the investment and employment commitments undertaken at the outset of the land use agreement. IDM at Cmt. 6. On this basis, the Department determined that the granting of rights to use government land so conditioned consisted of a provision of goods rather than the foregoing of revenue. *Id.* In fact, there is clear and consistent precedent at both the Department and at this Court for the treatment of

conditional discounts and exemptions from payments otherwise due to a government as revenue

foregone pursuant to section 19 U.S.C. § 1677(5)(D)(ii).  In *ATC Tires Pvt. Ltd.v. U.S.*, 322

F.Supp.3d 1365 (Ct. Int'l Trade 2018), the court concurred with the Department that exempted

duties and taxes conditioned on the fulfillment of Net Foreign Exchange requirements were

properly treated as revenue foregone consistent with 19 U.S.C. 1677(5). The court in *ATC Tires*

specifically stated "when the Government of India did not require companies to pay these taxes

and duties which were otherwise owed after meeting the NFE requirement, a benefit was

conferred in the form of . . . revenue forgone . . ." *Id.* In this case, the payment owed to the

government for the use of the land was exempt, provided the participating companies met their

investment and employment targets. GOT Second Supp. at 4 (**PR 189; CR 153**). Failure to

meet these commitments would result in the free usage being converted to paid usage. *Id.* The

payment obligation owed to the government that is exempted based on the fulfilment of

conditions are core characteristics of both the duty and tax exemptions in *ATC Tires* as well as

the land use agreement in this case. Accordingly, there is no basis in law or precedent for

finding the conditionality of the exemption under the land use agreement to result in the

exemption consisting of a provision of goods.

### e.   The Resort to a Benchmark in this Case was Unsupported by Record Evidence and Contrary to Law

The treatment of this program as revenue foregone as compared to the provision of

goods for LTAR has a direct impact on the calculation of benefit. The Department has

explained that "{n}ormally, we would find a benefit from rent exemptions in the amount of the

rent savings." *Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam:*

*Preliminary Countervailing Duty Determination*, 78 Fed. Reg. 33,342 (June 4, 2013) ("Shrimp

36

from Vietnam"). That is, the benefit equals the amount of rent that would have been owed, but for the exemption, just like the calculation of benefits resulting from tax or duty exemptions under 19 C.F.R. § 351.509.

In contrast, the benefit for goods for LTAR is based on an entirely different analysis. The provision of goods and services is governed by 19 C.F.R. § 351.511 which seeks to evaluate the provision of goods or services were "at preferential rates." *Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348, 65,377 (Nov. 25, 1998). In making this adequacy of remuneration analysis, the Department selects a benchmark pursuant to the three-tier hierarchy set forth in 19 C.F.R. § 351.511 taking into account "prevailing market conditions" such as "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E)(iv). These provisions are used when seeking to determine whether the prices the respondent paid for the good are less than market prices. The LTAR provisions are not needed when a total exemption is involved and the exempted amount in known.

In instances where the rent that would have been paid is known, the benefit analysis indisputably equals that rent amount. *See Non-oriented Steel from Taiwan*. The facts of this case permit the Department to follow this normal benefit analysis for land rent exemptions under the revenue forgone rubric and do not require reliance on a benchmark. In this case, Nur's land agreement provides the rental amount that would be owed if the investment and employment obligations (*i.e.*, the terms of the rent-free condition) are not met. [



] *See* Kaptan Second Supp. Response at 2 (**PR 188; CR 152**). As indicated in our Second Supplemental Response, pursuant to this Article 16, the amount of rent owed on an annual basis if the milestones are not met would be:

PUBLIC VERSION

| Total Investment | [          ] |
|---|---|
| 50% | [          ] |
| # of 1000s | [          ] |
| 5 per 1000 = Annual Fee | [          ] |

*Id*. Thus, the amount of rent that Nur was exempted from paying, and the amount of revenue

forgone and not paid to the government is [          ] per year, as stipulated in the contract. *Id*.

This is the rental amount that Nur would have to pay to continue to use the land for the term of

the lease and therefore represents the amount of revenue that the government has foregone in

providing Nur with a rental exemption.

