UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S.,<br>   Plaintiff,<br>  and<br>COLAKOGLU DIS TICARET A.S., *et al.*,<br>   Plaintiff-Intervenors,<br>  v.<br>UNITED STATES,<br>   Defendant,<br>  and<br>REBAR TRADE ACTION COALITION, *et al.*,<br>   Defendant-Intervenors. | Court No. 21-00565<br><br>**PUBLIC VERSION** |

**PLAINTIFF'S REPLY BRIEF**

        Andrew T. Schutz
        Jordan C. Kahn

        GRUNFELD, DESIDERIO, LEBOWITZ,
        SILVERMAN & KLESTADT LLP
        1201 New York Ave., NW, Suite 650
        Washington, DC 20005
        (212) 783-6881

Dated: October 11, 2022

**TABLE OF CONTENTS**

**ARGUMENT** ..................................................................................................................1

I.  COMMERCE DID NOT PROPERLY CONDUCT ITS "PRIMARILY DEDICATED" ANALYSIS ......................................................................................1

II. THE GOVERNMENT'S AND RTAC'S ARGUMENTS ON NUR'S LAND RENT EXEMPTION FAIL ...............................................................................................10

    A.    Nur Was Exempted from Paying Rent/Fees, this Is Revenue Foregone .....10

    B.    Adjustments to the Benchmark Should Have Been Made ................................14

**CONCLUSION** ...........................................................................................................16

# TABLE OF AUTHORITIES

<u>Administrative Decisions & Publications</u>

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review, 2018*, 86 Fed. Reg. 15,184 (Mar. 22, 2021) .................................................................................. 5, 6, 8, 9

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,209 (209 (Sept. 27, 2010) .................................................................................................... 15

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 38361 (June 22, 2020) ...................................................................................................... 6, 7

*Containers from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 31,141 (May 22, 2020) .............................................. 8

*Certain Uncoated Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Jan. 2, 2016) ....................................... 15

*Common Alloy Aluminum Sheet from Bahrain: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 13,333 (Mar. 8, 2021) ............................................. 16

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348 (Nov. 25, 1998) ................................. 2

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018) ............................................................ 15

*Certain Softwood Lumber Products from Canada: Final Results of Countervailing Duty New Shipper Review*, 70 Fed. Reg. 56,640 (Sept. 28, 2005) ......................................... 15

*Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 80,011 (Dec. 11, 2020) ................... 2, 3

*Steel Concrete Reinforcing Bar from the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind the Review in Part; 2014*, 81 Fed. Reg. 89,057 (Dec. 9, 2016) ........................................................................... 9

<u>Statutes & Regulations</u>

19 U.S.C. § 1677 ............................................................................................... 10, 14, 15

19 C.F.R. § 351.509 ................................................................................................... 11

19 C.F.R. § 351.510 ................................................................................................... 11

19 C.F.R. § 351.511 ............................................................................................. 10, 15

19 C.F.R. § 351.525 ..................................................................................................... 1

PUBLIC VERSION

Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan") submits this Reply Brief in response to the Response Briefs filed by the Defendant United States (the "Government") and Defendant-Intervenors Rebar Trade Action Coalition *et al.* (collectively, "RTAC") on August 4, 2022 (referred to as "Def. Br." and RTAC Br.", respectively). For the reasons outlined below, the Court should reject the arguments presented by these briefs in full.

## ARGUMENT

**I.     COMMERCE DID NOT PROPERLY CONDUCT ITS "PRIMARILY DEDICATED" ANALYSIS**

In its brief, the Government disagreed with Kaptan's arguments that Nur Gemicilik ve Tic. A.S. ("Nur") is not a cross-owned input supplier by concluding that: (1) scrap is used in the production of subject merchandise; and (2) all of Nur's scrap generation was sold to Kaptan, thereby making its scrap production "primarily dedicated" to the downstream product. Def. Br. at 12; RTAC Br. at 8. This conclusion, and the Government's support thereof, should be rejected because it fails to follow both the *Preamble* and the agency's own precedent.

