Slip Op. 23-62

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S.,**<br><br>**Plaintiff,**<br><br>**ÇOLAKOĞLU DIS TICARET A.S.** and **ÇOLAKOĞLU METALURJI A.S.,**<br><br>**Plaintiff-Intervenors,**<br><br>v.<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>and<br><br>**REBAR TRADE ACTION COALITION, BYER STEEL GROUP, INC., COMMERCIAL METALS COMPANY, GERDAU AMERISTEEL U.S. INC., NUCOR CORPORATION, and STEEL DYNAMICS, INC.,**<br><br>**Defendant-Intervenors.** | **Before: Gary S. Katzmann, Judge**<br>**Court No. 21-00565** |

## OPINION AND ORDER

[The court remands the Department of Commerce's final determination.]

Dated: <u>April 26, 2023</u>

<u>Andrew T. Schutz</u>, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., argued for Plaintiff Kaptan Demir Celik Endustrisi Ve Ticaret A.S. With him on the brief were <u>Kavita Mohan</u>, <u>Jordan C. Kahn</u>.

<u>Matthew M. Nolan</u>, <u>Nancy A. Noonan</u>, <u>Diana Dimitriuc Quaia</u>, <u>Jessica R. DiPietro</u> and <u>Leah N. Scarpelli</u>, ArentFox Schiff LLP, of Washington, D.C., for Plaintiff-Intervenors Colakoglu Dis Ticaret A.S. and Colakoglu Metalurji A.S.

Sosun Bae, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States.  With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, L. Misha Preheim, Assistant Director.  Of counsel on the briefs was W. Mitch Purdy, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Maureen Thorson, Wiley Rein, LLP, of Washington, D.C., argued for Defendant-Intervenor Rebar Trade Action Coalition and its individual members.  With her on the briefs were Alan H. Price and John R. Shane.

Katzmann, Judge: Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan"), a Turkish producer and exporter of steel concrete reinforcing bar ("rebar"), in its Motion for Judgment on the Agency Record, challenges certain aspects of the final results of the U.S. Department of Commerce ("Commerce") in the 2018 administrative review of the countervailing duty order on rebar from Turkey published in Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2018, 86 Fed. Reg. 53279 (Dep't Com. Sept. 27, 2021), P.R. 288 ("Final Results"), and the accompanying Issues and Decision Memorandum, Mem. from J. Maeder to C. Marsh, re: Issues and Decision Memorandum For the Final Results of the Countervailing Duty Administrative Review of Steel Concrete Reinforcing Bar from the Republic of Turkey; 2018 (Dep't Com. Sept. 21, 2021), P.R. 283 ("IDM").  Plaintiff-Intervenors Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S. ("Colakoglu"), a foreign manufacturer and foreign exporter of rebar from Turkey, also moved for judgment on the agency record.

Defendant United States ("the Government") and domestic producers, Defendant-Intervenors Rebar Trade Action Coalition, Byer Steel Group, Inc., Commercial Metals Company, Gerdau Ameristeel U.S. Inc., Nucor Corporation, and Steel Dynamics, Inc., ("Domestics"), oppose Kaptan's motion.  The Government and Domestics submit that Commerce's Final Results are

supported by substantial evidence and in accordance with law.  The Government and Domestics, however, do not object to Colakoglu's motion for a separate rate adjustment should Kaptan succeed in securing a recalculation of its overall subsidy rate as a result of this action.

For the reasons articulated below, the court finds that with respect to Commerce's attribution to Kaptan of subsidies of Nur Gemicilik ve Tic. A.S. ("Nur"), a ship building company affiliated with Kaptan, Commerce has not provided adequate explanation in the Final Results regarding its determination that Nur was a "cross-owned input supplier" of primarily dedicated inputs under 19 C.F.R. § 351.525(b)(6)(iv).  The court thus remands the Final Results for further review and explanation.

## FACTUAL AND LEGAL BACKGROUND

### I.    *Regulatory and Legal Framework*

Countervailing duties ("CVDs") are duties imposed on merchandise imported into the United States to "countervail" or offset the effect of subsidies granted by foreign governments. See 19 U.S.C. § 1671(a).  Foreign governments sometimes subsidize domestic industries to benefit the production or exportation of merchandise and thereby confer an advantage in the trading system.  If the International Trade Commission determines that the advantage causes material injury to the relevant domestic producers or domestic industry, Commerce calculates the amount of benefit conferred and may issue a CVD order to offset this unfair advantage.  See Guangdong Wireking Housewares & Hardware Co. v. United States, 745 F.3d 1194, 1203 (Fed. Cir. 2014) ("The congressional intent behind the enactment of countervailing duty and antidumping law generally was to create a civil regulatory scheme that remedies the harm unfair trade practices cause.").

