Ct. No. 21-00565                                    NON-CONFIDENTIAL VERSION

### IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

**KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S.,**

        **Plaintiff,**

        **and**

**COLAKOGLU DIS TICARET A.S.,** *et al.*,

        **Plaintiff-Intervenors,**

        **v.**

**UNITED STATES,**

        **Defendant,**

        **and**

**REBAR TRADE ACTION COALITION,** *et al.*,

        **Defendant-Intervenors.**

</td><td>

Before: Hon. Gary S. Katzmann,
      Judge

Court No. 21-00565

<u>NON-CONFIDENTIAL VERSION</u>

Business   Proprietary   Information Removed from Pages: 4-5, 15-16, 21, 23

</td></tr>
</table>

### <u>REBAR TRADE ACTION COALITION'S COMMENTS ON REMAND REDETERMINATION</u>

Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E. Thorson, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for the Rebar Trade Action Coalition and its individual members*

Dated: August 23, 2023

Ct. No. 21-00565                                    **NON-CONFIDENTIAL VERSION**

## **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................1

II.     HISTORY OF THE APPEAL ............................................................................1

III.    ARGUMENT ......................................................................................................7

        A.      Legal Background ....................................................................................7

        B.      Commerce's Remand Results are Flawed ..............................................10

                1.      Commerce's Conclusion Regarding the Nature of
                        Steel Scrap as an Input is Inadequately Explained and
                        Supported ................................................................................... 12

                2.      Commerce's Evaluation of Nur's Business Activities
                        is in Error ................................................................................... 18

IV.     CONCLUSION..................................................................................................24

i

Ct. No. 21-00565                                    NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Gujarat Fluorochemicals Ltd. v. United States*,
    617 F. Supp. 3d 1328 (Ct Int'l Trade 2023) ...........................................9, 10, 14, 15

*Kaptan Demir Celik Endustrisi Ve Ticaret A.S. v. United States*,
    slip op. 23-62 (Ct Int'l Trade Apr. 26, 2023)........................................................2, 3

*Nucor Corp. v. United States*,
    600 F. Supp. 3d 1225 (Ct Int'l Trade 2022) ....................................................17, 21

*Nucor Corp. v. United States*,
    612 F. Supp. 2d 1264 (Ct Int'l Trade 2009) ...........................................................11

*Ulasim Sanayi A.S. v. United States*,
    498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ....................................................13, 22

**Statutes**

19 U.S.C. § 1677(5)(B).........................................................................................................7

**Regulations**

19 C.F.R. 351.525(b)(6)(vi) ...............................................................................................11

19 C.F.R. § 351.525(b)(6)(i) ................................................................................................8

19 C.F.R. § 351.525(b)(6)(iv) .....................................................................................*passim*

19 C.F.R. § 351.525(b)(6)(iv)'s ..........................................................................................15

**Adiminstrative Materials**

*Countervailing Duties*,
    63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998)................................*passim*

*Carbon and Alloy Steel Wire Rod From the Republic of Turkey*,
    82 Fed. Reg. 41,929 (Dep't Commerce Sept. 5, 2017)........................................13

*Certain Cold-Rolled Steel Flat Products From the Republic of Korea*,
    81 Fed. Reg. 49,943 (Dep't Commerce July 29, 2016)........................................13

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*,
    85 Fed. Reg. 38,361 (Dep't Commerce June 26, 2020) .......................................17

*Certain Glass Containers From the People's Republic of China*,
   85 Fed. Reg. 31,141 (Dep't Commerce May 22, 2020) ....................................21

*Certain Oil Country Tubular Goods From the Republic of Turkey*,
   79 Fed. Reg. 41,964 (Dep't Commerce July 18, 2014) ...................................13

*Certain Pasta from Italy*,
   61 Fed. Reg. 30,288 (Dep't Commerce June 14, 1996) .....................................9

*Certain Softwood Lumber Products from Canada*,
   57 Fed. Reg. 22,570 (Dep't Commerce May 28, 1992) ......................................8

*Circular Welded Carbon Steel Pipes and Tubes From the Republic of Turkey*,
   84 Fed. Reg. 21,327 (Dep't Commerce May 14, 2019) ....................................13

*Forged Steel Fluid End Blocks From the Federal Republic of Germany*,
   85 Fed. Reg. 80,011 (Dep't Commerce Dec. 11, 2020) ...................................17

*Forged Steel Fluid End Blocks from the Federal Republic of Germany*,
   85 Fed. Reg. 31,454 (Dep't Commerce May 26, 2020) ....................................20

*Large Residential Washers From the Republic of Korea*,
   77 Fed. Reg. 75,975 (Dep't Commerce Dec. 26, 2012) .....................................9

*Seamless Carbon and Alloy Steel Standard, Lined, and Pressure Pipe From the
   Russian Federation*,
   85 Fed. Reg. 80,007 (Dep't Commerce Dec. 11, 2020) ...................................13

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
   86 Fed. Reg. 15,921 (Dep't Commerce Mar. 25, 2021) ......................................1

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
   86 Fed. Reg. 53,279 (Dep't Commerce Sept. 27, 2021).....................................1

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
   83 Fed. Reg. 63,472 (Dep't Commerce Dec. 10, 2018) ...................................13

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
   87 Fed. Reg. 21,640 (Dep't Commerce Apr. 12, 2022).....................................14

## I.      <u>INTRODUCTION</u>

The Rebar Trade Action Coalition ("RTAC") respectfully submits these comments in opposition to the July 24, 2023 final remand redetermination issued by the U.S. Department of Commerce ("Commerce") in this action. Final Results of Redetermination Pursuant to Court Remand (July 24, 2023), ECF No. 66-1 ("Remand Results"). Below, RTAC summarizes the history of the appeal, including the agency's draft remand results, the parties' comments on them, and the agency's final remand results. RTAC then explains why the Court should again remand this action to Commerce for further consideration of its treatment of Nur Gemicilik ve Ticaret A.S. ("Nur"), a cross-owned affiliate of respondent Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan").

