**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

```
_____x
                                :
KAPTAN DEMIR CELIK ENDUSTRISI VE :
TICARET A.S., et al             :
                                :
        Plaintiff/Plaintiff-Intervenor, :
                                :          Court No. 21-00565
        v.                      :
                                :
UNITED STATES, et al,           :
                                :
        Defendant/Defendant-    :
        Intervenors,            :
                                :
_____x
```

## <u>PLAINTIFF KAPTAN DEMIR'S REPLY COMMENTS IN SUPPORT OF COMMERCE'S REMAND REDETERMINATION</u>

On behalf of Plaintiff Kaptan Demir Celik Endustrisi Ve Ticaret A.S. ("Kaptan"), we provide these reply comments in support of Commerce's Final Results of Redetermination Pursuant to Court Remand ("Remand") filed on July 24, 2023, and in opposition to the Remand Comments filed by Defendant-Intervenors ("RTAC") on August 23, 2023 ("RTAC Cmts."). As outlined below, Commerce's Remand complies with the Court's instructions to further explain and review Commerce's finding that Nur was a cross-owned input supplier for the purposes of subsidy attribution and, in doing so, address the "fact-specific circumstances in this segment of the investigation." Slip Op. 23-62 at 15. Commerce's Remand not only complies with the Court's instructions but also presents a reasonable interpretation of 19 C.F.R. § 351.525 that is consistent with the *Preamble*[1] and supported by substantial evidence.

## I.     COMMERCE'S NEW DETERMINATION

In its Remand, Commerce goes through several important steps in presenting its reasoned

---

[1] *Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348 (Nov. 25, 1998) ("*Preamble*").

position that Nur's scrap is not "primarily dedicated" to Kaptan's rebar production.  First,

Commerce presented a clear set of criteria it evaluated for this determination. This included:

- Whether an input supplier produced the input;

- Whether the input could be used in the production of downstream products including subject merchandise, regardless of whether the input is actually used for the production of the subject merchandise;

- Whether the input is merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described in the *Preamble*, or whether the input is a common input among a wide variety of products and industries and it is not the type of input that is merely a link in the overall production chain, as plastic is to automobiles;

- Whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain; and

- Examining a company's business activities to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products."

Remand at 12-13.  These criteria, or this framework, matches the concerns and examples outlined

the *Preamble*, many of which were raised by Kaptan both before this Court[2] and in its Draft

Remand Comments. *See generally* Draft Remand Comments (discussing the relevance of the

nature of the input and the input production and the business activities of Nur).  These criteria were

not expressly outlined in Commerce's original determination, and, in fact, Commerce had not

previously assessed Nur's business activities or the nature of scrap in this specific context at all.

Commerce recognized is error:

> In its comments on the Draft Remand, Kaptan Demir raised certain case-specific facts that Commerce should analyze in determining whether Nur's steel scrap is primarily dedicated to Kaptan Demir's downstream

---

[2] *See* Kaptan's 56.2 Brief (ECF#32), Reply Brief (ECF#44), Response to Court Questions (ECF#57) and Post-Argument Submission (ECF#61), outlining these exact same criteria and focusing on the nature of the input and business activities of the input supplier.

> production. These factors include the business activities of the input
> supplier (*i.e.*, Nur) and whether Nur's relationship with Kaptan Demir
> constitutes a vertically integrated supply chain based on the extremely
> limited nature of the transactions between Nur and Kaptan Demir during
> the POR.[58] Upon consideration of Kaptan Demir's arguments, and further
> consideration of the facts on the record of this proceeding, we find that the
> facts on the record do not support a finding that the steel scrap generated
> by Nur is primarily dedicated to Kaptan Demir's downstream production.

Remand at 15.  Indeed, Commerce's previous determination was essentially limited to the fact that

Nur sold all its scrap to Kaptan and that Kaptan used it to produce subject merchandise.  Slip Op.

23-62 at 14 ("it merely repeats its position that if scrap has been generated in any form, and if that

scrap has been sold by a cross-owned entity, and subsequently used in the production of

downstream products, it is primarily dedicated.").  As Kaptan argued, and the Court agreed, such a

limited analysis was inconsistent with the regulation and *Preamble*, as well as other cases.  *See id.*

(noting that "it is 'well-established that an agency action is arbitrary when the agency offer[s]

insufficient reasons for treating similar situations differently.' *SKF USA Inc. v. United States*, 263

F.3d 1369, 1382 (Fed. Cir. 2001).").  A much more case-specific and fact intensive analysis was

needed.  And this is exactly what occurred.

