# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |  |
|---|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., | ) | |
| Plaintiff, | ) | |
| and | ) | |
| COLAKOGLU DIS TICARET A.S., *et al.,* | ) | |
| Plaintiffs-Intervenors, | ) | |
| v. | ) | Court No. 21-00565 |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| REBAR TRADE ACTION COALITION, *et al.*, | ) | |
| Defendant-Intervenor. | ) | |

## DEFENDANT'S RESPONSE TO COMMENTS ON REMAND RESULTS

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. MCCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:
W. MITCH PURDY
Attorney
U.S. Department of Commerce
Justice Office of the Chief Counsel for Trade
    Enforcement and Compliance
Branch 1401 Constitution Avenue, NW
Washington, DC  20230
Tel: (240) 482-5214
Email: william.purdy@trade.gov

Sosun Bae
Senior Trial Counsel
U.S. Department of
Civil Division
Commercial Litigation
PO Box 480
Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-7568
Fax: (202) 305-2062
Email: Sosun.Bae@usdoj.gov

September 22, 2023

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE**

FACTUAL AND PROCEDURAL BACKGROUND ................................................................ 2

SUMMARY OF THE ARGUMENT ...................................................................................... 4

ARGUMENT ......................................................................................................................... 5

    I.      Standard Of Review ................................................................................................ 5

    II.     Commerce's Determination That Nur's Provision Of Steel Scrap To Kaptan
           Does Not Constitute The Provision Of An Input Primarily Dedicated To
           Kaptan's Downstream Steel Production Is Supported By Substantial Evidence .. 6

         A.     Relevant Legal Framework ...................................................................... 7

         B.     Commerce Reasonably Determined, Based On The Facts Of This
              Proceeding, That Nur's Production Of Scrap Is Not Primarily Dedicated
              To Kaptan's Production Of The Downstream Product ............................. 9

CONCLUSION ....................................................................................................................16

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ...................................................................................7

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ...................................................................................6

*DynaEnergetics U.S., Inc. v. United States*,
   298 F. Supp. 3d 1363 (Ct. Int'l Trade 2018)..............................................6

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) ................................................................5, 7

*JBF RAK LLC v. United States*,
   790 F.3d. 1358 (Fed. Cir. 2015) ................................................................7

*PAM, S.p.A. v. United States*,
   582 F.3d 1336 (Fed. Cir. 2009)..................................................................5

*Timken Co. v. United States*,
   354 F.3d 1334 (Fed. Cir. 2004)..................................................................7

*U.S. Steel Grp. V. United States*,
   96 F.3d. 1352 (Fed. Cir. 1996)..................................................................7

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009) ................................................................................5, 7

*Viet I–Mei Frozen Foods Co., Ltd. v. United States*,
   839 F.3d 1099 (Fed. Cir. 2016)..................................................................6

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*,
   968 F. Supp. 2d 1255 (Ct. Int'l Trade 2014)..............................................6

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)................................................................................5
19 U.S.C. § 1671(a)(1)......................................................................................8
19 U.S.C. § 1677(5)(E) .....................................................................................8

## REGULATIONS

19 C.F.R. § 351.525(a) ................................................................................................8, 11

19 C.F.R. § 351.525(b)(6)(iv) ........................................................................................2, 8

## ADMINISTRATIVE DETERMINATION

*Countervailing Duties,*
   63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998) ............................................passim

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea,*
   85 Fed. Reg. 38,361 (Dep't of Commerce June 26, 2020) ....................................................13

*Forged Steel Fluid End Blocks From the Federal Republic of Germany,*
   85 Fed. Reg. 80,011 (Dep't of Commerce Dec. 11, 2020) ....................................................13

*Cut-to-Length Plate From the Republic of Korea,*
   86 Fed. Reg. 15,184 (Dep't of Commerce March 22, 2021) .................................................13

*Steel Concrete Reinforcing Bar from the Republic of Turkey,*
   86 Fed. Reg. 53,279 (Dep't of Commerce Sept. 27, 2021) .....................................................2