3.      **THE DEPARTMENT'S SELECTION OF AN INDUSTRIAL RENT BENCHMARK WITHOUT ADJUSTING THE BENCHMARK TO REMOVE RENT ATTRIBUTED TO BUILDING RATHER THAN LAND ONLY WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW**

If the Court finds that Commerce appropriately treated the benefit for Kaptan's land as an

LTAR program rather than a revenue foregone program, the Court should nonetheless remand

this issue back to Commerce to adjust the benchmark calculation.

In its Preliminary Results, the Department selected a land benchmark based on

Petitioner's submission of benchmark data. This benchmark consisted of rental prices contained

in a 2019 Colliers International's Real Estate Market Turkey Review Report ("CBRE Report").

PDM at 13 (**PR 222**). The rental prices were for eight different localities that were listed in the

section of the Report called "industrial and logistical facility rent." Petitioner Benchmark

Submission at Exh. 10 (**PR 197-198**). In its administrative case brief, Kaptan argued that

Commerce's benchmark selection was inappropriate because the rental prices covered the used

of land *and* facilities, while Nur's land is exclusive of the facilities that Nur developed and built

on the land. Kaptan Administrative Case Br. at 19-22 (**PR 264; CR 211**). Kaptan also argued

38

that, consistent with its practice in other cases, the Department should use a rental benchmark for

an area that is closest in population density to Surmene, Trabzon, where the land in question is

located. For the Final Results, the Department agreed with Kaptan's argument on population

density, and adjusted the benchmark by limiting it to rental prices from Cerkezkoy, Tekirdagm,

which was most similar in terms of population density.[36] However, the Department improperly

rejected Kaptan's arguments to adjust the benchmark to remove rent attributed to buildings

rather than land only.

The selection of benchmarks for LTAR programs is governed by 19 C.F.R. § 351.511.

Both this regulation and 19 U.S.C. § 1677(5)(E)(iv) require the Department to consider product

similarity or "other factors affecting comparability" in its benchmark selection. Thus, in

conducting this analysis, the selection of a commercial benchmark should be based on prices for

goods or services that are reasonably comparable to those provided by the government. In the

instant case, the Department must consider the level of development of the land in selecting an

appropriate benchmark.

In *Zhaoqing New Zhongya Aluminum Co. v. United States*, 37 C.I.T. 1003, 1006 (2013),

as amended (July 19, 2013), the Court considered whether it was appropriate for the Department

to select the purchase price of a fully developed industrial park as a benchmark for respondents

50-year lease of wholly undeveloped land. The Court found Commerce's determination to be

unreasonable and noted that Commerce failed "to squarely address Plaintiffs' argument that the

land it leased was completely undeveloped in 2006 and required significant improvement." *Id*. at

1007.

---

[36] *Final Results*, IDM at Cmt. 6.

39

In *Common Alloy Aluminum Sheet From Bahrain: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 13,333 (Mar. 8, 2021) ("Aluminum Sheet from Bahrain"), IDM at Cmt. 4., the Department discussed whether the use of petitioner's land benchmark price was appropriate when the benchmark prices included buildings on the land. Citing to the comparability factors outlined in 19 C.F.R. § 351.511(2), the Department explained:

> In this investigation, the land rental prices contained in the Savills Report are for properties that are more comparable to the land leased by GARMCO from the GOB than the price for rental property contained in the petitioners' benchmark submission. Specifically, the rental prices in the Savills Report are for land, which is what GARMCO rented from the GOB. In contrast, the rental price in the petitioners' benchmark submission is for a warehouse and not only land*. As such, the petitioners' benchmark reflects the price for higher valued property because it includes completed industrial buildings in addition to the price for land*.

*Aluminum Sheet from Bahrain* at IDM Cmt. 4 (emphasis added).

In its administrative case brief, Kaptan provided the Department with the following alternatives to compare Nur's land rental exemption to a land benchmark:[37]

(1) The Department could use the rental price set forth in the land rental contract, as discussed above. This is the most accurate method that is consistent with the Department's past practice.