This case turns on the meaning of "primarily dedicated" in 19 C.F.R. § 351.525(b)(6)(iv) and whether the overall production and business activity of the particular input supplier must be considered in this analysis. Commerce, and the Government in its brief, focus on the case-by-case nature of its analysis for this term, refusing to adhere to any other considerations or criteria. In their view, the term can be analyzed in two different ways, *without any further consideration* – either the input, generally, is primarily dedicated to subject merchandise (*e.g.*, as semolina is to pasta) or the input production of the specific company is dedicated almost exclusively to the respondent's production. Def. Br. at 12-13; RTAC Br. at 10-11. The Government's, and RTAC's, position in this case can then be distilled as follows – regardless of the nature of the input producer's overall business activity or the amount of the

1

input sold to respondent, as long as almost all of the input producer's input are sold to the respondent, then the production is "primarily dedicated" within the meaning of the regulation. Def. Br. at 15. As Kaptan demonstrated at length in its opening brief filed on April 5, 2022 ("Kaptan Br."), this oversimplification ignores both the *Preamble* and Commerce precedent (and the unique facts of this case). Kaptan Br. at 8-23.

The Government argues that there is no legal support for Kaptan's claim that the nature of the input producer's overall business activity is relevant. Def. Br. at 13. This is inaccurate. First, the *Preamble* itself addresses the nature of production. It first claims that "where a subsidy is provided to an input producer **whose production** is dedicated almost exclusively to the production of a higher value added product—the type of input product that is merely a link in the overall production chain." *Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348, 65,401 (Nov. 25, 1998) ("*Preamble*") (emphasis added). It then discusses the example of a plastics company selling to appliance or automobile manufactures. In that example, even if the *production* of the plastic company is *primarily dedicated* to the appliance or automobile manufactures, Commerce explains that attribution would not be appropriate because plastic itself is not primarily dedicated to appliances or automobiles. Thus, if *input* production was the only relevant inquiry, then Commerce *would* attribute the subsidies of the plastics producer.

Second, just as the production is not the only relevant inquiry, Commerce's precedent demonstrates that the nature of the input itself is not the sole inquiry either. A prime example of this agency practice is Commerce's determination in *Forged Steel Fluid End Blocks from Germany* ("*FEBs*")*: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 80,011 (Dec. 11, 2020), Issues and Decision Memorandum ("IDM") at Cmt. 14 (emphases added). Kaptan discussed *FEBs* at length in its opening brief. Kaptan Br. at 11-12. In that case, two

cross-owned affiliates of the FEB producer-respondent produced and sold ingot and scrap to the FEB producer. The FEB producer used scrap to produce subject merchandise. However, unlike in this case, Commerce in *FEBs* reviewed the "nature of input and downstream products and production processes" and specifically "examined BGH Freital's and BGH Lippendorf's business activities on the record." *Id*. Commerce considered the fact that "BGH Freital and BGH Lippendorf manufacture non-subject merchandise including semi-finished steel products, round and flat bar, and wire" and only provided small quantities of inputs to the respondent. *Id*. Commerce then concluded:

> the record demonstrates that BGH Freital and BGH Lippendorf supplied very small quantities of ingots and scrap to BGH Siegen. Analogous to the plastic as an input to an automobile example in the *CVD Preamble*, one cannot reasonably conclude that these inputs are dedicated almost exclusively to the production of downstream products or that these are the type of input products that are merely a link in the overall production chain.

*Id*. In making this determination, Commerce distinguished this case from others where the nature of the input (*e.g.*, pulp logs and pulp), "have one purpose, which is to be used as an input dedicated exclusively to the production of a higher value added product (*i.e.*, the downstream product including subject merchandise)." *Id*. That is, Commerce concluded in FEBs that scrap is not a "one purpose" input for downstream steel products.