One of the core questions in CVD investigations is whether a subsidy is "countervailable," or the subsidy meets the statutory and regulatory definition of an actionable subsidy.  See Fine Furniture (Shanghai) Ltd. v. United States, 748 F.3d 1365, 1369 (Fed. Cir. 2014).  The Tariff Act of 1930 ("Tariff Act") provides that before Commerce may impose a CVD on merchandise imported into the United States, it must determine that "the government of a country or any public entity within the territory is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of that merchandise."  19 U.S.C. § 1671(a)(1) (emphasis added).  "Except as provided in paragraph (5B), a countervailable subsidy is a subsidy described in [paragraph (5)(B)] which is specific as described in paragraph (5A)."  Id. § 1677(5)(A).

Thus, the determination of CVDs ultimately rests on whether a subsidy meets the "descriptions" contained in section 771 of the Tariff Act, as codified in Chapter 19 of the United States Code, section 1677.  In general, a countervailable subsidy is described as follows:

> A subsidy is described in this paragraph in the case in which an authority--
>
> **(i)** provides a financial contribution,
>
> **(ii)** provides any form of income or price support within the meaning of Article XVI of the GATT 1994, or
>
> **(iii)** makes a payment to a funding mechanism to provide a financial contribution, or entrusts or directs a private entity to make a financial contribution, if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments,
>
> to a person and a benefit is thereby conferred.  For purposes of this paragraph and paragraphs (5A) and (5B), the term "authority" means a government of a country or any public entity within the territory of the country.

19 U.S.C. § 1677(5)(B).  In short, the key elements are (1) a foreign authority, (2) making a financial contribution (or any form of income or price support, or payment), (3) to a person, and (4) a benefit conferred thereby.

These elements, appearing deceptively simple upon first glance, pose complex challenges when applied in real practice.  One such issue is the attribution of subsidies to a "person" in cases of subsidies given to a cross-owned input supplier.  Considering that corporations are often cross-owned, or part of larger conglomerate groups, the economic effect of subsidies granted to one legally separate corporation (and thus a separate legal "person") may in practice benefit another corporation that did not formally receive the subsidy.  Consequently, Commerce has developed practices on attributing subsidies received by one company to the total sales of a related company.

Commerce explains, in its preamble to the final rule on CVDs promulgated in 1998 that "[t]he underlying rationale for attributing subsidies between two separate corporations [with cross-ownership] is that the interests of those two corporations have merged to such a degree that one corporation can use or direct the individual assets (or subsidy benefits) of the other corporation in essentially the same ways it can use its own assets (or subsidy benefits)." Countervailing Duties; Final Rule, 63 Fed. Reg. 65348, 65401 (Dep't Com. Nov. 25, 1998) ("CVD Preamble").  The 1998 regulations were adopted following the enactment of the Uruguay Round Agreement Acts that necessitated systematic revision of the regulatory framework.  See id.  The interpretations given in the CVD Preamble should be given deference as an official regulatory interpretation that expresses authoritative departmental position to an interpretation of its underlying regulation.  See Kisor v. Wilkie, 139 S. Ct. 2400, 2416 (2019).

Commerce's regulations accordingly contain rules on attribution of subsidies for cross-owned corporations.  One such provision concerns input suppliers:

> (iv) Input suppliers.  If there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).

19 C.F.R. § 351.525 (2013).   Per the CVD Preamble, this regulation was adopted to address situations involving "an input producer whose production is dedicated almost exclusively to the production of a higher value added product -- the type of input product that is merely a link in the overall production chain." CVD Preamble at 65401.  Commerce explained that "in situations such as these, the purpose of the subsidy provided to the input producer is to benefit the production of both the input and downstream products." Id.  The regulation does not define "primarily dedicated." See 19 C.F.R. § 351.525 (2013).

## II.     Factual and Procedural History

Kaptan is a Turkish producer and exporter of rebar that became the subject merchandise of Commerce's CVD order in 2014.  Kaptan was selected as a mandatory respondent[1] in the 2018 administrative review of the CVD order.