## II.     <u>HISTORY OF THE APPEAL</u>

This action arises from the 2018 administrative review of a countervailing duty order covering steel concrete reinforcing bar ("rebar") from the Republic of Turkey ("Turkey"). In the review, Kaptan reported purchasing steel scrap used in its manufacturing operations from Nur, a cross-owned affiliate. *See, e.g.*, Preliminary Decision Memorandum accompanying *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 86 Fed. Reg. 15,921 (Dep't Commerce Mar. 25, 2021) (prelim. results of countervailing duty admin. rev. and intent to rescind in part; 2018), P.R. 222 at 9 ("Preliminary Memo"); Mem. of Law in Supp. of Pl.'s Mot. for J. on the Agency R. (Apr. 5, 2022), ECF No. 32 at 9 ("Kaptan's Opening Brief") (conceding cross-ownership). Commerce determined that this scrap was "primarily dedicated to the production of the downstream product," such that any countervailable subsidies that Nur received should be attributed to Nur and Kaptan's combined sales pursuant to 19 C.F.R. § 351.525(b)(6)(iv). Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 86 Fed. Reg. 53,279 (Dep't Commerce Sept. 27, 2021) (final results of countervailing duty admin. rev. and rescission,

in part; 2018) at 25-27, P.R. 283 ("IDM"); *see also* Preliminary Memo at 9; 19 C.F.R. § 351.525(b)(6)(iv).

In making this determination, the agency observed that it had previously treated scrap as an "input that is primarily dedicated to . . . downstream steel production, regardless of the amount of scrap purchased," and noted the Court's approval of this finding in an appeal of a prior review. IDM at 25-26 (citing *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1364 (Ct. Int'l Trade 2021)). Commerce also explained that while Nur was a shipbuilding company, Nur sold scrap that it generated through its shipbuilding activities to Kaptan; Kaptan then used that scrap in making downstream steel products including subject goods. *Id.* Further, the scrap that Nur produced was sold exclusively to Kaptan. *Id.* at 26. Accordingly, Commerce concluded that Nur's scrap supply was "devoted to Kaptan's downstream steel production." *Id.*

Kaptan appealed Commerce's conclusion and on April 26, 2023, the Court remanded Commerce's determination for further consideration. *Kaptan Demir Celik Endustrisi Ve Ticaret A.S. v. United States*, Ct. No. 21-00565, slip op. 23-62 (Ct Int'l Trade Apr. 26, 2023) ("Slip Op. 23-62"). In its opinion, the Court found that while Commerce may have treated scrap as an input primarily dedicated to downstream production in prior cases (and had that treatment upheld), it could not rely on that past treatment to the exclusion of analyzing the record of the 2018 administrative review. *Id.* at 13-14. The Court also found that the agency had not sufficiently addressed other, prior cases in which it had found scrap not to be primarily dedicated to downstream production. *Id. at* 14. The Court further noted that Commerce had not "offer{ed} any analysis on whether the scrap sold by Nur was a link in the overall production chain," a relevant consideration under the preamble to the agency's regulations. *Id.* at 14 n.3.

Commerce issued draft remand results on June 26, 2023. Draft Results of Redetermination Pursuant to Ct. Remand, *Kaptan Demir Celik Endustrisi Ve Ticaret A.S. v. United States*, Ct. No. 21-00565, slip op. 23-62 (Ct. Int'l Trade Apr. 26, 2023) (June 26, 2023), C.R.R. 1, P.R.R. 1 ("Draft Remand"). In the draft results, Commerce continued to treat Nur as Kaptan's cross-owned input supplier for subsidy attribution purposes. In response to the Court's direction that the agency must ground its decision in the record of the 2018 administrative review, Commerce explained that:

•  Nur, like other scrap-providing Kaptan affiliates, sold the scrap that it generated exclusively to Kaptan. *Id.* at 13-14.

•  The record shows a clear, vertically integrated scrap supply process pursuant to which multiple Kaptan affiliates (including Nur) provided scrap to Kaptan, which Kaptan then uses to make the billet that fed its production of downstream steel goods, including rebar. *Id.* at 14.

•  Scrap is a critical input into Kaptan's production of rebar and other steel goods. *Id.*

Based on the foregoing, the agency concluded that scrap produced by Nur is "part of an overall production chain to provide steel scrap to one affiliated manufacturer's downstream steel products." *Id.*

Commerce then addressed a prior case in which it treated scrap differently – the 2018 administrative review of the countervailing duty order on Korean cut-to-length steel plate. *Id.* at 15. The agency explained that, in that case, there was no evidence of a vertically integrated scrap supply process, and no evidence that the scrap generated by affiliates was provided exclusively to the downstream producer for use in its steel production. *Id.* Further, the scrap there was not

sold directly to the downstream producer by the affiliate that generated it, but through intermediaries. *Id.* This is unlike the situation here, which involved an affiliate, or a group of affiliates, that provided scrap directly to a single downstream producer of subject goods and similar steel products as part of a vertically integrated process.

Commerce also noted that its examination of Nur's business activities supported the company's treatment as a cross-owned supplier of an input primarily dedicated to Kaptan's downstream production. *Id.* at 15-16. While Nur's "main business" was shipbuilding, its scrap was sold exclusively to Kaptan for use in Kaptan's downstream steel production. *Id.* at 16. Nur's tax returns also reflected a [                                        ] Kaptan and its affiliated companies. *Id.* Overall, Commerce concluded that the 2018 review's specific factual situation was very like that of the subsidy investigation into Turkish oil country tubular goods, where the agency cross-attributed subsidies received by a scrap-providing company to its downstream, steel-producing affiliate. *Id.*

Finally, Commerce addressed cases in which it considered the by-product nature of scrap or the "broad business scope" of an input supplier to be relevant to the question of cross-attribution. *Id.* at 16-18. The agency explained that the input suppliers in its decisions involving Korean cut-to-length plate and Chinese glass containers provided a range of goods to the downstream producer, including goods unrelated to downstream production. *Id.* at 18. By contrast, the record here reflected "a vertically integrated steel scrap supply process" in which Nur and other affiliates "directly and exclusively provide{d}" the steel scrap that they generated to Kaptan for that company's use in producing downstream steel goods. *Id.* at 18.