        In this Remand, armed with this clear set of criteria, Commerce marches through the facts

of the case and fits them into each factor.  Remand at 16-19. Commerce then goes on to reconcile,

and if needed, distinguishes its findings on the specific facts of this case with other Commerce

decisions.  Commerce first explains that:

> As demonstrated in the various steel proceedings that Commerce
> administers, Commerce does not have a rule that steel scrap is always
> primarily dedicated to the production of steel in the manner of semolina to
> pasta or stumpage to lumber. Neither Commerce's regulations nor the
> *Preamble* states that scrap is always primarily dedicated to the production
> of downstream product. Thus, Commerce makes a determination
> regarding steel scrap as an input on a case-by-case, fact-specific basis.
> Commerce has never made a finding that steel scrap is always primarily
> dedicated to the production of steel. This is evident by not only this case,
> but *Cold-Rolled Steel from Korea*, *FEBs from Germany*, *CTL Plate from
> Korea*, and Commerce's Final Results of Redetermination Pursuant to
> Court Remand (*Nucor Remand*) in *Nucor Corporation v. United States*,
> Court No. 21-00182, Slip Op. 22-116 (CIT October 5, 2022) issued on

January 31, 2023, in which Commerce did not treat steel scrap as a
primarily dedicated input.

*Id*. at 15-16.  Then, later in the decision addressing the parties' comments, Commerce spends five

pages going through previous decisions in more detail and comparing them to this case and

addressing the parties arguments.  *Id*. at 27-31.  Commerce concludes:

> according to the facts present on the record of this proceeding, we find
> that: (1) Nur produced the steel scrap; (2) the steel scrap Nur produced
> could be, and was, used in the production of downstream steel products
> including subject merchandise; (3) Kaptan Demir was the primary, and
> exclusive, user of the inputs produced by Nur; (4) the steel scrap provided
> by Nur is not merely a link in the overall production chain, but is, instead,
> a common input that is used in a wide variety of products and industries;
> and (5) Nur's primary business activity in shipbuilding does not indicate
> that Nur's production is "dedicated almost exclusively to the production of
> a higher value-added product" in the manner suggested by the Preamble
> such that any subsidy provided to the company would "benefit the
> production of both the input and downstream products." Based on our
> analysis of all these factors, we find that the steel scrap Nur provided to
> Kaptan Demir is not primarily dedicated to Kaptan Demir's production of
> downstream steel product, including rebar.

*Id.* at 32.  And even more concisely – "Simply put, the facts on the record do not support the

premise that subsidies given to a shipbuilder would be given to 'benefit the production of both the

input and downstream products.'"  Remand at 19.

## II.    THE COURT SHOULD SUSTAIN COMMERCE'S REMAND REDETERMNATION AND REJECT RTAC'S ARGUMENTS

### A.    COMMERCE PRESENTED A CLEAR AND REASONABLE ANALYSIS OF THE NATURE OF THE SCRAP AND SCRAP PRODUCTION IN THIS CASE

In their Remand Comments, RTAC presents several arguments why they believe that

Commerce's Remand is "flawed."  RTAC first focuses on the nature of scrap, going through

several cases where Commerce previously found that scrap generation was primarily dedicated to

the production of subject merchandise.  RTAC Cmt. at 12-14.  RTAC then goes on to basically

argue that these cases show that scrap is *always* primarily dedicated to "steel production" arguing

that "steel scrap—again, regardless of processing level—has the sort of direct, physical relationship

with rebar that timber has with lumber, and semolina has with pasta." *Id*. at 14.  This simplicity –

that because steel scrap is used for steel products it is "merely a link in production"– was rightly

rejected by both Commerce in its remand (and by this Court).  The examples in the *Preamble*

discount this simplified approach, as agreed upon in the Remand.  Remand at 9-10, 15-16, 24-25.

Semolina is virtually only used in pasta, a distinct, singular end product, and lumber, also a distinct,

singular end product, can only be made from timber.  In contrast, while scrap is used for "steel

products", the term "steel products" represents a countless number of singular end products, not

just rebar.  Moreover, rebar itself is not always made from scrap (lumber, in contrast, is always

made from timber).  It is made from billet which can be made from either melted scrap steel or first

time steel.  Thus, on the spectrum of inputs, scrap is closer to an input of general use, like plastic,

than it is to less widely used inputs like semolina or lumber.  Just like plastic sometimes can and

sometimes cannot be a primarily dedicated input based on the totality of the circumstances, a

similar totality of the circumstances analysis is necessary here to evaluate the scrap in this case.