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | | |
|---|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., | ) ) ) | |
| Plaintiff, | ) ) | |
| and | ) ) | |
| COLAKOGLU DIS TICARET A.S., *et al.,* | ) ) | |
| Plaintiffs-Intervenors, | ) ) | |
| v. | ) ) | Court No. 21-00565 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| REBAR TRADE ACTION COALITION, *et al.*, | ) ) ) | |
| Defendant-Intervenor. | ) ) ) | |

## DEFENDANT'S RESPONSE TO COMMENTS ON REMAND RESULTS

Defendant, the United States, respectfully submits this response to the comments filed by defendant-intervenor Rebar Trade Action Coalition (RTAC), *see* RTAC Remand Results Cmts. (ECF No. 68)), regarding the Department of Commerce's (Commerce) final remand redetermination. *See Final Results of Redetermination Pursuant to Court Remand Order*, dated July 24, 2023 (Remand Results) (ECF No. 66). Commerce issued the remand results pursuant to this Court's opinion and remand order in *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, Consol. Ct, No. 21-00565, Slip Op. 23-62 (April 26, 2023) (Remand Order).

Because Commerce has fully complied with the Court's remand order and because the remand results are supported by substantial evidence and in accordance with law, the Court should sustain the remand results and enter final judgment in favor of the United States.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 27, 2021, Commerce published the final results of its administrative review covering steel concrete reinforcing bar (steel rebar) from Turkey. *See Steel Concrete Reinforcing Bar from the Republic of Turkey*, 86 Fed. Reg. 53,279 (Dep't of Commerce Sept. 27, 2021) (P.R. 288) [1], and accompanying Issues and Decision Memorandum (IDM) (final results). In its final results, Commerce found that respondent Kaptan Demir Celik Endustrisi ve Ticaret A.S.'s (Kaptan) affiliate, Nur Gemicilik ve Tic. A.S. (Nur), was a cross-owned input supplier within the meaning of 19 C.F.R. § 351.525(b)(6)(iv). *See* IDM at 25-27. In doing so, Commerce stated that, in previous segments of the same proceeding, it had considered scrap to be an input primarily dedicated to the production of the downstream steel production, regardless of the amount of scrap purchased from the cross-owned company. *Id.* at 25-26. It also explained that the nature of Nur's primary business activity should not be a relevant factor, and found that there was no question that one of Nur's byproducts (in producing ships, which is its primary business activity) is steel scrap, that Nur sold the scrap to Kaptan during the period of review, and that Kaptan used that scrap in manufacturing subject merchandise. *Id.* at 26.

In its remand order, the Court ordered Commerce to further explain and reconsider its determination that Nur was a cross-owned input supplier of inputs primarily dedicated to the production of downstream products. *See* Remand Order at 16. The Court held that Commerce

---

[1] Citations to the public documents (P.R.) and confidential documents (C.R.) refer to the record of the underlying administrative review. Citations to public remand documents (P.R.R.) and confidential remand documents (C.R.R.) refer to the record of the remand proceeding.

had not adequately explained the cross-owned input supplier issue, and that Commerce needed to provide additional explanation as to why the input in question (steel scrap) was primarily dedicated to production of downstream steel products. *Id.* at 13. The Court also held that Commerce had not adequately explained certain inconsistencies with its reasoning in other administrative determinations, and had failed to adequately address the fact-specific circumstances of this administrative review. *Id.* at 13-15.

Commerce issued draft remand results on June 26, 2023. *See* Draft Results of Redetermination Pursuant to Ct. Remand, ("Draft Remand") (C.R.R. 1, P.R.R. 1). In the draft remand, Commerce continued to find that Nur's scrap was primarily dedicated to Kaptan's downstream production. Commerce based its decision on multiple considerations: (1) Nur had produced the steel scrap; (2) the steel scrap Nur produced could be, and was, used in the production of downstream steel products, including subject merchandise; (3) the steel scrap was supplied as part of a vertically integrated production chain that fed into downstream steel production, and thus, the steel scrap was merely a link in the overall production chain of the downstream steel producer, Kaptan; and (4) Kaptan was the primary (and exclusive) user of the inputs produced by Nur, and the steel scrap produced by Nur was dedicated exclusively to Kaptan's downstream steel production. *See* Draft Remand at 18. Based on these factors, Commerce found that the steel scrap Nur provided to Kaptan was primarily dedicated to Kaptan's downstream production of steel product, including rebar. *Id.* at 18-19. Both Kaptan and RTAC filed comments on the draft remand. *See* RTAC Comments on Draft Results of Redetermination (RTAC Draft Remand Comments) (C.R.R. 5, P.R.R. 5); Kaptan Comments on Draft Remand (Kaptan Draft Remand Comments) (C.R.R. 6, P.R.R. 6).