(2) The Department can use the land prices used in the Remand Redetermination following *Ozdemir Boru San. Ve Tic. Ltd. Sti. v. United* States, 273 F. Supp. 3d 1225, 1251 (Ct. Int'l Trade 2017), which was provided in Kaptan's Rebuttal Benchmark submission at Exh. 1 (**PR 212**). This Remand used a benchmark of 36.47 TL/m2 for the *purchase* of land, not the

---

[37] Kaptan Administrative Case Br. at 21-22 (**PR 264; CR 211**).

rental of land. Thus, if the Department were to use this benchmark, it would need to be converted to a rental amount:

    A. Benchmark = 36.47 TL/m2

    B. Nur Land Area = [      ]

    C. Land Price = A x B = [      ]

    D. Lease Term = 49 years

    E. Annual Rental Benchmark = C / D = [     ]

    (3) The Department can adjust Petitioner's land rental benchmark by the rental ratio outlined in Nur's land contract. Based on the calculation outlined in Article 16 of the contract, the annual rent amount is 0.25% of the invested amount (*i.e.,* [       ]). In other words, the contract considers the land to be valued at 0.25% of the amount Nur incurred to develop the land and build the facilities. Thus, using this percentage, the revised benchmark for Q2 and Q4 are 0.05 and 0.04, respectively. The benefit calculation would therefore be revised as follows:

| Area (square meters) | Month | Rent paid (TL) | Revised Benefit |
|---|---|---|---|
| [    ] | January | Ł0.00 | [    ] |
| [    ] | February | Ł0.00 | [    ] |
| [    ] | March | Ł0.00 | [    ] |
| [    ] | April | Ł0.00 | [    ] |
| [    ] | May | Ł0.00 | [    ] |
| [    ] | June | Ł0.00 | [    ] |
| [    ] | July | Ł0.00 | [    ] |

| | | | | |
|---|---|---|---|---|
| [        ] | August | ₺0.00 | [        ] | |
| [        ] | September | ₺0.00 | [        ] | |
| [        ] | October | ₺0.00 | [        ] | |
| [        ] | November | ₺0.00 | [        ] | |
| [        ] | December | ₺0.00 | [        ] | |
| | | Total | [        ] | |

The Department's rejection in the Final Results of the above alternatives was unsupported by record evidence. Regarding the first option, the Department stated that it did not consider the terms outlined in the contract to constitute a lease, thus, there is no rental price as such being forgone by the government.[38] As discussed in Section B.2 above, this determination is unsupported by record evidence and not in accordance with the law.

The Department also cursorily dismissed the second option above because the prices outlined in Kaptan's benchmark submission "are for purchases of land" and it found "the use of purchase prices is inappropriate where rental benchmarks were provided by the petitioner on the record."[39] However, the Department entirely failed to address Kaptan's arguments that it is inappropriate to use the rental benchmarks provided by petitioner given the fact that they cover the use of land *and* facilities, while Nur's land is exclusive of the facilities that Nur developed and built on the land. Moreover, Kaptan provided the Department with a calculation to convert the purchase amount to an annual rental amount, a fact that the Department also failed to address. Finally, the Department provided no basis for its rejection of the third alternative above. Because

---

[38] Final Results, IDM at Cmt. 6l

[39] IDM at Cmt. 6.

the Department failed to address a "relevant and material argument," it "failed to explain its determination with sufficient clarity,"[40] warranting a remand on this issue.

For the reasons discussed above, the Court should issue a remand on this issue and direct the Department to adjust the benchmark calculation using one of the methods outlined by Kaptan above.

## **CONCLUSION**

Kaptan requests that this Court hold that Commerce's Final Results are unsupported by substantial evidence and otherwise not in accordance with law, and remand the Final Results with instructions to issue a new determination that is consistent with the Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP
*/s/ Andrew T. Schutz*
Andrew T. Schutz
Kavita Mohan

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

Dated: April 5, 2022

---

[40] *See Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 471 F. Supp. 3d 1313, 1348 (Ct. Int'l Trade 2020) Because Commerce failed to address ZMC's relevant and material argument regarding the labor union's inability to control majority shareholder rights, Commerce did not meet the requirements in 19 U.S.C. § 1677f(i)(3)(B) and failed to explain its determination with sufficient clarity. See *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1353 (Fed. Cir. 2005). ("{A}n agency must explain its action with sufficient clarity to permit 'effective judicial review.' " (quoting *Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973))). Therefore, the court remands this issue to Commerce for further explanation.").

PUBLIC VERSION

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Plaintiff's Memorandum of Law In Support of its 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2013, is 12,861 words, less than the 14,000 word limit.


*/s/ Andrew T. Schutz*

Andrew T. Schutz

*Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S.*

Dated: April 5, 2022