In its brief, the Government makes virtually no attempt to distinguish *FEBs*– stating only that:

> Commerce found in that proceeding that the production of the input suppliers' relevant product was not dedicated almost exclusively to the downstream product. *FEBs from Germany* IDM at Cmt. 14. Regardless of the amount of steel scrap manufactured by Nur, and regardless of the fact that it was manufactured as a byproduct rather than as Nur's primary production activity, scrap is an input product that is primarily dedicated to the production of Kaptan's downstream product. IDM at 26.

Def. Br. at 15.

3

In seeking to distinguish this case, the Government failed to explain how the nature of scrap can be primarily dedicated to Kaptan's downstream product but *not* the FEB producer's product.  Indeed, RTAC makes the same mistake by fist noting that FEBs and the other cases Kaptan cites "focus of the analysis is on whether the input being supplied is one that is usable across many non-specific manufacturing process or one that it usable primarily for manufacturing a limited number of specific goods" – but then fails to explain how the scrap in *this* case is different.  RTAC Br. at 12.  Fluid end blocks are no more downstream or complicated of a product than subject rebar.[1]  Moreover, scrap is not a "one purpose" input like pulp logs and pulp are to paper.  Scrap is used for a wide variety of steel products and there is no evidence on the record that is primarily used for rebar and/or billet.

The nature of the input is identical in *FEBs* and in this case.  In each instance, the input supplier generates scrap from its production, *as an ancillary by-product*, that is sold to the subject merchandise producer in "small quantities." *FEBs*, 85 Fed. Reg. 80,011 (Dec. 11, 2020), IDM at Cmt. 14.  In both cases the business activities of the input suppliers are varied – manufacture of semi-finished steel products, round and flat bar, and wire *versus* manufacture of a variety of ships and fishing vessels (yet both steel related).  Neither of these production activities are "merely a link in the production" of the downstream product.  *Id*. Thus, it not clear how the Government concludes that "Nur is not involved in a wide range of activities completely unrelated to producing the input product at issue – steel scrap." Def. Br. at 16.  In *FEBs*, the input producers' primary business were commodity steel products of which scrap was a clear

---

[1] *See, e.g.*, *Fluid End Blocks*, ELLWOOD CITY FORGE GROUP, https://www.ellwoodcityforge.com/fluid-end-blocks (fluid end blocks are a forged piece of metal into a specific shape).

(and likely consistent) by-product. In this case, Nur's main business activity is shipbuilding, a significantly more downstream (and complex) product than commodity steel products and an activity of which steel is only one of many components. Moreover, scrap production and sales are *not* a constant byproduct of Nur's production as demonstrated by the fact that this the first review in which Nur had scrap sales to Kaptan. Given these facts, Nur should be considered like the input suppliers in *FEBs* and its production found to not be merely a link in Kaptan's production and/or primarily dedicated to the downstream product.

The Government's attempts to distinguish the other cases outlined in Kaptan's brief similarly fail. In particular, the Government misunderstands the importance of *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review, 2018*, 86 Fed. Reg. 15,184 (Mar. 22, 2021) ("*CTL Plate from Korea 2018*"). There, the issue was whether Plantec, a cross-owned affiliate of POSCO, the respondent, was an input supplier and Commerce explained that: "Record evidence shows that Plantec provided various materials to POSCO. One of the inputs was scrap generated from Plantec's production process as a by-product and sold to another POSCO input supplier, PDC, prior to being resold to POSCO." *Id*. at IDM Cmt. 2. The Government attempts to distinguish this case because Commerce concluded that Plantec did not "produce" the scrap and sell directly to respondent while in contrast "Nur both produced the scrap and sold the scrap to Kaptan. Def. Br. at 15. This alleged distinction is without merit. Nur did not "produce" scrap; nor can any company produce scrap. Like Plantec, scrap "was generated from {the company's} production process as a by-product." *Id*. Kaptan Affiliation Response at 6-7 (**PR 47**; **CR 6**). Though Plantec did sell scrap indirectly to the respondent while Nur sold scrap directly to the respondent, Plantec also provided a number of other materials

directly to POSCO.  Thus, while the facts of *CTL Plate from Korea 2018* are not identical to the ones here, how Commerce analyzed "primarily dedicated" in this context is extremely relevant. The fact that Plantec sold scrap indirectly was not the reason the company was not an "input supplier".  *Id*.  Instead, Commerce undertook a full analysis, explaining:

> in deciding whether to attribute subsidies received by Plantec to POSCO, Commerce examined Plantec's business activities as reflected in information on the record of this review, followed the guidelines mentioned above, and concluded that Plantec's production is not "dedicated almost exclusively to the production of a higher value product" (i.e., POSCO's steel production) and that it is not reasonable to assume the purpose of a subsidy to Plantec is to benefit POSCO's products.  As we stated in the Preliminary Results, the record shows that Plantec's primary function is the "construction of industrial plant{s}."

*Id*.  Plantec's primary function as a constructor of industrial plants (of which scrap is a by-product) is strikingly similarly to Nur's primary function of a constructor of shipping vessels (of which scrap is a by-product).

The Government similarly, and mistakenly, discounts *Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 38,361 (June 22, 2020) ("*CRS from Korea*").  According to the Government, this case is distinguishable because Commerce found that "byproduct scrap inputs from the input producer were not used 'in a way that they are primarily and/or exclusively dedicated to the production of the downstream product'."  Def. Br. at 15-16.  Yet the Government provides no explanation of this conclusion.  Indeed, had the Government provided the context for Commerce's conclusion in that case it would have had to explain that Commerce made this determination by evaluating the nature of the input producer's, Plantec, business activities.  In that case, petitioner attempted to argue that "Commerce's input supplier analysis does not rely on whether an input supplier supplies inputs exclusively to one company, in one country, or for one purpose; rather it focuses on the nature and use of the input at issue, not on

6

the totality of the input producer's operations." *Id*. at IDM Cmt. 2. Commerce disagreed and instead explained that: !

> Commerce's input supplier analysis in the post-preliminary results did not solely rely on whether an input producer supplies an input exclusively to a particular company and/or industry. Commerce also examined the nature of the various inputs at issue to determine whether POSCO Plantec meets the criteria for a cross-owned input supplier under 19 CFR 351.525(b)(6)(iv). Commerce concluded that, similar to the plastic to automobile example set out in the CVD Preamble, inputs that POSCO Plantec provided to POSCO are used in a typical manufacturing process and not in a way that they are primarily and/or exclusively dedicated to the production of the downstream product.
>
> The issue of whether production of the input product is primarily dedicated to production of the downstream product depends on the specific factual situations presented to Commerce, because the nature of input and downstream products and production processes vary among cases. For this reason, the petitioners' reliance on Certain Line Paper Indonesia Final, Seamless Pipe China Final, and CRS Brazil Final is misplaced. The nature of the inputs and downstream products in those cases were different from those of this case. Accordingly, Commerce cannot reasonably rely on Certain Line Paper Indonesia Final and Seamless Pipe China Final as precedents to find inputs provided by POSCO Plantec in this case to be primarily dedicated.
>
> Record evidence also show that POSCO Plantec provided various materials to POSCO. One of the inputs is scrap that was generated from POSCO Plantec's production process as a by-product and sold to POSCO's other intermediaries prior to being resold to POSCO. Analogous to the plastic as an input to an automobile example in the CVD Preamble, one cannot reasonably conclude that these inputs are dedicated almost exclusively to the production of downstream products and these are the type of input products that are merely a link in the overall production chain. One also cannot reasonably conclude that the purpose of a subsidy provided to POSCO Plantec is to benefit the production of POSCO's steel production.