---

[1] In CVD investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(e)(2), which provides:

> If the administering authority determines that it is not practicable to determine individual countervailable subsidy rates under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may —
>
> > (A) determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to —
> >
> > > (i) a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of selection, or
> > >
> > > (ii) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined; or
> >
> > (B) determine a single country-wide subsidy rate to be applied to all exporters and producers.

In the 2018 administrative review, Kaptan reported purchasing steel scrap used in its manufacturing operations from a cross-owned affiliate, Nur.  See Mem. from J. Maeder to C. Marsh, re: Decision Memorandum for the Preliminary Results of Countervailing Duty Administrative Review at 8 (Dep't Com. Mar. 19, 2021), P.R 222 ("PDM").  Commerce preliminarily determined that this scrap was "primarily dedicated to the production of the downstream product,"[2] such that any countervailable subsidies that received by corporations in the "Kaptan Group," including Martas Marmara Ereglisi Liman Tesisleri A.S., Aset Madencilik A.S., and Nur, should be included in the subsidy analysis.  Id.

Kaptan submitted comments to Commerce, challenging the finding in the PDM.  Kaptan submitted that unlike the other corporations, Nur's primary business was shipbuilding rather than scrap production and further argued that the quantity of scrap sold to Kaptan was de minimis. Letter from Kaptan to G. Raimondo, Sec'y of Com., re: Administrative Case Brief: Administrative Review of the Countervailing Duty Order on Steel Concrete Reinforcing Bar from the Republic of Turkey (C-489-815) (POR: 2018) (July 28, 2021), P.R. 264, C.R. 211, at 5–6, 12 ("Kaptan's Comm. Sub.").  Kaptan also noted that it used Nur's scrap to manufacture non-subject merchandise in addition to rebar.  Id.  Kaptan argued that, given these circumstances, Commerce's precedent did not support treatment of the scrap from Nur's shipbuilding activity as "primarily dedicated" to the production of downstream products.  Id. at 6–12.

Despite Kaptan's comments, Commerce continued to treat Nur as Kaptan's cross-owned supplier of an input "primarily dedicated" to downstream production in the Final Results.  IDM at

---

The individual countervailable subsidy rates determined under subparagraph (A) shall be used to determine the all-others rate under section 1671d(c)(5) of this title.

[2] 19 U.S.C. § 1677f-1(e)(2).

25–27.  Commerce explained that in previous segments of the proceeding it had considered scrap

as an "input that is primarily dedicated to downstream steel production, regardless of the amount

of scrap purchased," and noted the court's approval of this finding in an appeal of a prior review

involving the other mandatory respondent.  Id. at 25–26 (citing Icdas Celik Enedi Tersane ve

Ulasim Sanayi A.S. v. United States, 43 CIT __, __, 498 F. Supp. 3d 1345, 1364 (2021)).

Commerce also explained that Nur produced steel scrap, which Nur sold to Kaptan, and which

Kaptan then used in making downstream steel products including subject goods.  Id.  Further,

Commerce found that there was no evidence of Nur selling its scrap product to anyone else.  Id. at

26.  Accordingly, Nur's scrap supply was "devoted to Kaptan's downstream steel production."  Id.

Kaptan brought this action before the court on October 19, 2021.  See Complaint, Oct. 19,

2021, ECF No. 6.  Presently, Kaptan moves for judgment on the agency record pursuant to Rule

56.2 of the U.S. Court of International Trade.  See Pl.'s Mot. for J. on Agency R., Apr. 5, 2022,

ECF No. 33 ("Pl.'s Br.").  Kaptan challenges two aspects of the Final Results in its Motion for

Judgment on the Agency Record: (1) Commerce's finding that Nur was a "cross-owned input

supplier" under 19 C.F.R. § 351.525(b)(6)(iv); and (2) Commerce's finding that Nur's land rent

exemption program with the local government, allowing Nur to use land without paying rent in

exchange for meeting certain investment and employment criteria, constituted a countervailable

subsidy within the meaning of section 771 of the Tariff Act, 19 U.S.C. § 1677.  Id. at 1–3.

Kaptan offers four reasons for its position: (1) Commerce's cross-owned input supplier

finding does not meet the substantial evidence standard because Commerce did not properly

conduct the "primarily dedicated" analysis in 19 C.F.R. § 351.525(b)(6)(iv); (2) Nur's rent-free

land benefit was not a countervailable subsidy because it does not meet the statutory definition of

"regionally specific" under 19 U.S.C. § 1677(5A)(D)(iv); (3) even if countervailable, the land rent

benefit should have been calculated as "revenue forgone" under 19 U.S.C. § 1677(5)(D)(ii), rather than a good for less than adequate renumeration ("LTAR") program under 19 U.S.C. § 1677(5)(D)(iii); and (4) even if the land rent exemption program was an LTAR program, Commerce should have made adjustments to the benchmark by removing rent attributed to buildings rather than land only.  Id. at 8–42.