RTAC filed comments expressing support for the agency's draft remand results, while also pointing out additional record evidence that supported treating Nur as Kaptan's cross-owned

BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED NON-CONFIDENTIAL VERSION

input supplier for subsidy attribution purposes. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from the Republic of Turkey: Comments on Draft Results of Redetermination* (July 7, 2023), C.R.R. 5, P.R.R. 5. Specifically, RTAC drew Commerce's attention to other Kaptan affiliates with respect to which the company conceded early in the review that the standards for cross-attribution were met. *Id.* at 7-8. RTAC drew parallels between these companies and Nur, arguing that Kaptan's treatment of these affiliates supported like treatment of Nur as a cross-owned supplier of an input dedicated to Kaptan's downstream production. *Id.* Finally, RTAC noted that [

], further bearing out the draft results' conclusion that the record demonstrated a close, vertically integrated relationship between Kaptan and Nur. *Id.*

Kaptan filed comments in opposition to the draft results, arguing that the proper focus of Commerce's analysis should be on the role of the input at issue, and particularly on whether the input is one commonly used by multiple industries and in producing multiple products. Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Ledstadt LLP to Sec'y Commerce, re: *Kaptan Comments on Draft Remand: Remand of the 2018 Administrative Review of the Countervailing Duty Order on Steel Concrete Reinforcing Bar from the Republic of Turkey (C-489-819)* (July 7, 2023), C.R.R. 6, P.R.R. 6 at 5-15 ("Kaptan's Draft Comments"). Kaptan pointed out that in its January 31, 2023 remand results in an appeal involving Korean steel plate, the agency distinguished "unprocessed scrap," which it found to be "a common input among a variety of products and industries," from scrap that had been processed so that it was no longer "generic," but fit for a particular purpose. *Id.* at 5-6. Kaptan also argued that Commerce's draft results inappropriately focused on transactions between Nur and non-Kaptan affiliates and between

Kaptan and non-Nur affiliates, and failed to consider the "miniscule" volume of scrap that Nur supplied. *Id.* at 8-10.

In the final remand results, Commerce determined no longer to treat Nur as Kaptan's cross-owned input supplier for subsidy attribution purposes. Remand Results at 8. Commerce began by noting that it had "never made a finding that steel scrap is always primarily dedicated to the production of steel." *Id.* at 16. The agency nonetheless conceded that several prerequisite factors for cross-attribution of subsidies were satisfied here. Specifically, Commerce found that Nur's generation of scrap qualified as "production" for purposes of 19 C.F.R. § 351.525(b)(6)(iv). *Id.* at 16, 31-32. The agency found that Nur's scrap could be used to produce "the downstream product," as Kaptan in fact used it to produce rebar and other downstream steel goods. *Id.* at 16; *see also* IDM at 26. Commerce noted that Nur sold the scrap that it produced exclusively to Kaptan. Remand Results at 17. Commerce also indicated that while Nur may have supplied only a small quantity of scrap, the volume supplied was immaterial to its analysis. *Id.* at 25.

Nonetheless, Commerce found that Nur's scrap was not "merely a link in the overall production chain." *Id.* at 17-18. Commerce explained that Nur's scrap was neither generated for the specific purpose of feeding Kaptan's downstream production, nor processed before being used in Kaptan's downstream production of steel goods. *Id.* at 17. Commerce then concluded that, "like plastic, unprocessed steel scrap is a common input among a variety of products and industries and used in a variety of production processes." *Id.* at 17, 27-28. Commerce also found that its draft results inappropriately considered Kaptan's relationships with non-Nur affiliated input suppliers in assessing whether the scrap that Nur provided to Kaptan was "merely a link in Kaptan{}'s downstream production chain." *Id.* at 18, 25-27. Finally, the agency noted that Kaptan's shipbuilding production was "far removed" from Kaptan's downstream production, particularly

given the "extremely limited transactions" between the two companies. *Id.* at 19, 28-31. As such, Commerce concluded that the record did not indicate that subsidies received by Nur would benefit both Nur's scrap production and Kaptan's downstream steel production. *Id.* at 19.

## III.   **ARGUMENT**

The Court should remand Commerce's determination regarding whether to cross-attribute subsidies received by Nur for a second time. Commerce's remand results are inadequately explained and inadequately supported. While purporting to address the concerns raised in the Court's first remand order and opinion, the remand results raise the same concerns. Specifically, the remand results are inconsistent with unaddressed, relevant record evidence regarding Nur's supply of scrap to Kaptan, and fail to appropriately address past cases in which Commerce has confronted similar situations. And while Commerce analyzed "whether the scrap sold by Nur was a link in the overall production chain," Slip Op. 23-62 at 14 n.3, its conclusions are inadequately explained and unsupported by substantial record evidence.

Below, RTAC provides an overview of the legal landscape underpinning the agency's cross-attribution of subsidies. Next, RTAC explains the reasons why Commerce's determination should be remanded for a second time.

### A.   **Legal Background**

The U.S. trade remedy laws provide that a "subsidy" exists where a foreign governmental "authority . . . provides a financial contribution . . . to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B). In some instances, Commerce encounters respondent companies that are cross-owned with other, separately incorporated companies that receive countervailable subsidies. Cross-ownership exists "where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets." *Id.* § 351.525(b)(6)(vi). Where a company receiving a countervailable subsidy is cross-owned with other corporations,

Commerce will normally attribute the subsidy to the products produced by the recipient company.

19 C.F.R. § 351.525(b)(6)(i). However:

> If there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).

*Id.* § 351.525(b)(6)(iv).