RTAC goes on to complain about Commerce's discussion of processed versus unprocessed

and a more dedicated generation of scrap.  RTAC Cmt. at 15-16.  These comments go directly to

the nature of scrap as a by-product.  Given this nature, as required by the *Preamble*, Commerce

must determine whether the scrap is "merely a link" in the downstream production.  The word

"merely" is critical in this requirement and necessitates the totality of circumstances approach

Commerce espouses.  It is not, as RTAC seems to argue, that the input is just a link.  If simply

being a link in the production chain were sufficient, every input would be "primarily dedicated."

But the *Preamble* is clear with the plastics example that something more is required – hence

Commerce's interpretation to look at both the nature of the input and the nature of the input

production.  In some instances, this additional fact can be further processing of scrap (e.g., slitting,

cutting, etc) and in other instances this could be a more dedicated production (e.g., producing other

comparable level steel products like angles, bar, etc.)  Commerce explained:

> Where we examined the by-product nature of steel scrap, we have done so
> in the context of determining whether steel scrap is merely a link in the

overall production chain. For example, in *CTL Plate from Korea* and the *Nucor Remand*, we considered a range of case-specific factors, including an analysis of the by-product nature of the steel scrap as it relates to an input supplier's overall production process, the fact it was sold through an intermediary, the scope of business of the steel scrap input supplier, and the nature of other services provided by the input supplier in determining whether the materials and inputs provided were primarily dedicated to downstream production.[117] Based on the totality of the circumstances, we then determined that the steel scrap was not primarily dedicated to downstream products. In this proceeding, we continue to find that the by-product nature of an input, by itself, is not evidence that a product is not primarily dedicated to the production of downstream products. Instead, whether an input is a by-product must be considered in relation to the business activity of the input supplier and the nature of the input in question as that input relates to the downstream producer's production process.

Remand at 31.  Commerce then distinguished *OCTG from Turkey*, which RTAC relies on in its

comments:

a closer analysis of the primary business activity of the input supplier in *OCTG from Turkey*, wherein we found that an input supplier provided steel scrap to the mandatory respondent to produce intermediate products, also shows the significance of a company's business activity as it relates to our primarily dedicated analysis. While we did not reference primary business activity in our decision from *OCTG from Turkey*, we find it significant for the purposes of the arguments raised by the parties to this proceeding that the primary business activity of the input supplier at issue in that case, Tosyali Demir, involved the production of steel angles and profiles.[115] While we found the steel scrap in *OCTG from Turkey* to be primarily dedicated to downstream production, our finding in *OCTG from Turkey* does not necessitate that we likewise must find the steel scrap generated by Nur, which Nur produced as a part of a much further removed production process in shipbuilding, is primarily dedicated to Kaptan Demir's downstream production. Likewise, as explained above, while it is true that Nur's production of steel scrap is exclusively provided to Kaptan Demir, as was the case in *OCTG from Turkey*, this alone does not support a finding that Nur's provision of steel scrap is primarily dedicated to Kaptan Demir's downstream production given other facts on the record.

*Id*. 30-31.  Thus, what RTAC's arguments overall fail to take into consideration is that

Commerce's decision is based on a totality of circumstances approach. Commerce's decision did

not turn solely on the fact that the scrap was or was not processed; nor did it find that unprocessed

scrap can never be a primarily dedicated input.  Instead, Commerce reasonably used that fact as

one of the factors in its decision.  Put another way, Commerce weighed the evidence on the record

in this case, outlined the factors it reviewed, liking them to the *Preamble*, compared its analysis to

decisions in other cases, and came to a reasonable conclusion that the segment specific facts in this

case do not support a finding that Nur is a cross-owned input supplier under the regulations.  This

is precisely what the Court asked Commerce to do.

Finally, RTAC argues that Commerce's failure to distinguish its decision on Nur from its

treatment of Kaptan's other scrap suppliers, Martas Marmara Ereglisi Liman Tesisleri A.S.

("Martas"), a seaport operator, and Aset Madencilik A.S. ("Aset") renders Commerce's decision

arbitrary.  RTAC Cmt. at 16.  We agree that the facts for Martas and Aset are roughly equivalent to

Nur and that these companies likely should not be considered cross-owned input suppliers.

However, at no point, either in the challenged review, at court, or in the remand proceeding, did

Kaptan challenge Commerce's determination as to these two affiliates.  The reason there was no

challenge, and hence no discussion by Commerce, was because neither of these companies had

subsidies attributable to Kaptan and, thus, the treatment of these companies as cross-owned input

suppliers was, and remains, irrelevant for all practical purposes.