After reviewing the parties' comments and further analyzing the record, Commerce reversed its findings for its final remand redetermination. In doing so, it continued to find that: (1) Nur produced the steel scrap; (2) the steel scrap Nur produced could be, and was, used in the production of downstream steel products including subject merchandise; and (3) Kaptan was the primary, and exclusive, user of the inputs produced by Nur. Remand Results at 14-19. However, Commerce determined, based on the record, that: (1) the steel scrap provided by Nur *was not* merely a link in the overall production chain, but, instead, a common input that is used in a wide variety of products and industries; and (2) Nur's primary business activity in shipbuilding did not indicate that its production was "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *CVD Preamble* such that any subsidy provided to the company would "benefit the production of both the input and downstream products." *Id.* (quoting *Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998) (*Preamble*). Commerce, accordingly, concluded that the steel scrap Nur provided to Kaptan was not primarily dedicated to Kaptan's downstream steel product, including rebar.

## SUMMARY OF THE ARGUMENT

Commerce's remand redetermination is supported by substantial evidence and in accordance with law. Commerce thoroughly explained its determination that Nur is not a cross-owned input supplier, finding in particular that the inputs Nur provided to Kaptan were not "primarily dedicated to production of the downstream product." Neither the statute nor the regulations defines the meaning of "primarily dedicated." Thus, Commerce appropriately looked to its regulations, the *Preamble*, and past determinations in revisiting its "primarily dedicated" analysis. Examining these sources, Commerce explained that, similar to plastic, the scrap Nur

produced and provided to Kaptan is a common input among a variety of products and industries, rather than merely a link in the overall production chain. While certain factors may have supported a determination that Nur is a cross-owned input supplier, Commerce reasonably found, based on the record evidence and relevant factors, that Nur's provision of scrap is not primarily dedicated to the production of downstream product.

RTAC's attempts to undermine Commerce's explanations fall short. Commerce has repeatedly emphasized that the primarily dedicated analysis is record-specific; thus, RTAC's reliance on unique facts from earlier determinations in urging Commerce to apply a blanket rule regarding steel scrap as an input must fail. Indeed, this Court emphasized the need for Commerce to look at the facts of this particular record that Commerce's reliance on determinations in prior segments is misplaced. *See* Remand Order at 13, 15.

## ARGUMENT

## I.     Standard Of Review

In reviewing Commerce's final results of an administrative review of a countervailing duty order, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). Furthermore, "{t}he specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" amounts to "more than a mere scintilla" of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). The requisite proof may be "less than

the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent {Commerce's} finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted). This standard applies equally to remand redeterminations. *DynaEnergetics U.S., Inc. v. United States*, 298 F. Supp. 3d 1363, 1367 (Ct. Int'l Trade 2018). Remand redeterminations are also reviewed for compliance with the Court's order. *See Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014).

## II. Commerce's Determination That Nur's Provision Of Steel Scrap To Kaptan Does Not Constitute The Provision Of An Input Primarily Dedicated To Kaptan's Downstream Steel Production Is Supported By Substantial Evidence

RTAC fails to demonstrate that Commerce's determination that Nur is not a cross-owned input supplier of product primarily dedicated to the production of Kaptan's downstream product is unsupported by record evidence or violates any law. As stated above, when examining whether an input is primarily dedicated to the production of the downstream product, Commerce conducts a holistic, fact-specific analysis. *See* Remand Order at 15, Remand Results at 15. Because the companies, production processes, inputs, subject merchandise, and other factual considerations involved in each proceeding can vary drastically, applying a blanket rule (as RTAC at least implicitly suggests) to specific inputs would be inappropriate, inconsistent with the statute and regulations, and contrary to Commerce's stated practice. RTAC relies on certain isolated facts in arguing against Commerce's finding, but fails to consider the entirety of the record evidence and the various factors Commerce considers, even while arguing that Commerce's conclusion is not supported by substantial evidence.[2] Furthermore, while RTAC

---

[2] To the extent that RTAC's arguments can be construed as an invitation to reweigh Commerce's consideration of the factors, the Court should decline to do so, as Commerce's determination is still supported by substantial record evidence. *See Viet I–Mei*, 839 F.3d at 1106.

points to other determinations in which Commerce found production of steel scrap to be primarily dedicated, Commerce's determination in *this* remand that Nur is not a cross-owned input supplier was based on the facts specific to *this* proceeding and was fully explained and supported by substantial evidence.