*Id*. (internal citations omitted)

These cases collectively demonstrate that the nature of the input supplier's production is a key consideration to the "primarily dedicated" analysis. In each of the cases outlined above, Commerce found that scrap input sales to the respondent –even where used in the production of

7

subject merchandise – were not sufficient to find the input primarily dedicated because of the nature of the input supplier's business activities. In these cases, Commerce specifically rejected an "exclusivity" standard whereby the primarily dedicated standard would always be satisfied if all of the producer's input was sold the respondent. Yet such rationale comprises the exact the basis for Commerce's finding in this case. Ultimately, Commerce concluded that because Nur sold all of its scrap to Kaptan during the POR, that Nur's "production" was dedicated almost exclusively to the downstream product. In rejecting such an analysis, Commerce explained in the cases above that "Commerce did not set an 'exclusivity standard or requirement . . . . Rather, in deciding whether to attribute subsidies received by {the input supplier} to {the respondent}, Commerce examine{s the inputs supplier's} business activities on the record, followed the guidelines mentioned above." *CTL Plate from Korea 2018* at IDM Cmt. 2.

In following the guidelines Commerce has established, the following critical facts are highly relevant to this inquiry: Nur "produces and sells fishing vessels and other ships". Kaptan First Supp. Response at 6 (**PR 173**; **CR 126**). This industry is completely distinct from, and has no connection to, subject merchandise or steel production in general.[2] Indeed, evidence on the record demonstrates that this is a very miniscule by-product to Nur's production and that this scrap purchase from Nur was a very miniscule component of Kaptan's production:

---

[2] *See Certain Glass Containers from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 31,141 (May 22, 2020), IDM at Cmt. 12. ("Company A's business license details a variety of production activities other than glass equipment manufacturing. Thus, record evidence in the instant case does not indicate that Company A's production is "dedicated almost exclusively to the production of a higher value added product" in the manner suggested by the Preamble or that the purpose of any subsidy provided to Company A would be "to benefit the production of both the input and downstream products.").

(1) the sale of scrap represented [    ] of Nur's sales of all products during the period of review ("POR") – confirming that the generation of scrap is a minuscule portion of the Nur's production.

(2) Nur does not supply Kaptan with scrap on a regular basis. The company has been in business since 2005. Kaptan First Supp. Response at 6 (**PR 173; CR 126**). Kaptan had been involved in three CVD reviews prior to the challenged review and this is the first review in which Nur sold scrap to Kaptan.

(3) Nur sold [    ] of the scrap Kaptan purchased during the POR. This miniscule amount of scrap was used for both subject and non-subject merchandise[3] and therefore could not be "primarily dedicated" to the downstream product.

Ultimately, the question Commerce should be asking, as it did in *CTL Plate from Korea 2018*, is whether the purpose of a subsidy provided to Nur is to benefit the production of Kaptan's steel products. Nur is a ship builder that may or may not have scrap generation and sales during a given year. Nur began in 2005 and the alleged land subsidy the company received was in 2014. While the record is not clear whether Nur had scrap sales during this year, the fact that Kaptan was a mandatory respondent in the 2014 administrative review of this CVD Order and did not report Nur as a cross-owned scrap supplier demonstrates that scrap sales did not exist between the companies.[4] Moreover, that ship and fishing vessel construction is not generally

---

[3] The Government notes that billet is used for subject merchandise. Def. Br. at 12. Yet Kaptan also produces other types of non-subject steel products using scrap, having reported in its initial questionnaire response that: "Kaptan Demir manufactures steel billets, reinforcing bars, angles, square bars, flat bars, and round bars in its meltshop and two rolling mills. Kaptan Demir also produces oxygen, nitrogen, and argon gases." Kaptan Initial Response at 8 (**PR 88**; **CR 37**).