Plaintiff-Intervenors Colakoglu also moved for judgment on the agency record. Colakoglu's motion presents the sole issue of whether Commerce should recalculate Colakoglu's assigned subsidy rate at the all-others rate if Kaptan's rate changes pursuant to the litigation.  See Pl.-Inters.' Mem. of Law in Support of Mot. for J. on Agency R., Apr. 5, 2023, ECF No. 31. Colakoglu's argument is that to the extent that Commerce recalculates Kaptan's rate as a result of this litigation, Commerce must redetermine a separate rate for Colakoglu in accordance with 19 U.S.C. § 1671d(c)(5)(A)(i).  Id. at 3–4.

The Government opposes Kaptan's motion.  See Def.'s Opp. to Pl.'s Mot. for J. on Agency R., Aug. 4, 2023, ECF No. 41 ("Def.'s Br.").  First, the Government argues that in previous segments of the investigation, scrap has been found to be "an input primarily dedicated to the production of the downstream steel production, regardless of the amount of scrap purchased from the cross-owned company."  Id. at 5, 13–17.  The Government further argues that the facts on the record demonstrate that Nur produced scrap, sold that scrap to Kaptan, and Kaptan then used that scrap to produce downstream product in the form of rebar.  Id. at 17.  Thus, according to the Government, Nur's production of scrap as an input product is primarily dedicated to Kaptan's product of downstream product, and Commerce appropriately attributed Nur's subsidies as a cross-owned input supplier.  Id.  Second, the Turkish law under which Nur received the land, Law 5084, is limited to specifically designated geographic regions, and is thus regionally specific pursuant to

19 U.S.C. § 1677(5A)(D)(iv).  Id. at 18–22.  This provision of land for use constituted a provision of a good for LTAR, pursuant to 19 U.S.C. § 1677(5)(D)(iii), and a benefit was thereby conferred upon Nur under 19 U.S.C. § 1677(5)(E)(iv).  Id.  The Government, however, does not object to Plaintiff-Intervenor Colakoglu's argument that to the extent that Commerce recalculates Kaptan's overall subsidy rate as a result of this litigation, it must also recalculate Colakoglu's separate rate.  Id. at 22–23.

Domestics also oppose Kaptan's motion.  See Rebar Trade Action Coalition's Resp. Br., Aug. 4, 2023, ECF No. 40.  Domestics submit that Commerce properly treated Nur as Kaptan's cross-owned supplier of an input primarily dedicated to Kaptan's production of downstream goods.  Id. at 8–13.  Domestics further argue that the court should affirm Commerce's (1) finding that Nur obtained regionally specific benefits, (2) measurement of the benefits using a LTAR methodology associated with measuring the benefit obtained through a government's provision of goods or services, and (3) selection of the benchmark for measuring the benefits.  Id. at 13–24.  Domestics, however, do not object to Plaintiff-Intervenor Colakoglu's contention that the net subsidy rate should be adjusted to the extent that Kaptan's margin is adjusted.  Id. at 1.  Nevertheless, Domestics submit that there is no reason for Kaptan's rate to be adjusted.  Id.

Kaptan filed a reply brief on October 11, 2022.  See Pl.'s Reply Br., Oct. 11, 2022, ECF No. 45.  Kaptan reiterated its positions and argued that Commerce's approach is "an oversimplification [that] ignores both the [CVD] Preamble and Commerce precedent."  Id. at 2.  Kaptan also noted that it is not pursuing its claim that the land agreement was not made pursuant to Law 5084.  Id. at 13 n.7.

The court held oral argument on January 24, 2023.  Domestics filed a post-argument submission on January 31, 2023.  Rebar Trade Action Coalition's Post-Arg. Subm., Jan. 31, 2023,

ECF No. 60 ("Def.-Inters.' Post-Arg. Br.").  On the same day, Kaptan filed its post-argument

submission.  See Pl.'s Post-Arg. Subm., Jan. 31, 2023, ECF No. 61.

On February 2, 2023, Kaptan filed a notice of supplemental authority.  See Notice of Supp.