In promulgating section 351.525(b)(6)(iv) of its regulations, Commerce explained that it was concerned with closing "a loophole whereby vertically integrated businesses could avoid countervailing duty exposure for input subsidies simply by separately incorporating the division that makes the input." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Dep't Commerce Nov. 25, 1998) (final rule) ("Preamble"). To avoid this circumvention, Commerce determined to cross-attribute subsidies received by separately incorporated, cross-owned companies, where such companies supplied an input to the investigated producer of subject goods, and that input was "primarily dedicated to production of the downstream product." *Id.*; *see also* 19 C.F.R. § 351.525(b)(6)(iv). Commerce explained that in applying its new attribution policy, it would seek to determine whether the input at issue was of the sort used "almost exclusively" to produce a "higher value added product," and thus formed "a link in the overall production chain" for that product. *Preamble*, 63 Fed. Reg. at 65,401.

To illustrate its intention, Commerce provided two examples of inputs that it would consider "primarily dedicated" to certain downstream production: (1) timber, which is used to produce lumber, and (2) semolina, which is used to produce products like pasta. *Id.* Both examples involve inputs that are critical to the production of a limited group of downstream products, but which are not widely used across multiple industries or in disparate kinds of products. *See id.*; *see also Certain Softwood Lumber Products from Canada*, 57 Fed. Reg. 22,570, 22,577-78 (Dep't

Commerce May 28, 1992) (final affirmative countervailing duty determination) (indicating that timber is used to produce lumber and pulp); *Certain Pasta from Italy*, 61 Fed. Reg. 30,288, 30,829 (Dep't Commerce June 14, 1996) (final affirmative countervailing duty determination) (noting that semolina is a "primary input" into pasta production). Reflecting this, the downstream products in both examples (lumber and pasta) heavily rely on the named inputs (timber and semolina) for their overall characteristics. It is also apparent that timber and semolina are not finished goods but used "almost exclusively" to produce a "higher value added product." *Preamble*, 63 Fed. Reg. at 65,401. The "close physical relationship" between the named inputs and downstream products further indicates that the inputs form "a link in the overall production chain" for the downstream products. *Gujarat Fluorochemicals Ltd. v. United States*, 617 F. Supp. 3d 1328, 1337 (Ct Int'l Trade 2023); *see also Preamble*, 63 Fed. Reg. at 65,401.

Commerce also provided a contrasting example of an input that would not form such a link: plastics, as used in the production of automobiles or appliances. *Preamble*, 63 Fed. Reg. at 65,401. Reviewing this example, the Court has noted that plastics play a "universal role" in manufacturing. *Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1337. Rather than being used to produce a limited number of downstream goods, they are used as inputs across a large variety of products and industries. *See id.*; *see also Preamble*, 63 Fed. Reg. at 65,401. While plastics may be input materials into automobiles or appliances (or incorporated into components for such goods), they are not as likely to contribute importantly to finished product characteristics as timber contributes to lumber or semolina to pasta. *See* Issues and Decision Memorandum accompanying *Large Residential Washers From the Republic of Korea*, 77 Fed. Reg. 75,975 (Dep't Commerce Dec. 26, 2012) (final affirm. countervailing duty deter.) at 3 (explaining that the point of the example is that plastics are an input "used in the production of many different products in different

industries," rather than an input used primarily to make a limited group of downstream products). Reasoning from this example, the Court has rejected cross-attribution of subsidies where the input is of "universal application" and lacks a "physical relationship" to the downstream product. *Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1337-38 (rejecting cross-attribution of subsidies based on the provision of electricity to a downstream producer of wind towers).

### B.   Commerce's Remand Results are Flawed

The record of the review on appeal confirms that scrap is a primary input into Kaptan's rebar production, just as semolina is a primary input into pasta, and timber is a primary input into lumber. As described in its initial questionnaire response, Kaptan's production process begins with melting scrap. Letter from Grunfeld, Desidero, Lebowitz, Silverman & Klestadt LLP to Sec'y Commerce, re: *Kaptan Initial Questionnaire Response: Administrative Review of the Countervailing Duty Order on Steel Concrete Reinforcing Bar from the Republic of Turkey (C-489-819) (POR: 2018)* (July 6, 2020), C.R. 37-48, P.R. 88 at 9 and Exhibit 2 ("Kaptan's IQR"). Kaptan uses the melted scrap to produce billets, which it rolls into rebar and similar products. *Id.* Scrap is the only raw material identified in Kaptan's production flow diagram for rebar, and the company described scrap as a "major input" into its production operations. *Id.* at Exhibit 2; *see also* Letter from Grunfeld Desiderio Lebowitz Silverman & Klestadt LLP to Sec'y Commerce, re: *Kaptan Affiliation Response: Administrative Review of the Countervailing Duty Order on Steel Concrete Reinforcing Bar from the Republic of Turkey (C-489-819) (POR: 2018)* (June 5, 2020), C.R. 6, P.R. 47 ("Affiliation QR") at Exhibit 3.[1]

---

[1]   Kaptan is not unusual in this regard. *Habas Sinai ve Tibbi Gazlar Isithsal Endustrisi*, 625 F. Supp. 2d 1339, 1348 (Ct Int'l Trade 2009) (noting that scrap is the "single primary input" in producing rebar); *Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1323 (Ct Int'l Trade 2009) (same).

Kaptan has conceded that it is cross-owned with Nur, meaning that Kaptan "can use or direct the individual assets of {Nur} in essentially the same ways it can use its own assets." Kaptan's Opening Brief at 9; 19 C.F.R. 351.525(b)(6)(vi). Commerce has further found that (1) Nur's generation of scrap is "production" for purposes of the cross-attribution regulation, (2) that Nur's scrap was exclusively sold to Kaptan, and (3) the scrap was usable – and used – as an input into Kaptan's production. Remand Results at 16-17; IDM at 26. The record indicates that steel scrap is not just one among many inputs input into Kaptan's rebar production, but a primary input with a close physical relationship to Kaptan's downstream goods. Kaptan's IQR at 9 and Exhibit 2. Indeed, based on Kaptan's information, its rebar is simply steel scrap that has been remelted and reshaped, much as lumber is simply timber that has been sawn to particular dimensions. *Id.*

Nonetheless, Commerce concluded that Nur should not be treated as Kaptan's cross-owned input supplier for subsidy attribution purposes, for two reasons. First, Commerce found that Nur's steel scrap was not generated or processed specifically to feed Kaptan's downstream production and was therefore a "common input among a variety of products and industries and used in a variety of production processes." Remand Results at 17-18, 28. Commerce thus reasoned that the relationship between Nur's scrap and Kaptan's rebar is like that of plastics with automobiles/appliances, rather than like that of timber with lumber or semolina with pasta. *See id.* Second, Commerce found that Nur's primary business activities are "far removed" from Kaptan's downstream steel production activities, particularly in light of the "extremely limited transactions between the two companies." *Id.* at 19, 29-30. As such, Nur's "business activity is not 'dedicated almost exclusively to the production of a higher value-added product' in the manner suggested by the Preamble." *Id.* at 19.