### 2. IT IS REASONABLE, AND NECESSARY, TO CONSIDER THE BUSINESS ACTIVITIES OF THE INPUT SUPPLIER IN THE PRIMARILY DEDICATED ANALYSIS

In addition to disagreeing with Commerce on its analysis of the nature of scrap, RTAC also

argues that the overall business activity of the input supplier is irrelevant to Commerce's analysis

and that, even if it was relevant, Commerce's analysis was wrong.  RTAC Cmt. at 19.  The Court

should reject RTAC's complaints.

First, in its Remand, Commerce evaluated the business activities of Nur to help determine

whether Nur's production of scrap is primarily dedicated to the production of Kaptan's rebar.  As

Commerce noted, "neither the Preamble nor the statute and regulations offer an explicit definition

of "primarily dedicated"; the determination may, therefore, be reasonably made based on the facts

of each proceeding." Remand at 10.  To assess this term, Commerce outlined its criteria, taking

significant cues from the *Preamble* and the purpose of this regulation. Commerce's interpretation of "primarily dedicated" need not be "the only one it permissibly could have adopted" in order for Commerce's determination to be reasonable." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 843 (1984)

Commerce's interpretation, based on the *Preamble*, that the business activities of the input supplier are a relevant factor in the preliminary dedicated analysis is reasonable.  Commerce explained:

> primarily dedicated" normally involves an analysis of both the input
> supplier's entire production (*i.e.*, the nature of the supplier's operations)
> and input production itself and its relationship to downstream products
> (*i.e.*, nature of the input). These concepts are reflected in the discussed
> factors in our analysis relating to whether a product is "merely a link in the
> overall production chain" and an input supplier's business activities.

Remand at 18.  That is, Commerce reasonably concluded that one of the ways in which to interpret the purpose of the input production and its status in the supply chain is to look at the input supplier's business activities.  In some instances, the business activities will be a minor factor while in others it will be more important.  Commerce explained: "As we explained in *Glass Containers from China*, an input supplier's broad business scope can serve as evidence that the input supplier's production is not "dedicated almost exclusively to the production of a higher value-added product." Remand at 29.  In this case, the business activities of Nur were important because Commerce reasonably concluded that the "input Nur provided, steel scrap, is not the type of input product that is merely a link in the overall production chain contemplated in the Preamble barring other intervening factual circumstances.'" Remand at 17.  Nur's business is one of those intervening circumstances that needed to be reviewed.  Nur's business activities were especially relevant in this case because they are directly linked to scrap generation.  In other words, unlike other types of inputs that are generated on their own and separate from the company's other business activities, the generation of scrap is inextricably intertwined with Nur's main business activities.  This is not a separate line of business; there would be no scrap unless Nur built ships because scrap is a by-

product of that process.  Thus, the business activities in this specific factual scenario are highly

relevant to whether Nur's production is primarily dedicated almost exclusively to Kaptan's

production.

RTAC further took issue with Commerce discussion regarding the level of integration

between Nur and Kaptan.  RTAC Cmt. At 29-30.  In its Remand, Commerce explained:

> In the Draft Remand, we argued that these cases were distinguishable from
> the facts of this proceeding because Nur is not involved in a broad range of
> activities unrelated to steelmaking; however, we now find, upon further
> consideration, that this was an overly narrow interpretation of how we
> review a company's business activity in our primarily dedicated analysis.
> While a broad scope of business activities can constitute evidence of an
> input  supplier's production process not being dedicated almost exclusively
> to the production of downstream product, this is not the only aspect of a
> company's business activity that Commerce considers as a part of this
> analysis. As Kaptan Demir points out, and we explained in setting forth the
> factors we were considering, the primary focus of this analysis is on whether
> an input supplier's production is "dedicated almost exclusively to the
> production of a higher value-added product" in the manner suggested by the
> *Preamble* such that the purpose of any subsidy provided to the company
> would "benefit the production of both the input and downstream products."
> Upon further consideration, the facts on the record indicate that Nur's
> production of ships is sufficiently removed from Kaptan Demir's production
> of downstream products, including rebar, such that it cannot be considered
> "dedicated almost exclusively to the production of a higher value-added
> product."

Remand at 29-30.  Despite this explanation, RTAC focuses on Commerce's discussion of the lack

of vertical integration and "extremely limited transactions".  RTAC complains:

> Commerce's generalized citation does not elucidate the agency's thinking,
> given that Kaptan's arguments were that (1) neither Nur nor Kaptan's
> transactions with affiliates other than each other should be taken into
> account and (2) Nur sold only a "miniscule" amount of scrap to Kaptan.
> Kaptan's Draft Comments at 8-10. In other words, the only argument that
> Kaptan made about the "limited" nature of Nur's transactions with Kaptan
> was grounded in the volume of steel scrap that Nur sold to Kaptan – the
> very thing that Commerce says is irrelevant.