### A.      <u>Relevant Legal Framework</u>

If a "statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). In such cases, "{a}ny reasonable construction of the statute is a permissible construction," *see Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *See United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009). Commerce's interpretation of the statute need not be "the only one it permissibly could have adopted" for its determination to be reasonable. *See Chevron*, 467 U.S. at 843.

Additionally, Commerce is afforded great deference "when a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests.'" *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. V. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)). In that circumstance, "Commerce 'may perform its duties in the way it believes most suitable.'" *Id.* Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and apply methodologies to implement the dictates of the trade statute. *See Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996).

Here, the relevant statute instructs Commerce to calculate countervailing duties based upon the net countervailable subsidy provided "directly or indirectly" with respect to "the manufacture, production, or export of a class or kind of merchandise imported { } into the United States{.}" 19 U.S.C. § 1671(a)(1). The statute provides guidance for measuring any benefit conferred by such a subsidy, 19 U.S.C. § 1677(5)(E), but does not specify how Commerce is to calculate the *ad valorem* subsidy rate.

Commerce has filled this statutory gap with regulations governing the attribution of subsidy benefits. Under those regulations, Commerce will "divid{e} the amount of the benefit allocated to the period of investigation or review by the sales value {} of products to which {Commerce} attributes the subsidy under paragraph (b)." 19 C.F.R. § 351.525(a). Paragraph (b) identifies a number of attribution scenarios. Relevant to this investigation, the regulations provide that:

> If there is {cross-ownership} between an input supplier and a downstream producer, and *production of the input product is primarily dedicated to production of the downstream product*, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations.

19 C.F.R. § 351.525(b)(6)(iv) (emphasis added).

In reviewing a cross-owned company to determine if that company constitutes a cross-owned input supplier pursuant 19 C.F.R. 351.525(b)(6)(iv), there are no delineated statutory or regulatory criteria that Commerce must consider. However, the preamble to Commerce's countervailing duty regulations provides context for Commerce's input supplier attribution analysis, stating that, "where the input and downstream production takes place in separately incorporated companies with cross-ownership . . . and the production of the input product is primarily dedicated to the production of the downstream product," Commerce must attribute the

subsidies received by the input producer to the combined sales of the input and downstream products. *Preamble*, 63 Fed. Reg. at 65,401. Because the nature of inputs and downstream products, as well as production processes and other relevant facts, varies among cases, Commerce's determination of whether the production of the input product is primarily dedicated to the production of a downstream product will be based on the specific factual circumstances of the proceeding in question. *See* Remand Results at 13.

**B.      Commerce Reasonably Determined, Based On The Facts Of This Proceeding, That Nur's Production Of Scrap Is Not Primarily Dedicated To Kaptan's Production Of The Downstream Product**

Commerce examined its regulations, the *Preamble*, and past determinations in reconsidering its primarily dedicated analysis; this comprehensive examination resulted in a list of non-exhaustive factors it would consider, in conjunction with the underlying record, in analyzing whether Nur provided inputs primarily dedicated to the production of downstream product. Commerce's process, analysis, and ensuing conclusion was thoroughly reasoned, consistent with the aforementioned sources, and supported by the record evidence. RTAC fails to demonstrate otherwise.

Commerce developed its regulations for a specific purpose, explaining that "the main concern we have tried to address is the situation where a subsidy is provided to an input supplier whose production" of the input product "is dedicated almost exclusively to the production of a higher-value added product—the type of input product that is merely a link in the overall production chain." Remand Results at 9 (quoting *Preamble*, 63 Fed. Reg. at 65,401). At the same time, Commerce cautioned against finding all cross-owned input producers to be primarily dedicated, explaining that "{w}here we are dealing with input products that are not primarily dedicated to the downstream products, however, it is not reasonable to assume that the purpose

of a subsidy to the input product is to benefit the downstream product." *Id.* at 24 (quoting *Preamble*, 63 Fed. Reg. at 65,401).