[4] *See Steel Concrete Reinforcing Bar from the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind the Review in Part; 2014*, 81 Fed. Reg. 89,057 (Dec. 9, 2016) ("Kaptan Demir responded on behalf of itself and the following affiliates: Kaptan Metal Dış Ticaret ve Nakliyat A.Ş. (Kaptan Metal) (export trading and transportation company), and Kaptan İş Makinaları Hurda Alım Satım Ltd. Şti. (Kaptan Is Makinalari) (scrap metal trading company) (collectively, the Kaptan Demir Companies) . . . Concerning the other Kaptan Demir-affiliated companies, which are involved in shipping, port operations, energy, storage, construction, recycling, trading, and journalism, we preliminarily find that these companies do not meet any of the conditions of 19 CFR 351.525(b)(6)(ii)-(v).") (unchanged in final).

9

thought of as a scrap generation industry (ships are often made of fiberglass and other materials). With the scrap sales so small during the POR, combined with the fact that the scrap purchases were such a minor portion of Kaptan's overall scrap purchases, one cannot reasonably conclude that the purpose of a subsidy provided to Nur is to benefit Kaptan's steel production. As a result, Nur should not be considered a cross-owned input supplier of Kaptan and its subsidies should not be attributed to Kaptan.

## II. THE GOVERNMENT'S AND RTAC'S ARGUMENTS ON NUR'S LAND RENT EXEMPTION FAIL

### A. Nur Was Exempted from Paying Rent/Fees, this Is Revenue Foregone

In its brief, the Government argues that Commerce properly consider Nur's exemption from paying rent as a good for less than adequate remuneration ("LTAR") under 19 C.F.R. § 351.511 rather than revenue foregone under 19 U.S.C. § 1677(5)(D)(ii). Def. Br. at 19-21; RTAC Br. at 16. The only support the Government provides for this claim is that it considers the agreement to create a "conditional easement". Like Commerce in the underlying proceeding, the Government does not present any legal basis, or precedential support, for the claim that "conditional easements" (or however one frames the land use agreement at issue here) are subject to an LTAR analysis rather than a revenue foregone analysis. *See* Def. Br. at 18-21.

In its brief, the Government first states that: "Because the terms of the contract depict a conditional easement, the application materials describe the agreement as a free easement or free usage permit, and the government of Turkey described the program as a free use permit rather than an exemption from lease payments, it is clear based on the facts on the record that this program

provided a good for LTAR under 19 U.S.C. § 1677(5)(D)(iii)." Def. Br. at 20.[5]  The Government then concludes that "rather than being required to pay rent to use the land, as would be the case under a lease, Nur instead was given an easement to use the land conditioned on the fulfillment of certain other obligations. In providing the land, the Turkish government provided a good, in the form of land, for less than adequate remuneration under Law 5084." *Id*.  After making this statement, the Government admits that both discounts and exemptions on lease terms are analyzed under the revenue forgone provisions.  However, the Government's position is that the nature of this agreement lends itself to an LTAR analysis rather than a revenue foregone analysis.  This position is without merit.

The revenue foregone provisions address circumstances where the government authority sets an amount owed – taxes, fees, rent for government owned land/buildings, etc – which is then exempted or reduced.  *See, e.g.*, 19 C.F.R. §§ 351.509, 351.510.  The benefit represents the amount that would otherwise be owed to the government *but for* the exemption or reduction.  In Kaptan's brief, we identified a number of cases where the foreign government either exempted rent from government owned land or offered rent reductions.  Kaptan Br. at 29-30.  In each of these cases, Commerce considered the program under the revenue foregone provision.  The Government does not dispute this precedent in its brief.

Rather than address these cases, the Government's position is that Nur's arrangement should be viewed as a contingent easement which somehow converts the situation into Nur receiving a "good" from the government rather than Nur not having to pay money to the government that were otherwise owed.  The Government states that because Nur was "given an

---

[5] It is notable that RTAC avoids any discussion of the agreement as an "easement" in its brief. Instead, RTAC focuses only on its position that this transaction was the purchase of a good. RTAC Br. at 15-20.