Auth., Feb. 2, 2023, ECF No. 62.  The Government filed a response to the notice of supplemental

authority on February 8, 2023.  See Def.'s Resp. to Pl.'s Supp. Br., Feb. 8, 2023, ECF No. 63

("Def.'s Post-Arg. Br.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C.

§ 1516a(a)(2)(B)(iv) and (vi).  The standard of review is set forth in the statutory language of 19

U.S.C. § 1516a(b)(1)(B)(i): "[t]he court shall hold unlawful any determination finding or

conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law."  Substantial evidence refers to "such evidence that a reasonable mind might

accept as adequate to support a conclusion."  SeAH Steel VINA Corp. v. United States, 950 F.3d

833, 840 (Fed. Cir. 2020) (internal quotation marks and citation omitted).

## DISCUSSION

Kaptan does not raise a facial challenge to section 351.525(b)(6)(iv).  Instead, Kaptan

argues that Commerce has developed a certain practice in applying the regulation, namely in

determining whether an input is "primarily dedicated" to the production of the downstream

product.  Therefore, the focus of the analysis is on whether such practice exists, and if so, whether

Commerce adequately explained its changes or reversals in policy.  See Save Domestic Oil, Inc.

v. United States, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004) ("[I]f Commerce has a routine practice

for addressing like situations, it must either apply that practice or provide a reasonable explanation

as to why it departs therefrom." (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile

Ins. Co., 463 U.S. 29, 42 (1983))); see also SKF USA Inc. v. United States, 630 F.3d 1365, 1373

(Fed. Cir. 2011) ("When an agency changes its practice, it is obligated to provide an adequate

explanation for the change." (citing Motor Vehicle Mfrs., 463 U.S. at 42)).

For the reasons set forth below, the court finds that Commerce has not offered a satisfactory

explanation on the cross-owned input supplier issue and the primarily dedicated analysis. See

Motor Vehicle Mfrs., 463 U.S. at 42.  The court thus remands the Final Results for further

explanation and review.

In the three pages of the IDM devoted to the finding of Nur as a cross-owned input supplier,

Commerce offered only one substantive reason for its decision.  Commerce's position is that

because it had previously found that "scrap" is an input product primarily dedicated to the

production of downstream steel products, and because such finding was upheld by this court, it is

a matter of routine.  IDM at 25, 27.  According to Commerce, as long as scrap has been sold

exclusively, the issue requires no further inspection.  Specifically, Commerce reasoned that:

> Regardless of the amount of steel scrap manufactured by Nur and regardless of the
> fact that it was manufactured as a byproduct rather than as Nur's primary
> production activity, as previously stated, steel scrap has been found, in previous
> segments of this proceeding to be a product that is primarily dedicated to the
> production of downstream steel products.  Nothing Kaptan argues changes that fact.

IDM at 27 (emphasis added).  Commerce further cites to a previous opinion of this court, Icdas

Celik Enedi Tersane ve Ulasim Sanayi A.S. v. United States, 43 CIT __, 498 F. Supp. 3d 1345

(2021) ("Icdas"), in support of its position.  The remainder of the IDM on the cross-owned input

supplier issue focuses on distinguishing the prior Commerce determinations that Kaptan has raised,

"because the nature of input and downstream products and production processes vary among

cases."  IDM at 26.

Commerce's reliance on determinations in prior segments, and this court's opinion in Icdas, is misplaced. Commerce's determinations are based "upon the record of the relevant segment of the proceeding, not previous segments." Hyundai Steel Co. v. United States, 41 CIT __, __, 279 F. Supp. 3d 1349, 1372 (2017) (internal quotation marks omitted) (quoting Pakfood Pub. Co. v. United States, 34 CIT 1122, 1134, 724 F. Supp. 2d 1327, 1342 (2010)). "[E]ven assuming Commerce's determinations at issue are factually identical [to a prior segment], as a matter of law a prior administrative determination is not legally binding on other reviews before this court." Id. (quoting Alloy Piping Prods., Inc. v. United States, 33 CIT 349, 358–59 (2009)). Commerce's conclusions from earlier segments "do not serve as precedent controlling its conclusions in the instant review." Pakfood, 34 CIT at 1138, 724 F. Supp. 2d at 1345.