Commerce's reasoning is flawed. First, the agency's conclusion that Nur's scrap has the sort of attenuated relationship with Kaptan's rebar that plastics have with automobiles or appliances is neither supported by the record nor adequately explained. Rather, the record indicates that the relationship is far more similar to that of timber/lumber and semolina/pasta. Second, the agency has inappropriately focused on the nature of Nur's "business activity" over the record evidence regarding Nur's production of scrap, and the relationship between scrap and Kaptan's downstream production. In both parts of its analysis, Commerce failed to adequately address prior cases in which it found scrap to be primarily dedicated to downstream production of rebar and similar steel products, while also failing to recognize relevant distinctions between the record here and prior cases in which it treated scrap not forming a link in the overall production chain for downstream goods. Commerce also arbitrarily treated Nur differently than other scrap-supplying Kaptan affiliates. Accordingly, the Court should remand this action for a second time.

> **1.      Commerce's Conclusion Regarding the Nature of Steel Scrap as an Input is Inadequately Explained and Supported**

Commerce found that Nur provided Kaptan with "unprocessed" steel scrap, a "common input among a variety of products and industries and used in a variety of production processes." Remand Results at 17-18, 28.  Commerce also found that the scrap that Nur sold to Kaptan was not "generated or otherwise prepared for downstream products," indicating that it was not a link in the overall production chain for Kaptan's rebar. *Id.* at 17. These findings are inadequately explained and supported.

As an initial matter, Commerce has repeatedly found that steel scrap – without any consideration of its processing level – is primarily dedicated to downstream steel production. Preliminary Decision Memorandum accompanying *Seamless Carbon and Alloy Steel Standard, Lined, and Pressure Pipe From the Russian Federation*, 85 Fed. Reg. 80,007 (Dep't Commerce

Dec. 11, 2020) (prelim. affirm. countervailing duty deter. and alignment of final deter. with final antidumping duty deter.) at 10 (unchanged in final); Preliminary Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 83 Fed. Reg. 63,472 (Dep't Commerce Dec. 10, 2018) (prelim. results countervailing duty admin. rev. and intent to rescind the rev. in part; 2016) at 10 (finding that scrap provided by affiliated companies was primarily dedicated to Kaptan's downstream production of rebar) (unchanged in final);[2] Preliminary Decision Memorandum accompanying *Circular Welded Carbon Steel Pipes and Tubes From the Republic of Turkey*, 84 Fed. Reg. 21,327 (Dep't Commerce May 14, 2019) (prelim. results of countervailing duty admin. rev. and intent to rescind the rev., in part; calendar year 2017) at 8 (unchanged in final); Preliminary Decision Memorandum accompanying *Carbon and Alloy Steel Wire Rod From the Republic of Turkey*, 82 Fed. Reg. 41,929 (Dep't Commerce Sept. 5, 2017) (prelim. affirm. countervailing duty deter. and prelim. affirm. critical circumstances deter., in part) at 9, 20 (unchanged in final); Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products From the Republic of Korea*, 81 Fed. Reg. 49,943 (Dep't Commerce July 29, 2016) (final affirm. deter. of the countervailing duty inv.) at cmt. 5; Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods From the Republic of Turkey*, 79 Fed. Reg. 41,964 (Dep't Commerce July 18, 2014) (final affirm. countervailing duty deter. and final affirm. critical circumstances deter.) at 8 ("OCTG from Turkey IDM"); *see also* Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 87 Fed. Reg. 21,640 (Dep't Commerce Apr. 12, 2022) (final results of countervailing duty

---

[2]     This is the case that gave rise to *Icdas*, an appeal in which the Court upheld cross-attribution of subsidies where an electrical company supplied an affiliated, downstream rebar producer with a small quantity of steel scrap used in the downstream producer's production operation. *See Icdas*, 498 F. Supp. 3d 1345.

admin. rev. and rescission, in part; 2019) at 10-11 (treating scrap provided by Nur to Kaptan as primarily dedicated to downstream steel production).

In support of its analysis of the processing level of Kaptan's scrap, Commerce cites the January 31, 2023 remand results in a separate appeal involving Korean cut-to-length steel plate. Remand Results at 18, 28, citing Final Results of Redetermination Pursuant to Court Remand (Jan. 31, 2023), CIT Ct No. 21-182, ECF No. 61-1 at 60 ("CTL Plate Remand Results"). But the Court recently remanded these results' treatment of input scrap as insufficiently supported and explained. *See Nucor Corporation v. United States*, CIT Ct No. 21-182, ECF No 81 (Aug. 21, 2023).[3] Further, the now-remanded CTL Plate Remand Results appear to be the only previous instance in which Commerce has drawn a distinction between "processed" steel scrap and other steel scrap supplied by cross-owned affiliates and used to produce downstream steel goods. Tellingly, Commerce has not identified in either this case or in the CTL Plate Remand Results any industries/products in which "unprocessed" steel scrap could be used except downstream steel production. Remand Results at 17-18, 28; *see also* CTL Plate Remand Results at 58, 60-62. Indeed, there is no obvious use for steel scrap, regardless of its processing level, except in the production of more steel through remelting. Certainly, steel scrap is not an input of "universal application," like electricity, which is directly used to produce a wide variety of items across many industries. *Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1337. The record also indicates that steel scrap—again, regardless of processing level—has the sort of direct, physical relationship with rebar that timber has with lumber, and semolina has with pasta. Kaptan's IQR

---

[3]     The Court's remand opinion in the Korean plate case has, as of the time of this filing, been issued only in confidential form. Based on the Court's request for the parties' comments regarding redaction of confidential information in the opinion, RTAC expects that the public version of the opinion, Slip Op. 23-119, will be issued on or around August 29, 2023.

BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED

at 9 and Exhibit 2 (identifying scrap as Kaptan's only input, without distinguishing between processed and unprocessed scrap); *see also Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1337; Preamble, 63 Fed. Reg. at 65,401. While Commerce asserts that unprocessed and/or byproduct scrap's relationship with rebar is more like that of plastics to automobiles and appliances, Remand Results at 17-18, it has not adequately explained or supported that view.

Moreover, in previously treating steel scrap as primarily dedicated to downstream steel production without any discussion of its processing level, Commerce has pointed to the fact that the affiliate-supplied steel scrap is used in the downstream producer's steel production process. *See, e.g.,* OCTG from Turkey IDM at 8. The record here indicates that Kaptan used Nur's scrap to produce downstream steel products, including rebar. Kaptan's IQR at 9 and Exhibit 2; [                                    ]; Remand Results at 16-17; IDM at 26. Commerce contends that, nonetheless, Nur's scrap was not "generated or otherwise prepared for downstream products." Remand Results at 17. But given that steel scrap is a byproduct of manufacturing steel-intensive articles, it is unclear how (or why) scrap could ever be "generated" for the specific purpose of feeding downstream production. There is also an unaddressed tension between Commerce's apparent finding that scrap does not form a link in the overall production chain unless specifically generated for the purpose of feeding downstream operations, and its finding that generation of scrap as a byproduct satisfies 19 C.F.R. § 351.525(b)(6)(iv)'s "production" requirement. *Compare* Remand Results at 16 *with id.* at 17; *see also OCTG from Turkey* IDM at 8 (rejecting argument that byproduct generation did not qualify as production for purposes of the cross-attribution regulation). At any rate, Kaptan did not indicate that it only used, or could only use, scrap generated intentionally for its operations or prepared in particular ways. Kaptan's IQR at 9 and Exhibit 2; [                                    ]. Instead, Nur's byproduct scrap was

apparently used as-is (with Kaptan the exclusive user), indicating that Nur's scrap was appropriate by nature for use in Kaptan's downstream steel production operations. [                    ]; Remand Results at 16-17. Neither the alleged lack of processing nor the byproduct nature of scrap support Commerce's conclusion that Nur's scrap was not primarily dedicated to downstream steel production.

Commerce also fails to cite any evidence showing that Nur's scrap was qualitatively different from the scrap provided to Kaptan by other scrap-supplying affiliates that the agency treated as cross-owned input suppliers for purposes of 19 C.F.R. § 351.525(b)(6)(iv). Specifically, Commerce treated Martas Marmara Ereglisi Liman Tesisleri A.S. ("Martas"), a seaport operator, and Aset Madencilik A.S. ("Aset"), a packer/heater of anthracite coal, as such suppliers while observing no distinctions between the scrap that they supplied to Kaptan and the scrap that Nur supplied. *See, e.g.,* Preliminary Decision Memo at 10; *see also* [

 ]. Nor is there any indication that Martas or Aset intentionally generated scrap for Kaptan's use; rather, Kaptan reported that both companies generated the scrap that they supplied to Kaptan as a byproduct of their own operations. *See* Affiliation QR at 5-6. Commerce's failure to point to record evidence distinguishing Nur's scrap from that of other scrap-supplying Kaptan affiliates that the agency treated as cross-owned input suppliers demonstrates the arbitrary nature of the distinctions that the agency has attempted to draw between purposefully-generated/processed scrap and the steel scrap that Nur supplied to Kaptan. *See, e.g., Nucor Corporation v. United States*, CIT Ct. No. 21-182, ECF No 81 (Aug. 21, 2023).

Finally, while Commerce points to certain prior cases for the proposition that it does not universally treat steel scrap as an input primarily dedicated to downstream steel production, these cases are readily distinguishable. Remand Results at 16. In its investigation into German forged

steel fluid end blocks, the agency ultimately relied on the "miniscule" volume of scrap supplied – a factor that it has disavowed here. Issues and Decision Memorandum accompanying *Forged Steel Fluid End Blocks From the Federal Republic of Germany*, 85 Fed. Reg. 80,011 (Dep't Commerce Dec. 11, 2020) (final affirm. Countervailing duty deter.) at 57-58 ("FEBs from Germany IDM"); Remand Results at 13, 25. As for the final results of the 2018 administrative review of the countervailing duty order on Korean cut-to-length plate, this court remanded the agency's treatment of scrap as not primarily dedicated to downstream steel production as inadequately explained. *Nucor Corp. v. United States*, 600 F. Supp. 3d 1225, 1234-38 (Ct Int'l Trade 2022). While Commerce has continued to treat the scrap at issue in that appeal as not primarily dedicated to downstream steel production, that treatment was recently remanded for a second time. CTL Plate Remand Results at 21-32, 55-66; Remand Results at 16; *see also Nucor Corporation v. United States*, CIT Ct No. 21-182, ECF No 81 (Aug. 21, 2023). And the agency's treatment of scrap in the 2017 review of the order on Korean cold-rolled steel reflects the same reasoning that the Court found insufficient in remanding the 2018 review regarding cut-to-length plate. *Compare* Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 85 Fed. Reg. 38,361 (Dep't Commerce June 26, 2020) (final results of countervailing duty admin. rev.; 2017) at 30-32 ("Cold-Rolled Korea 2017 IDM") *with Nucor Corp.* 600 F. Supp.3d at 1234-38. These agency precedents, accordingly, do not serve to support or explain Commerce's analysis of Nur's scrap here.