RTAC Cmts. at 22.  We disagree; RTAC seems to forget what actually occurred in this remand

proceeding.

In the Draft Redetermination, Commerce focused on the amount of transactions between Nur and Kaptan, not just scrap sales.  Draft Remand at 16, citing to Kaptan's financial statements. Commerce explained in that draft determination that Nur's financials did not show what exactly the transactions were but that the large amount of transactions showed that the companies were highly integrated.  *Id*.  In its comments on the Draft Remand, Kaptan pointed out a significant factual error in this analysis – the very next page of the financial detailed the exact nature of the transactions.  Kaptan explained:

> This shows that a vast majority of the transactions are service and financial related, with no purchases of goods from any other affiliates and only a small sale of goods to an affiliate. The provision of services generally do not rise to the level an "input supplier" under the cross ownership regulations (leasing and financing definitely do not) and thus these affiliated transactions do not support a vertically integrated production process between Nur and other member companies of the Cebi Family. Indeed, it shows the opposite; all the services are financial, leasing or port services and unrelated to production altogether. These affiliated transactions only show a small amount . . . of commercial goods. This matches the exact amount Kaptan reported for its purchases of scrap from Nur. *See* Kaptan Affiliation Response at Exhibit 2. Thus, the reference to the affiliated transactions section of Nur's tax return (financial statement) in fact shows an extremely limited amount of commercial good transactions between the affiliates, all of which are accounted for by this minuscule amount of scrap sold to Kaptan.

Kaptan Draft Remand Comments at 10.  Then, in response to this argument, Commerce correctly changed its position in its Remand:

> In its comments on the Draft Remand, Kaptan Demir raised certain case-specific facts that Commerce should analyze in determining whether Nur's steel scrap is primarily dedicated to Kaptan Demir's downstream production. These factors include the business activities of the input supplier (*i.e.*, Nur), whether Nur's relationship with Kaptan Demir constitutes a vertically integrated supply chain, and the extremely limited nature of the transactions between Nur and Kaptan Demir during the POR.[105] It is important to note that the significance of the limited nature of these transactions is not based upon volume, as Kaptan Demir argues, but instead, an analysis of the totality of the facts contained within the transactions between Nur and Kaptan Demir. Upon consideration of Kaptan Demir's arguments, we find that facts on the record do not support a finding that the steel scrap generated by Nur is primarily dedicated to Kaptan Demir's downstream production.

Remand at 25.  While RTAC protests that Commerce created the very "miniscule" standard it disavowed, like with RTAC's argument regarding scrap described above, this argument is too simplified.  The reality is that Commerce explained clearly that it is not setting such a standard but instead it is one factor in its analysis.  The difference between a factor to consider and a hard-lined standard is significant.  This approach reasonably permits Commerce to have flexibility to apply its primarily dedicated criteria to a variety of different fact patterns in a consistent manner.  In some instances, the nature of the input supplier combined with a miniscule amount of transactions will nevertheless result in a primarily dedicated finding.  In others, like here, where the nature of the activities is highly disengaged from the production of subject merchandise and the input sales very low, the limited number of transactions is just one factor that tips the scale in the favor of no cross-ownership.

## III.     CONCLUSION

Taken all together, Commerce reasonably and completely followed the Court's remand instructions in this case.  Commerce's Remand is significantly more elucidated than its original determination.  The Remand clearly outlines the criteria considered, all of which are reasonable interpretations of the statute and Commerce's regulations.  And, equally as important, this analysis considers the ultimate purpose of the primarily dedicated analysis; that is, whether subsidies given to a shipbuilder would be given to "benefit the production of both the input {scrap} and downstream products {rebar}."  Substantial evidence reveals – clearly not.  For these reasons, the Court should sustain Commerce's remand results.

Finally, in its decision, the Court stated that "The court does not reach the other arguments raised by the parties as the arguments are contingent on the court upholding Commerce's finding that Nur was a cross-owned input supplier." Slip Op. 23-62 at n. 4.  This statement remains accurate and if the Remand is sustained there are no longer any issues outstanding in this case before the Court.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Andrew T. Schutz

1201 New York Ave., NW
Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Kaptan Demir*

Dated: September 22, 2023

12

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies that this brief complies with the word limitation requirement provided in the Standard Chambers Procedures . The word count for Plaintiff's Remand Comments, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2013, is 4,115 words, less than the 10,000 word limit.


/s/ Andrew T. Schutz
Andrew T. Schutz

Counsel for Plaintiff Kaptan Demir Celik Endustrisi ve
Ticaret A.S.

Dated: September 22, 2023