Consistent with the guidance set forth in the *Preamble* and the knowledge gained from its past administrative determinations, Commerce identified a non-exhaustive list of factors to consider in undertaking a primarily dedicated analysis. *See* Remand Results at 8-19. These factors include:

> 1) Whether an input supplier produced the input;
>
> 2) Whether the input could be used in the production of downstream products including subject merchandise, regardless of whether the input is actually used for the production of the subject merchandise;
>
> 3) Whether the input is merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described in the *Preamble*, or whether the input is a common input among a wide variety of products and industries and it is not the type of input that is merely a link in the overall production chain, as plastic is to automobiles;
>
> 4) Whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain; and
>
> 5) Examining a company's business activities to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products."

*Id.* at 12-13. Commerce also explained that its decision would not depend on the outcome of a single controlling factor or fact, but instead involve a holistic analysis of all the relevant factors and record evidence. *Id.* at 13, 15.

Commerce undertook an analysis of the various factors, acknowledging that certain

elements, namely that Nur produced the scrap, the scrap can be used in the production of Kaptan's downstream product, and Kaptan was the exclusive user of Nur's scrap, were satisfied. *See* Remand Results at 16-17. However, as Commerce explained, fulfillment of those three criteria alone did not require a finding that Nur's scrap was primarily dedicated to Kaptan's downstream steel production, especially upon consideration of the other relevant factors. *Id.* at 17-19.

Commerce examined whether Nur's input is merely a link in the overall production chain. In considering this issue, Commerce looked at both the input supplier's entire production (*i.e.*, the nature of the supplier's operations), as well as the input production itself and its relationship to downstream products (*i.e.*, nature of the input). Remand Results at 13, 19. As Commerce explained in the remand results, steel scrap is a common input among a wide variety of products and industries, and therefore not the type of input that is merely a link in the overall production chain. Remand Results at 18. Indeed, Commerce cited numerous proceedings involving steel which show that steel scrap can be used in a wide variety of ways.[3] *See* Remand Results at 16. Even considering only the cases cited by Commerce (which are non-exhaustive), Commerce has made determinations regarding scrap as an input in cases involving rebar, cut-to-length plate, cold-rolled steel, oil country tubular goods, and fluid end blocks. *Id.* Given the variety of products that scrap is used to create, scrap is clearly not "merely a link in the overall production chain" in the manner that stumpage is to lumber or semolina to pasta—situations where the input product is determinatively linked to the downstream product. *Id.* at 17, 27. Rather, as Commerce explained, it is more akin to plastic, a common input used in many industries and a variety of production processes. *Id.* at 17. And in fact, Kaptan itself produces a

---

[3] RTAC implicitly acknowledges this as well. *See* RTAC Remand Comments at 17.

wide variety of downstream products, including non-subject merchandise, which involve the melting of scrap. *Id.* at 26-27; *see also* Kaptan Initial Questionnaire Response (Kaptan IQR) at 8 (P.R. 89).

In arguing that Commerce failed to adequately explain and support its finding that the scrap Nur sold to Kaptan was not "generated or otherwise prepared for downstream products," and thus was not a link in the overall production chain for Kaptan's rebar, RTAC cites certain Commerce determinations in which Commerce found scrap to be a primarily dedicated input. RTAC Remand Comments at 12-17. As an initial matter, the language of the *Preamble* does not describe a primarily dedicated input as simply "a link" in the production chain. Instead, the *Preamble* has Commerce consider "whether the input is *merely* a link in the overall production chain . . . or whether the input is a common input among a wide variety of products and industries." Remand Results at 12; *see also Preamble*, 63 Fed. Reg. at 65,401. As Commerce explained, evidence on the record of *this* proceeding shows that steel scrap can be used in a wide variety of steel products, ranging from subject merchandise to angle profiles. *See* Remand Results at 26-27; Kaptan IQR at 8 (P.R. 89). In addition, as described above, the wide variety of products at issue in the numerous cases cited by both Commerce and RTAC demonstrate that scrap can be used to produce numerous different steel products. *See* Remand Results at 16; RTAC Remand Comments at 17. Commerce's determination that steel scrap is not "merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described in the *Preamble*," but is instead "a common input among a wide variety of products and industries and it is not the type of input that is merely a link in the overall production chain, as plastic is to automobiles" is thus amply supported and more than adequately explained. Remand Results at 17, 18, 27-28.