11

easement to use the land," "the Turkish government provided a good, in the form of land." Def. Br. at 20. Yet neither the Government nor Commerce provides the definition of an "easement" in this context or why it creates the provision of a "good."

The absence of any further explanation highlights a number of errors with this analysis. First, the agreement between Nur and the government only permits Nur to use and develop the land for a temporary period of time. This is an identical characteristic to the defining nature of lease and it is the exact opposite of the purchase of a good.[6] The purchase of a good is typically the retention of the sole and exclusive ownership of an item *ad infinitum*. A key characteristic of the purchase of a good is that one is not required to return the good. In contrast, a key characteristic of a lease (or of the temporary use of good) is that the good must be returned. Thus, to own the good, it is being purchased, while to use the good temporarily, a fee is being charged. *See* Kaptan Br. at 31-32 (providing definitions)

Second, not only does the Nur agreement set a finite time period to use the good, but it also outlines the terms and consideration for that usage and the fee that would be charged if the terms are not met. In other words, the agreement indicates that Nur can use the land regardless of whether the terms and conditions are met but that if they are not met, usage fees are owed to the government:

---

[6] The examples RTAC provides regarding the land being treated under the LTAR provision are distinguishable. RTAC Br. at 19-20. In each of these instances, the government entered into a lease agreement with the respondent and the respondent actually paid the government set rent as per the contract. Thus, in those instances, Commerce was evaluating whether the rent *paid* was at market values – *i.e.*, at LTAR or not. In this case, however, Nur received a complete exemption from the usage fees. Under these instances, as the Government concedes, Commerce has normally treated the complete exemptions as "revenue foregone" and not whether the zero dollars paid were for LTAR. Def. Br. at 21.

12

Thus, the maximum rent charged would be based on half the investment amount and would be calculated as follows:

| Total Investment | [ ] |
|---|---|
| 50% | [ ] |
| # of 1000s | [ ] |
| 5 per 1000 = Annual Fee | [ ] |

Kaptan Second Supp. Response at 2 (**PR 188**; **CR 152**). The existence of the right of use fee (*i.e.*, the fee that would be charged and has been exempted) could not be clearer.

Third, the land was provided pursuant to Law 5084.[7] This law provides for the usage of government land exempt from applicable fees if certain investment conditions are met. Nur's agreement mirrors this law and sets forth the fees that are exempt if the investment conditions are not met.

Taken together, the record evidence very clearly establishes a term lease-like arrangement whereby Nur is permitted to use and develop government land free from government fees. The record further establishes the fees that would be owed to the government if certain conditions are not met. The conditional nature of this arrangement is consistent with

---

[7] Kaptan is not pursuing its claim that the land agreement was not made pursuant to Law 5084. *See* Kaptan's Br. at 24-27.

13

other types of exemption programs – *e.g.*, obtaining lower tax rates for being located in certain areas or for certain types of production. The conditional nature of this arrangement does not alter the fact that the arrangement is an exemption from government fees rather than a purchase of a good. Indeed, the agreement outlines the fee that would be owed for "right to use" if the conditions are not met. Because the facts fall squarely within the revenue foregone provisions rather than the LTAR provisions, the revenue foregone analysis applies. If the revenue foregone analysis applies, the *ad valorem* CVD rate for this program would have been 0.01% rather than 1.62%, a significant difference.

### B. Adjustments to the Benchmark Should Have Been Made

The Government in its brief argues that the rental benchmark applied to Nur land benefit analysis was reasonable because Commerce compared "rental prices to rental prices" and thus no adjustment was needed. Def. Br. at 21; RTAC Br. at 21. The Government misunderstands the nature of Nur's agreement and thus its argument must fail.