In the prior segments, the determinations were made with respect to different companies within the Kaptan group. These determinations did not involve Nur, nor the specific factual circumstances surrounding Nur's generation of scrap and the sale of these products to Kaptan, and the use of the inputs in Kaptan's productions. Likewise, Icdas only involved the specific factual circumstances of a different entity, Içdaş Elektrik, selling scrap to Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. Icdas, 498 F. Supp. 3d. at 1363–64. Icdas does not stand for the proposition that all cross-owned vendors of scrap, by definition, would be considered a supplier of input primarily dedicated to the production of steel products. Commerce needs to explain further why the input product in question, i.e., scrap metal generated by Nur, is in fact primarily dedicated to the production of downstream products in this case. This is especially true considering record evidence that the scrap may have been used for the production of products other than the subject

merchandise.[3]

The IDM also attempts to distinguish prior Commerce decisions cited by Kaptan.  IDM at 26.  Commerce, however, does not adequately address or explain why in some of these prior decisions, the department considered factors such as the byproduct nature of the scrap, and why it has declined to do so in the instant case.  Id.  Nor does it adequately address Kaptan's contention that although there is no de minimis standard, Commerce has previously found that ingots and scrap sold in miniscule amounts are not "primarily dedicated" to the production of the downstream product.  Instead, it merely repeats its position that if scrap has been generated in any form, and if that scrap has been sold by a cross-owned entity, and subsequently used in the production of downstream products, it is primarily dedicated.  Id.

It is "well-established that an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently."  SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001).  Although the court recognizes that the determination in question "depends on the specific factual situations presented to Commerce," IDM at 26, the court finds that Commerce has offered insufficient explanation as to how the specific factual situations in this case support the conclusion that Nur was a cross-owned input supplier.

Domestics raise several points on the nature of rebar and Commerce's familiarity with rebar production.  Def.-Inters.' Post-Arg. Br. at 2–3.  As these reasons were not given in the IDM,

---

[3] Also of note is the CVD Preamble's language on the "type of input product that is merely a link in the overall production chain," and its reasoning given that in such scenarios it may deem "the purpose of the subsidy provided to the input producer is to benefit the production of both the input and downstream products."  CVD Preamble at 65401.  Indeed, as the Government recognizes, "evidence of a vertically integrated supply chain" or evidence that the scrap "was used exclusively by the downstream producer in its production of downstream product" are all factors that Commerce has considered in relevant determinations.  Def.'s Post-Arg. Br. at 3.  Yet Commerce here has failed to offer any analysis on whether the scrap sold by Nur was a link in the overall production chain.

they may be deemed post hoc rationalizations not permissibly before the court for consideration. SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."); see also Koyo Seiko Co. v. United States, 95 F.3d 1094, 1099 (Fed. Cir. 1996) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." (internal quotation marks omitted) (quoting Chenery, 318 U.S. at 87)). But even if they were considered, such general trends cannot explain why Nur's generation of scrap and subsequent sale to Kaptan in the instant case is a production of input product primarily dedicated to the production of a downstream product. As Commerce, the Government, and Domestics point out repeatedly, the analysis called for under the regulation "depends on the specific factual situations." IDM at 26; see also Def.'s Br. at 10, 14, 17; Def.-Inters.' Post-Arg. Br. at 1. Commerce "cannot simply ignore the facts of a particular record on the basis that it has seen similar situations in the past," Def.-Inters.' Post-Arg. Br. at 1, as "each decision is highly record-dependent," Def.'s Post-Arg. Br. at 2; see also Def.'s Br. at 10, 14, 17. Based upon the record before this court, Commerce has not provided adequate explanation addressing such fact-specific circumstances in this segment of the investigation. Therefore, Commerce's finding that Nur is a cross-owned input supplier for the purposes of subsidy attribution is remanded for further explanation and review.[4]

---

[4] The court does not reach the other arguments raised by the parties as the arguments are contingent on the court upholding Commerce's finding that Nur was a cross-owned input supplier. See Pl.'s Br. at 24.

**CONCLUSION**

In light of the above, the court remands Commerce's <u>Final Results</u> for further explanation

and review on Commerce's finding that Nur was a cross-owned input supplier of input products

primarily dedicated to the production of downstream products.  It is hereby

**ORDERED** that Commerce shall file with this court and provide to the parties its remand

results within 90 days of the date of this order; and it is further

**ORDERED** that the deadlines provided by USCIT Rule 56.2(h) shall govern thereafter.

**SO ORDERED.**

/s/      <u>*Gary S. Katzmann*</u>
Judge

Dated: <u>April 26, 2023</u>
         New York, New York