In sum, Commerce failed to adequately explain or support its conclusion that the physical nature of Nur's scrap and the circumstances of its generation were such that the scrap did not form a "link in the overall production chain" for Kaptan's downstream rebar. While Commerce determined that unprocessed, byproduct steel scrap is a "common input among a variety of

products and industries and used in a variety of production processes," Remand Results at 17-18, 28, it provided no support for this assertion. It did not identify products/industries using such scrap beyond downstream steel products. It did not adequately explain its reasons for finding the relationship between such scrap and rebar more like the relationship that plastics have with automobiles and appliances than the relationship that timber has with lumber or that semolina has with pasta. It cited no record evidence demonstrating that Kaptan used or could only use scrap that had been pre-processed or purposely generated with its downstream operations in mind. It failed to identify any qualitative distinctions between the scrap that Nur provided to Kaptan and the scrap provided by other scrap-supplying Kaptan affiliates that the agency treated as cross-owned input suppliers for subsidy attribution purposes. Commerce failed to acknowledge or confront the multiple past cases in which it found steel scrap primarily dedicated to downstream steel production without any finding as to whether that scrap was processed or not, as well as its own prior rejection of the argument that the byproduct nature of scrap is relevant to the cross-attribution analysis. RTAC respectfully submits that the Court should therefore remand Commerce's analysis of the physical nature and production of Nur's steel scrap for further consideration.

### 2.    Commerce's Evaluation of Nur's Business Activities is in Error

Commerce also found that Nur's business activities failed to support cross-attribution of subsidies. Specifically, Commerce found that Nur's "business activity is not 'dedicated almost exclusively to the production of a higher value-added product' in the manner suggested by the Preamble." Remand Results at 19; *see also id.* at 30 (noting that Nur's "production of ships" is not dedicated to a higher value-added product). Rather, Commerce found that Nur's activities as a shipbuilder are "far removed" from Kaptan's downstream steel production activities, particularly

in light of the "extremely limited transactions between the two companies." *Remand Results* at 19, 29-30.

This analysis is flawed for three reasons. First, it focuses on Nur's overall operations rather than, as the Preamble and regulation indicate, on the nature of the input and its role in Kaptan's production. Second, in support of the analysis, the agency relies on prior precedent that is distinguishable or otherwise underscores the flaws in Commerce's remand results. Third, the agency's conclusion that the transactions between Nur and Kaptan were "extremely limited" is inadequately explained and supported.

First, Commerce's analysis inappropriately focused on Nur's overall operations rather than on the nature of the input and its role in Kaptan's production. Remand Results at 19, 29-30. In explaining the "primarily dedicated" standard, the Preamble does not state that the input supplier's main business activity is a relevant factor. Preamble, 63 Fed. Reg. at 65,401. Rather, the Preamble indicates that the salient issue is whether the input is, by its nature, usable only in producing a narrow subset of goods and/or is a primary input into such goods. *Id.* Consistently with this view, both the Preamble and the regulation discuss the input supplier's "production" of the input, and whether that "production is dedicated almost exclusively to the production of a higher value added product - the type of input product that is merely a link in the overall production chain." *Id.*; *see also* 19 C.F.R. § 351.525(b)(6)(iv). While Commerce here has found that Nur's "business activity is not 'dedicated almost exclusively to the production of a higher value-added product,'" the Preamble does not use the term "business activity," but as noted above, "production," with the focus of that term being the "production" of the "input" at issue. Remand Results at 19; Preamble, 63 Fed. Reg. at 65,401. Indeed, the term "business activity" is found in neither the Preamble nor the regulation. Preamble, 63 Fed. Reg. at 65,401; 19 C.F.R. § 351.525(b)(6)(iv). Likewise, while

Commerce noted that Nur's "production of ships" is not dedicated to a higher value-added product, Remand Results at 30, the Preamble and regulations are focused on production of the "input," and whether the input feeds a higher value-added product, not on the supplier's production of other goods.

Second, to the extent that the agency argues that it has previously taken a supplier's "business activity" into account in cross-attribution analyses, the cases it cites are distinguishable, or otherwise underscore the problems with the agency's analysis here. Remand Results at 12 n.49, 28-29. In the agency's investigation into German forged steel fluid end blocks, for example, it declined to cross-attribute subsidies where cross-owned input suppliers provided a "miniscule" amount of scrap and ingots that were not used in the respondent's production. Preliminary Determination Memorandum accompanying *Forged Steel Fluid End Blocks from the Federal Republic of Germany*, 85 Fed. Reg. 31,454 (Dep't Commerce May 26, 2020) (prelim. affirmative countervailing duty deter. and alignment of final deter. With final antidumping duty deter.) at 17. While the agency stated that it considered the suppliers' "business activities," its analysis ultimately came down to the "quantities and types of materials" that the input suppliers provided. FEBs from Germany IDM at 57-58. Here, Commerce has stated that the quantity of scrap that Nur supplied is not relevant to its analysis. Remand Results at 13. And as explained above, the agency's analysis of the "type{}" of material that Nur provided is legally flawed.

With respect to the agency's investigation into glass containers, it considered the supplier's business activities solely in the context of determining whether to employ adverse inferences. Issues and Decision Memorandum accompanying *Certain Glass Containers From the People's Republic of China*, 85 Fed. Reg. 31,141 (Dep't Commerce May 22, 2020) (final affirm. countervailing duty deter.) at 68-70. Moreover, the "input" at issue was machinery and equipment,

rather than materials physically incorporated into the respondent's goods. *Id.* Here, of course, Nur provided Kaptan with scrap that was physically incorporated into Kaptan's goods. *See, e.g.,* IDM at 26. Moreover, the record indicates that there is a close physical relationship between scrap and Kaptan's downstream steel products, including rebar. Kaptan's IQR at 9 and Exhibit 2.