Additionally, and despite RTAC's suggestion to the contrary, "{a}s demonstrated in the various steel proceedings that Commerce administers, Commerce does not {and should not} have a rule that steel scrap is always primarily dedicated to the production of steel in the manner of semolina to pasta or stumpage to lumber." Remand Results at 15. Instead, Commerce makes a determination regarding steel scrap as an input on a case-by-case, fact-specific basis. *See, e.g., Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 85 Fed. Reg. 38,361 (Dep't of Commerce June 26, 2020), *Forged Steel Fluid End Blocks From the Federal Republic of Germany*, 85 Fed. Reg. 80,011 (Dep't of Commerce Dec. 11, 2020), *Cut-to-Length Plate From the Republic of Korea*, 86 Fed. Reg. 15,184 (Dep't of Commerce March 22, 2021), and Commerce's Final Results of Redetermination Pursuant to Court Remand in *Nucor Corporation v. United States*, Court No. 21-00182, Slip Op. 22-116 (Ct. Int'l Trade Oct. 5, 2022), *issued* Jan. 31, 2023.

Commerce also reviewed Nur's business activities as a shipbuilder and found that the nature of this primary business activity did not support a finding that any subsidy provided to the company would "benefit the production of both the input and downstream products." Remand Results at 30. As Commerce explained, Nur's production process in shipbuilding is far removed from Kaptan's downstream product of rebar and involves a much higher-value product than the products Kaptan produces as a part of its downstream production. *Id.* at 19, 30-31. This, combined with the extremely limited nature of the transactions between Nur and Kaptan during the period of review, and the context of Nur's primary business activity as a shipbuilder, supports Commerce's conclusion that Nur's production is not "dedicated almost exclusively to the production of a higher value-added product" such that the purpose of any subsidy provided to the company would be to "benefit the production of both the input and downstream products."

*Id.* at 19.

RTAC claims that Commerce "inappropriately focused on Nur's overall operations rather than on the nature of the input" in reviewing Nur's business activity, but, as Commerce explained in the remand results, a cross-owned input analysis is multifaceted, and, when examining a company's business activities, Commerce considers both the nature of the input *and* the company's entire production process. *See* Remand Results at 26. RTAC's contention that Commerce must consider the production of the input separate from the input supplier's business activity ignores key language in the *Preamble* that the concern addressed by the regulations involves a "situation where a subsidy is provided to an input supplier *whose production is dedicated almost exclusively* to the production of a higher-value added product." *Preamble*, 63 Fed. Reg. at 65,401. The *Preamble* supports Commerce's decision to look at Nur's entire production process, rather than simply the nature of the input. Moreover, RTAC's argument that Commerce must somehow analyze the production of the input—steel scrap—separately from Nur's production of ships would, bizarrely, require Commerce to treat one production process as two separate processes, given that the scrap is created through Nur's shipbuilding process. *See* Remand Results at 19. Without Nur's shipbuilding activities, there would be no scrap; accordingly, Commerce cannot merely remove the "production of the input" from Nur's shipbuilding production process.

RTAC further argues that the determinations Commerce relied on are distinguishable. *See* RTAC Remand Comments at 20-22. But RTAC cherry-picks particular facts from these proceedings, removes them from their context, and then claims that the determinations do not support Commerce's remand findings, all while ignoring the significant elements of those determinations that demonstrate Commerce's consistency in rationale. *Id.* As Commerce has

explained in these determinations, its interpretation of whether an input should be considered "primarily dedicated" is necessarily complex because of the vast variety of companies, inputs, subject merchandise, production processes, and other factual considerations that Commerce must examine in each individual case. Indeed, RTAC's argument that certain facts in Commerce's cited determinations are not perfectly analogous to the facts underlying this proceeding only emphasizes that each "primarily dedicated" analysis must be based on a holistic examination of the facts on the record of the proceeding in question.