The agreement Nur entered into with the government was for the use of undeveloped industrial land. Kaptan Second Supp. Response at Exh. SS-1 (**PR 188**; **CR 152**). The agreement permits Nur to use the land free of any fee or rent as long as Nur develops the land and invests a certain amount to construct a shipyard. *Id*. Thus, the "rent" that Nur is being exempted from paying is for the land, not the land and facilities (since no facilities existed). *Id*. Despite this fact, Commerce used a benchmark for "industrial and logistical facility rent" covering land and facilities and applied it to Nur's land only arrangement. This apples to oranges comparison was unlawful.

The selection of benchmarks is governed by 19 U.S.C. § 1677(5)(E)(iv). This provision instructs Commerce to determine the adequacy of remuneration "in relation to the prevailing market conditions for the good." The statute goes on to define "prevailing market conditions" to

14

include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.* In addition, Commerce must evaluate "factors affecting comparability" in selecting the proper benchmark under 19 C.F.R. § 351.511 and 19 U.S.C. § 1677(5)(E)(iv). To comply with these benchmark selection criteria, Commerce seeks to select the most product-specific benchmark possible for use in LTAR calculations in accordance with its well-establish practice that includes:

- *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018), IDM at Cmt. 3 ("Commerce's practice is normally to rely on data reflecting the narrowest category of products encompassing the input product, which, in this case, would be the annual IHS Markit data (which reflects prices for aluminum frames, while the Comtrade data encompasses a broader range of aluminum products).");

- *Certain Uncoated Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Jan. 2, 2016), IDM at "3. Provision of Caustic Soda for LTAR" ("As noted above, our approach in this regard is consistent with the Department's practice of deriving benchmark prices by grade when such data are available and when the record evidence indicates that the respondent firm purchases the good in question on a grade-specific basis.");

- *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,209 (Sept. 27, 2010) (finding a species-specific benchmark for timber to be more appropriate than a generic timber value); and

- *Certain Softwood Lumber Products from Canada: Final Results of Countervailing Duty New Shipper Review*, 70 Fed. Reg. 56,640 (Sept. 28, 2005), IDM at Cmt. 1 (selecting a region-specific benchmark in order to "conduct the most accurate 'apples-to-apples' comparison between U.S. PNW and B.C. Coast log prices").

Kaptan's opening brief outlined several cases where Commerce applied these same criteria to the selection of "tier 2" land benchmarks. Kaptan Br. at 40. Specifically, in *Common Alloy Aluminum Sheet From Bahrain: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 13,333 (Mar. 8, 2021), IDM at Cmt. 4., Commerce found that petitioner's benchmark, which included land and warehouse rent, was inappropriate to compare

15

to the respondents' land-only rent.  The Government in its brief is silent with regard to these cases and their clear relevance here.  Instead, the Government simply stated that Commerce was correct to apply rental prices to rental prices.  But, as noted, what the Government misunderstands (or ignores) is that Commerce applied land rental prices to *land & building* rental prices.  By using a benchmark that includes both land and buildings, Commerce greatly inflated the benefit Nur received from this program, thereby inflating the CVD rate applied.  Indeed, in doing so, Commerce found that Nur's use of its own facilities (which it constructed itself) to result in a countervailable benefit.  This is unsupported by substantial evidence and unlawful.  As explained in Kaptan's brief, Kaptan provided sufficient information on the record of the underlying review that would permit Commerce to adjust the rental benchmark to make it a land rent to land rent comparison.  Kaptan Br. at 40-42.  Commerce's failure to use or address this information necessitates a remand on this issue.

## CONCLUSION

Kaptan requests that this Court hold that Commerce's Final Results are unsupported by substantial evidence and otherwise not in accordance with law, and remand the Final Results with instructions to issue a new determination that is consistent with the Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Andrew T. Schutz
Jordan C. Kahn

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

Dated:  October 11, 2022

PUBLIC VERSION

# CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiff's Reply Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2013, is 5,262 words plus an embedded graphic with 217 words, for a total of 5,479 – less than the 7,000 word limit.

/s/ Andrew T. Schutz

Andrew T. Schutz

*Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S.*

Dated: October 11, 2022

11881471_1