To the extent that Commerce relies on the final results of its 2018 administrative review of the order on Korean cut-to-length plate, the Court remanded Commerce's reliance on the supplier's "business activities" in that case as inadequately explained.  Remand Results at 28-29; *see also Nucor Corp.* 600 F. Supp.3d at 1234-38. As for Commerce's reliance on the remand results in that proceeding, those results have themselves recently been remanded. Remand Results at 28-29; *see also Nucor Corporation v. United States*, CIT Ct No. 21-182, ECF No 81 (Aug. 21, 2023). Moreover, while Commerce cited the relevant supplier's diffuse business activities in those remand results, Nur's business activities are not nearly as diffuse, as Commerce concedes. Remand Results at 29. Commerce also relied on certain other factors in the Korean proceeding that are not present here or that do not support the agency's remand results in this case. For example, Commerce relied on the fact that the supplier did not provide scrap directly to the downstream producer but through an intermediary. CTL Plate Remand Results at 28, 61. There is no intermediary here; rather, Nur sold scrap to Kaptan that Kaptan then used directly in its subject production. IDM at 26; *see also* [                                        ]. Commerce also relied in the Korean case on the supposedly "generic" (*i.e.*, unprocessed) nature of the scrap provided and the lack of evidence indicating that it was intentionally generated for the downstream producer's use. CTL Plate Remand Results at 61-62. As explained above, these factors do not support the remand results here. *See* discussion *supra* at 15-21; *see also Nucor Corporation v. United States*, CIT Ct No. 21-182, ECF No 81 (Aug. 21, 2023) (remanding the CTL Plate Remand Results' treatment of

affiliated scrap supply for further consideration). For that matter, Commerce in the Korean remand results explained why Nur/Kaptan's situation is different from the one considered there and merits a distinct result. CTL Plate Remand Results at 62-63.

Commerce argues that while it did not rely on the supplier's business activities in the investigation into Turkish oil country tubular goods, the case supports its treatment of Nur on remand in that the supplier there generated scrap through its own production of steel angles and profiles, while Nur's shipbuilding operations are "further removed" from steel production. Remand Results at 30-31. This argument, however, fails to acknowledge that Commerce has previously treated steel scrap as primarily dedicated to downstream steel production notwithstanding the fact that the affiliate generating the scrap is not a producer of any steel product (beyond scrap). *Icdas Celik Enerji Ternsane ve Ulasim Sanayi A.S. v. United States,* 498 F. Supp. 3d 1345 (Ct Int'l Trade 2021) (finding that scrap supplied to a downstream rebar producer by an affiliated electrical company was primarily dedicated to downstream steel production). Commerce's argument also fails to acknowledge that the agency here treated Martas and Aset as cross-owned input suppliers for subsidy attribution purposes, although Kaptan described them as a "seaport operator" and a provider of packing and heating services for anthracite coal. Affiliations QR at 5; Preliminary Decision Memo at 9.

Third, while Commerce found that the "extremely limited transactions" between Nur and Kaptan supported its decision not to cross-attribute subsidies, it has failed to adequately explain or support this finding. Remand Results at 19, 25. Rather than detail the basis upon which the agency concluded that the transactions were "extremely limited," it cited generally to Kaptan's comments on the draft remand results, *id.*, while simultaneously explaining that it was not the volume of scrap supplied by Nur that it found relevant. *Id.* at 25. Commerce's generalized citation does not

elucidate the agency's thinking, given that Kaptan's arguments were that (1) neither Nur nor

Kaptan's transactions with affiliates other than each other should be taken into account and (2)

Nur sold only a "miniscule" amount of scrap to Kaptan. Kaptan's Draft Comments at 8-10. In

other words, the only argument that Kaptan made about the "limited" nature of Nur's transactions

with Kaptan was grounded in the volume of steel scrap that Nur sold to Kaptan – the very thing

that Commerce says is irrelevant.

     Further, while Commerce agreed that Nur and Kaptan's transactions with affiliates other

than one another should not be taken into account, an examination of the affiliated transactions of

non-Nur affiliates underscores the arbitrary nature of Commerce's treatment of Nur. Again,

Commerce treated Martas and Aset as cross-owned input suppliers for subsidy attribution

purposes. Aset sold [                                    ] Affiliations QR at Exhibit 3, and its

[                                    ]. Kaptan's IQR at Exhibit 14 ([

                                    ]). While Martas sold [

        ], Affiliations QR at Exhibit 3, its [

      ]. Kaptan's IQR at Exhibit 11 ([

                ]). Moreover, Kaptan reported that Martas, Aset, and [

                                    ]. Affiliation QR at Exhibit 1. Regardless

of whether Kaptan or Nur's transactions with affiliates other than one another are relevant to the

Kaptan/Nur cross-attribution analysis, Commerce's treatment of Nur is inconsistent with its

treatment of similarly-situated affiliates that supplied Kaptan with scrap. Commerce's failure to

acknowledge, much less explain, this disparate treatment additionally supports a remand here.

     In conclusion, Commerce has not adequately explained or supported its analysis of Nur's

business activity. The Preamble and regulations indicate that the agency's focus should be on the

supplier's production of the input product, rather than its operations as a whole. In attempting to justify its analysis, the agency relies on precedent that it distinguishable or that only illustrates the flaws in its analysis. Finally, the agency has not adequately explained or supported its finding that Kaptan and Nur's "extremely limited" intercompany transactions justify its decision not to cross-attribute subsidies received by Nur. As such, RTAC respectfully submits that further remand is required.

## IV.   **CONCLUSION**

As explained above, Commerce has failed to appropriately explain or support its remand results. Commerce's determination regarding whether to treat Nur as Kaptan's cross-owned input supplier for subsidy attribution purposes should therefore be remanded for a second time.

Respectfully submitted:

*/s/ John R. Shane*
Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E. Thorson, Esq.

*Counsel to Rebar Trade Action Coalition*

Dated: August 23, 2023

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chambers Procedure 2(B)(1), the undersigned certifies that these comments comply with the word limitation requirement. The word count for Defendant-Intervenor Rebar Trade Action Coalition's Comments on Remand Redetermination, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 7,411 words.


<u>/s/ John R. Shane</u>
(Signature of Attorney)

<u>John R. Shane</u>
(Name of Attorney)

<u>Rebar Trade Action Coalition</u>
(Representative Of)

<u>August 23, 2023</u>
(Date)