Despite RTAC's assertions to the contrary, Commerce sufficiently explained its determination that the extremely limited nature of Nur's interactions with Kaptan did not support a finding that Nur's production is "dedicated almost exclusively to the production of a higher value-added product," such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products." RTAC Remand Comments at 22-23; Remand Results at 19, 25. In RTAC's view, Kaptan relied solely on the volume of steel scrap as the justification for its position in its comments on the draft remand, and because Commerce only cited to Kaptan's draft remand comments in coming to its conclusion, Commerce necessarily failed to provide any other justification. This is simply incorrect. Commerce explicitly noted that "Nur's tax returns show most of its affiliated transactions are service and financial related, with no purchase of goods and only the sales of a small amount of goods (*i.e.*, steel scrap) to Kaptan Demir." Remand Results at 21 (citing Kaptan Draft Remand Comments at 8-10). Commerce further explained that the significance of the "limited nature of these transactions is not based upon volume . . . but instead, an analysis of the totality of the facts contained within the transactions between Nur and Kaptan." *Id.* at 25.

Finally, while RTAC argues that Commerce arbitrarily treated two other suppliers of scrap, Martas Marmara Ereglisi Liman Tesisleri A.S. (Martas) and Aset Madencilik A.S. (Aset), differently from Nur, Commerce's treatment of Martas and Aset has not been challenged in this litigation. Moreover, as Commerce explained, "an analysis of Kaptan Demir's relationship with other affiliates, or input suppliers, as put forth by the petitioners in their comments" is not appropriate to consider "as a part of our analysis regarding whether Nur's production of steel scrap is primarily dedicated to Kaptan Demir's downstream production." Remand Results at 26. Commerce's treatment of those affiliates, which are different companies with different production processes (and involve other distinct factual circumstances), is not pertinent to Commerce's analysis of Nur as a cross-owned input supplier. The relationship Kaptan has with other affiliates has no bearing on the issues considered by Commerce in performing its primarily dedicated analysis with respect to Nur. *See* Remand Results at 26.

Instead of addressing Commerce's analysis head on, RTAC's arguments conflate and intermingle several separate factors Commerce considered as a part of its analysis. *See* RTAC Remand Comments at 19-20. While RTAC may disagree with Commerce's interpretation of the regulations and the language of the *Preamble*, Commerce's analysis is afforded great deference and certainly constitutes a permissible construction of the statute. Because the redetermination is supported by substantial evidence, the Court should sustain Commerce's determination that Nur's production of scrap is not primarily dedicated to Kaptan's downstream production.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's remand results and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA MCCARTHY
Director

s/L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:                          s/Sosun Bae
W. MITCH PURDY                       Sosun Bae
Attorney                             Senior Trial Counsel
U.S. Department of Commerce          U.S. Department of Justice
Office of the Chief Counsel for Trade   Civil Division
    Enforcement and Compliance    Commercial Litigation Branch
1401 Constitution Avenue, NW         PO Box 480
Washington, DC  20230                Ben Franklin Station
Tel: (240) 482-5214                  Washington, DC  20044
Email: william.purdy@trade.gov       Tel: (202) 305-7568
                                     Fax: (202) 305-2062
                                     Email: Sosun.Bae@usdoj.gov

September 22, 2023                    Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that the foregoing complies with the word-count limitation. In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare the brief. According to the word count, the brief contains 4,690 words.


/s/Sosun Bae

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., | ) ) ) |
| Plaintiff, | ) ) |
| and | ) ) |
| COLAKOGLU DIS TICARET A.S., *et al.,* | ) ) |
| Plaintiffs-Intervenors, | ) ) |
| v. | ) ) Court No. 21-00565 |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| REBAR TRADE ACTION COALITION, *et al.*, | ) ) ) |
| Defendant-Intervenor. | ) ) |

## <u>ORDER</u>

Upon consideration of the remand redetermination, the comments and responses filed by the parties, the administrative record, and all other pertinent papers, it is hereby

ORDERED that the Department of Commerce's remand results are sustained in all respects, and it is further

ORDERED that judgment is entered in favor of the United States.


Dated: _____          _____
     New York, NY                                                JUDGE