Slip Op. 23-167

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| KAPTAN DEMIR ÇELIK ENDUSTRISI VE TICARET A.Ş., <br><br> **Plaintiff,** <br><br> and <br><br> ÇOLAKOĞLU DIŞ TICARET A.Ş. and ÇOLAKOĞLU METALURJI A.Ş., <br><br> **Plaintiff-Intervenors,** <br><br> v. <br><br> UNITED STATES, <br><br> **Defendant,** <br><br> and <br><br> REBAR TRADE ACTION COALITION, BYER STEEL GROUP, INC., COMMERCIAL METALS COMPANY, GERDAU AMERISTEEL U.S. INC., NUCOR CORPORATION, and STEEL DYNAMICS, INC., <br><br> **Defendant-Intervenors.** | Before: Gary S. Katzmann, Judge <br> Court No. 21-00565 |

## <u>OPINION</u>

[ The court sustains the Department of Commerce's remand redetermination. ]

Dated:  <u>November 27, 2023</u>

<u>Andrew T. Schutz</u>, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., for Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S.

Matthew M. Nolan, Jessica R. DiPietro and Leah N. Scarpelli, ArentFox Schiff LLP, of Washington, D.C., for Plaintiff-Intervenors Çolakoğlu Diş Ticaret A.Ş. and Çolakoğlu Metalurji A.Ş.

Sosun Bae, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States.  With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, L. Misha Preheim, Assistant Director.  Of counsel on the briefs was W. Mitch Purdy, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

John R. Shane, Alan H. Price, and Maureen E. Thorson, Wiley Rein, LLP, of Washington, D.C., for Defendant-Intervenors Rebar Trade Action Coalition, Byer Steel Group, Inc., Commercial Metals Company, Gerdau Ameristeel U.S. Inc., Nucor Corporation, and Steel Dynamics, Inc.

Katzmann, Judge: The court returns to litigation arising from a challenge to the Department of Commerce's ("Commerce") 2018 administrative review of the countervailing duty order on rebar[1] from Turkey.  See Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2018, 86 Fed. Reg. 53279 (Dep't Com. Sept. 27, 2021), P.R. 288 ("AR Results").  Now before the court is a challenge to Commerce's Final Results of Redetermination Pursuant to Court Remand (Dep't Com. July 24, 2023), ECF No. 66 ("Remand Results").  Resolving this challenge implicates the trade law applications of the proverbial wisdom that one man's trash is another's treasure: on remand, Commerce determined that a shipbuilder's sale of steel scrap to an affiliated rebar manufacturer did not warrant the attribution of Turkish government subsidies from seller to buyer.  The court concludes that this redetermination is both adequately explained and supported by substantial evidence on the record, and accordingly sustains the Remand Results in their entirety.

---

[1] "Rebar," which is a portmanteau of "reinforcing" and "bar," refers to rods of steel that are embedded into concrete as a means of strengthening the resulting structure.  See Rebar, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/rebar (last updated Nov. 4, 2023); Reinforced Concrete, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/reinforced%20concrete (last visited Nov. 9, 2023).

## BACKGROUND

### I.   *Legal Background*

Commerce is directed by statute to assess countervailing duties on the basis of the countervailable subsidies provided "directly or indirectly" with respect to "the manufacture, production, or export of a class or kind of merchandise imported . . . into the United States."  19 U.S.C. § 1671(a)(1).  As this provision is silent on the question of how Commerce is to attribute countervailable subsidies to products, see id., Commerce in 1998 promulgated a series of gap-filling regulations on the subject.  Relevant here is Commerce's regulation with respect to "Input suppliers," which reads as follows:

> If there is cross-ownership between an input supplier and a downstream producer, and production of the input product is <u>primarily dedicated</u> to production of the downstream product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).

19 C.F.R. § 351.525(b)(6)(iv) (emphasis added).

This provision leaves open the question of when the production of an input product is "primarily dedicated" to the production of a downstream product.  Commerce provided the following illustrations in the preamble to the <u>Federal Register</u> notice in which it promulgated § 351.525:

> The main concern we have tried to address is the situation where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value added product—the type of input product that is merely a link in the overall production chain.  This was the case with stumpage subsidies on timber that was primarily dedicated to lumber production and subsidies to semolina primarily dedicated to pasta production.  We believe that in situations such as these, the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products.

<u>Countervailing Duties</u>, 63 Fed. Reg. 65348, 65401 (Dep't Com. Nov. 25, 1998) ("<u>Preamble</u>") (citations omitted).

Commerce also laid out the following contrasting scenario:

Where we are dealing with input products that are not primarily dedicated to the downstream products, however, it is not reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product. For example, it would not be appropriate to attribute subsidies to a plastics company to the production of cross-owned corporations producing appliances and automobiles.

Id.

As Commerce's reference to illustrative examples in its explanation suggests, Commerce's "primarily dedicated" analyses are highly fact-specific and defy attempts to trace universally applied decisional principles. See Nucor Corp. v. United States ("Nucor I"), 46 CIT __, __, 600 F. Supp. 3d 1225, 1238 (2022). In some cases Commerce has focused on the nature of the business entity producing the input product, finding production of that product not to be "primarily dedicated" to the downstream product where the entity's business is largely dedicated to matters other than production of the product. See, e.g., Certain Glass Containers from the People's Republic of China: Final Affirmative Countervailing Duty Determination, 85 Fed. Reg. 31141 (Dep't Com. May 22, 2020) and accompanying Issues and Decisions Mem. cmt. 12 (declining to attribute subsidies for glass machinery where an input supplier's business license listed "several kinds of business activities beyond merely glass equipment manufacturing, such as rubber machinery and winery equipment"). In other cases Commerce has analyzed the nature of the input product itself, finding production of the input not to be "primarily dedicated" to the downstream product where the input product has many other potential applications besides incorporation into the downstream product.[2] See Final Affirmative Countervailing Duty Determination and Final

---

[2] Commerce's differing focus from analysis to analysis can be (at least partially) explained by the appearance in § 351.525(b)(6)(iv) of the phrase "production of the input product." This phrase could conceivably refer to two distinct things. First, it could refer to the general act of producing the input product, as in the sentence "production of textiles involves fibers and dye." This reading invites a focus on inherent attributes of the input product, whereby any production of that product

Negative Critical Circumstances Determination: Certain Lined Paper Products from Indonesia, 71

Fed. Reg. 47174 (Dep't Com. Aug. 16, 2006) and accompanying Issues and Decisions Mem. cmt.

3 (finding that production of pulp logs was primarily dedicated to production of downstream paper

products because "pulp logs are used to make pulp which, in turn, is used to make paper").  This

court will uphold such differing modes of "primarily dedicated" analysis—and indeed differing

conclusions with respect to the same input product in different cases, see Nucor I, 46 CIT at __,

600 F. Supp. 3d at 1238—so long as Commerce's conclusion in each case rests on substantial

evidence and Commerce reasonably explains the basis for its decision.  See NMB Sing. Ltd. v.

United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009)); see also Save Domestic Oil, Inc. v. United

States, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004) (citing Motor Vehicle Mfrs. Ass'n v. State Farm

Mut. Auto. Ins. Co., 463 U.S. 29, 42 (1983)); see also SKF USA Inc. v. United States, 630 F.3d

---

would necessarily be primarily dedicated to a downstream product.  But "production of the input
product" could also conceivably refer to a specific supplier's actual process of producing an input
product, as in the sentence, "my neighbor's backyard production of chemical solvents causes a
nuisance."  This reading invites a focus on attributes of the supplier's specific act of producing the
input product when determining whether input production is primarily dedicated to downstream
production.

Commerce's examples in the Preamble appear to resolve this ambiguity in favor of the first
reading, as Commerce singles out a "type of input product" and seems to suggest (for example)
that semolina production necessarily implies primary dedication to the downstream production of
pasta.  See Preamble; see also Gujarat Fluorochemicals Ltd. v. United States, 47 CIT __, __, 617
F.Supp.3d 1328, 1336–37 (2023).  On the other hand, the Preamble also states that Commerce's
"main concern" is with subsidies provided to "an input producer whose production is dedicated
almost exclusively to the production of a higher value added production."  Preamble.  This
grammatically definite focus on the actions of the input's producer appears to support the second
reading.

These readings are not necessarily mutually exclusive, and the question of which is more
compelling is not squarely before the court.  See infra Part II.A. The court simply notes the
conundrum as a means of sketching out the background against which Commerce relies on
multiple factors in its "primarily dedicated" determinations.  Remand Results at 8, 17–18.

1365, 1373 (Fed. Cir. 2011) ("When an agency changes its practice, it is obligated to provide an

adequate explanation for the change." (citing <u>Motor Vehicle Mfrs.</u>, 463 U.S. at 42)).

## II.        *Procedural Background*

The court presumes familiarity with the background of this case as discussed in the court's

review of challenges to the AR Results.  See Kaptan Demir Celik Endustrisi ve Ticaret A.S. v.

United States ("Kaptan I"), 47 CIT __, 633 F. Supp. 3d 1276 (2023).  In that proceeding, Plaintiff

Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan"), a Turkish producer and exporter of

rebar, brought a motion for judgment on the agency record on the basis of two challenges to

Commerce's determinations in the <u>AR Results</u>.  <u>Id.</u> at 1281.  Kaptan specifically challenged

Commerce's determination that subsidies received by Nur Gemicilik ve Ticaret A.S. ("Nur"), a

shipbuilding company affiliated with Kaptan, were properly attributed to Kaptan on the basis of a

cross-owned input supplier relationship as defined by 19 C.F.R. § 351.525(b)(6)(iv).[3]  Defendant

the United States ("the Government") and domestic producers, Defendant-Intervenors Rebar Trade

Action Coalition, Byer Steel Group, Inc., Commercial Metals Company, Gerdau Ameristeel U.S.

Inc., Nucor Corporation, and Steel Dynamics, Inc., ("Domestics"), opposed Kaptan's motion.  The

court concluded that Commerce had failed to properly explain how Nur's production of steel scrap,

which Kaptan bought and melted down to produce rebar, constituted "production of the input

product [that] is primarily dedicated to production of the downstream product."  <u>Id.</u> at 1280, 1285

---

[3] Kaptan also challenged Commerce's finding that Nur's participation in a land rent exemption
program with the Turkish government was a countervailable subsidy within the meaning of section
771 of the Tariff Act, 19 U.S.C. § 1677.  <u>See</u> <u>Kaptan I</u>, 633 F. Supp. 3d at 1281–82.  Because the
court remanded for further explanation on the threshold question of whether to attribute Nur's
subsidies to Kaptan, the court did not address this challenge.  <u>See</u> <u>id.</u> at 1285 n.4.  Nor is that
challenge at issue on remand.

(quoting 19 C.F.R. § 351.525(b)(6)(iv)).  The court remanded Commerce's finding for "further

explanation and review."  Kaptan I, 633 F. Supp. 3d at 1285.

 On remand, Commerce initially indicated that it would reaffirm its determination that Nur

is Kaptan's cross-owned input supplier.  Draft Results of Redetermination Pursuant to Court

Remand (Dep't. Com. June 26, 2023), P.R.R. 1 ("Draft Remand Results").[4]  But following the

submission of comments from interested parties on the Draft Remand Results, see Letter from

Kaptan to G. Raimondo, Sec'y of Com., re: Kaptan Comments on Draft Remand (July 7, 2023),

P.R.R. 6 ("Kaptan's Cmts. on Draft Remand Results"); Letter from Domestics to G. Raimondo,

Sec'y of Com., re: Comments on Draft Results of Redetermination (July 7, 2023), P.R.R. 5

("Domestics' Cmts. on Draft Remand Results"), Commerce changed course and determined that

Nur is not Kaptan's cross-owned input supplier with respect to steel scrap.  See Remand Results.

Commerce explained that it "reexamined the facts on the record of this proceeding" and changed

its subsidy attribution determination "upon further consideration of those facts in conjunction with

Commerce's regulations."  Id. at 1.

 Domestics now challenge these Remand Results.  Def.-Inters.' Cmts. on Remand

Redetermination, Aug. 23, 2023, ECF No. 68 ("Domestics' Br.").  Kaptan and the Government

oppose this challenge, see Pl.'s Reply Cmts. in Support of Remand Redetermination, Sept. 22,

2023, ECF No. 70 ("Kaptan's Br."); Def.'s Resp. to Cmts. on Remand Redetermination, Sept. 22,

2023, ECF No. 72 ("Gov't Br.").

---

[4] "P.R.R." and "C.R.R." respectively refer to the Public Remand Record and Confidential Remand
Record in this case.  See Pub. Remand Joint App'x., October 6, 2023, ECF No. 74; Confidential
Remand Joint App'x., October 6, 2023, ECF No. 73.

### III.   *Factual Background*

Commerce adopted a multifactor approach in preparing the <u>Remand Results</u> at issue in this case.  Drawing on these past determinations (among others), Commerce provided the following set of factors as a "general outline of our considerations in our examination of the record in determining whether to attribute Nur's subsidies to Kaptan":

1.   Whether an input supplier produced the input;

2.   Whether the input could be used in the production of downstream products including subject merchandise, regardless of whether the input is actually used for the production of the subject merchandise;

3.   Whether the input is merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described in the <u>Preamble</u>, or whether the input is a common input among a wide variety of products and industries and it is not the type of input that is merely a link in the overall production chain, as plastic is to automobiles;

4.   Whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain; and

5.   Examining a company's business activities to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the <u>Preamble</u> such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products."

<u>Remand Results</u> at 12–13 (bullets in original presented here as ordinals).[5]

Commerce determined on the basis of these factors that Nur's production of steel scrap was not primarily dedicated to Kaptan's production of rebar.  <u>Remand Results</u> at 16–19.  On Factors 1 and 2, which Commerce described as "threshold factor[s]," Commerce acknowledged that Nur supplied Kaptan with all of its steel scrap and that steel scrap generally can be used in the

---

[5] These factors are identical to those on which Commerce based its analysis in the <u>Draft Remand Results</u>.  <u>Draft Remand Results</u> at 12.

production of rebar.[6]  Id. at 16.  But on Factor 3, Commerce noted that unprocessed steel scrap is "a common input among a variety of products and industries and used in a variety of production processes."  Id. at 17.  Commerce explained that Nur's steel scrap could be distinguished on this basis from the examples of semolina and stumpage—which are limited in their downstream applications to pasta and lumber, respectively.  Id.

On Factor 5, Commerce noted that Nur's primary business activity is shipbuilding, not steel scrap production.  Id. at 19.  Commerce explained that it would accordingly be inappropriate to consider Nur's production of ships as "primarily dedicated" to Kaptan's production of rebar, as ships are "much further downstream" than rebar.  Id.  "Nur's business activity," Commerce concluded, "is not 'dedicated almost exclusively to the production of a higher value-added product' in the manner suggested by the Preamble."  Id.

Commerce's ultimate conclusion can be summarized as resting on two grounds: first, that unprocessed steel scrap can be used for many purposes and is thus not the type of input product that is inherently "primarily dedicated" to a single downstream product.  Second, that the steel scrap that Nur provided to Kaptan was merely a byproduct of Nur's main business activity of shipbuilding—in other words, that Nur's production of steel scrap was "primarily dedicated" to producing ships and not rebar.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I), (a)(2)(B)(ii).  Under § 1516a(b)(l)(B)(i), "[t]he court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on

---

[6] As Commerce noted in the Draft Remand Results, there is "no debate among the parties" as to these points.  Draft Remand Results at 13.

the record, or otherwise not in accordance with law," <u>see also</u> <u>Huaiyin Foreign Trade Corp. v.</u> <u>United States</u>, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting 19 U.S.C. § 1516a(b)(l)(B)(i)), "which includes compliance with the court's remand order," <u>see</u> <u>SMA Surfaces, Inc. v. United</u> <u>States</u>, 47 CIT __, __, Slip Op. 23-137, at 5 (Sept. 20, 2023); <u>see also</u> <u>Xinjiamei Furniture</u> <u>(Zhangzhou) Co. v. United States</u>, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014). Substantial evidence refers to "such evidence that a reasonable mind might accept as adequate to support a conclusion." <u>SeAH Steel VINA Corp. v. United States</u>, 950 F.3d 833, 840 (Fed. Cir. 2020) (internal quotation marks and citation omitted).

## DISCUSSION

Domestics assert that the <u>Remand Results</u> "raise the same concerns" that led the court to remand the <u>AR Results</u>. They argue that Commerce's reconsidered conclusion—that Nur's production of steel scrap is not "primarily dedicated" to Kaptan's production of rebar under § 351.525(b)(6)(iv) and its accompanying <u>Preamble</u> in the <u>Federal Register</u>—is insufficiently explained and unsupported by substantial evidence on the record. 19 U.S.C. § 1516a(b)(l)(B)(i); Domestics' Br. at 7, 12.

Referencing the examples that Commerce offered in the <u>Preamble</u>, Domestics argue that Commerce erred in finding the relationship of Nur's scrap to Kaptan's rebar to be more similar to that of plastic to appliances and automobiles than the relationship of timber to lumber, or of semolina to pasta. Domestics' Br. at 12. Domestics further argue that Commerce "inappropriately focused" on the fact that Nur is a shipbuilding company, and should have instead focused on "record evidence regarding Nur's production of scrap, and the relationship between scrap and Kaptan's downstream production." <u>Id.</u>

The court finds these arguments unavailing for the reasons set forth below.

I.      *Commerce's Characterization of Nur's Steel Scrap as Not Necessarily Primarily Dedicated to Kaptan's Rebar Production Is Lawful*

As an initial matter, Commerce's determination of whether steep scrap is primarily dedicated to downstream steel production is a fact-specific inquiry unique to each case. Domestics cite several prior administrative decisions that purportedly show that "Commerce has repeatedly found that steel scrap—without any consideration of its processing level—is primarily dedicated to downstream steel production." Domestics' Br. at 12–14. Domestics appear to suggest that against this background, Commerce's findings that steel scrap is a "common input among a variety of products and industries and used in a variety of production processes" and that "the scrap that Nur sold to Kaptan was not 'generated or otherwise prepared for downstream products'" are anomalous and thus require additional explanation. Domestics' Br. at 12 (quoting Remand Results at 12–18, 28). The existence of an agency practice would saddle Commerce with the burden of explaining its departure from that practice. See Save Domestic Oil, 357 F.3d at 1283–84. But Domestics' cited examples do not establish a practice whereby Commerce has reflexively treated steel scrap as a primarily dedicated input of rebar. In none of the cited determinations did Commerce expressly commit itself to such a categorical rule. Domestics' Br. at 12. Commerce has in fact stated elsewhere that it does not adhere to such a rule. See, e.g., Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Final Results of Redetermination Pursuant to Court Remand at 58 (Dep't Com. Jan. 30, 2023), remanded on other grounds, Nucor Corp. v. United States ("Nucor II"), 47 CIT __, __, Slip Op. 23-119 (Aug. 21, 2023). What Domestics' examples show, at most, is that Commerce has in the past reached positive primary dedication conclusions on different facts. See Nucor I, 600 F. Supp. 3d at 1238 ("[D]ecisions regarding [subsidy] attribution are fact specific and Commerce may reach different conclusions in different cases in relation to the same input.").

Even if past agency practice did saddle Commerce with the burden of explaining its departure from that practice, Domestics' challenges to Commerce's explanation of its reasoning are unpersuasive.[7]  These challenges, to the extent they are not conclusory, address only peripheral aspects of Commerce's detailed explanation of the considerations underlying its characterization of the relationship of Nur's steel scrap to Kaptan's rebar.  See Remand Results at 8–18.

First is Domestics' contention that Commerce "did not identify products/industries using [steel] scrap beyond downstream steel products" and thus "did not adequately explain its reasons for finding the relationship between such scrap and rebar more like the relationship that plastics have with automobiles and appliances than the relationship that timber has with lumber or that

---

[7] Domestics summarize their challenges as follows:

> In sum, Commerce failed to adequately explain or support its conclusion that the physical nature of Nur's scrap and the circumstances of its generation were such that the scrap did not form a "link in the overall production chain" for Kaptan's downstream rebar. While Commerce determined that unprocessed, byproduct steel scrap is a "common input among a variety of products and industries and used in a variety of production processes," Remand Results at 17-18, 28, it provided no support for this assertion. It did not identify products/industries using such scrap beyond downstream steel products. It did not adequately explain its reasons for finding the relationship between such scrap and rebar more like the relationship that plastics have with automobiles and appliances than the relationship that timber has with lumber or that semolina has with pasta. It cited no record evidence demonstrating that Kaptan used or could only use scrap that had been pre-processed or purposely generated with its downstream operations in mind. It failed to identify any qualitative distinctions between the scrap that Nur provided to Kaptan and the scrap provided by other scrap-supplying Kaptan affiliates that the agency treated as cross-owned input suppliers for subsidy attribution purposes. Commerce failed to acknowledge or confront the multiple past cases in which it found steel scrap primarily dedicated to downstream steel production without any finding as to whether that scrap was processed or not, as well as its own prior rejection of the argument that the byproduct nature of scrap is relevant to the cross-attribution analysis.

Domestics' Br. at 17–18.

semolina has with pasta." Domestics' Br. at 18.[8]  This argument merely fulfills a self-fulfilling

prophecy: after first constructing a category of "downstream steel products" that by its terms

sweeps in all conceivable downstream applications of steel scrap, Domestics then insist that

Commerce failed in its Remand Results to enumerate examples of downstream applications of

steel scrap that fall outside this maximally broad definition.

By this reasoning, it would appear that even in the archetypical case of plastics,

automobiles, and appliances, Commerce would be required to offer examples of downstream uses

for plastics other than "downstream plastic products" in order to show that plastics production is

not primarily dedicated to automobile production.  And because every product that incorporates

plastics as an input is arguably a "downstream plastics product," as Domestics suggest is the case

with "downstream steel products," Domestics' Br. at 18, Domestics' proposed standard would

seemingly compel a primary dedication finding in the very hypothetical case that Commerce

invoked to demonstrate a lack of primary dedication—and, indeed, in every case.  This standard

wants for a limiting principle, and the court declines to adopt it.

Contrary to Domestics' suggestion, Commerce's task in establishing steel scrap's closer

similarity to plastics than to semolina was not to "identify products/industries using [steel] scrap

beyond downstream steel products."[9]  Domestics' Br. at 18.  Commerce's task was instead to

assess the range of downstream steel products that steel scrap can be used to produce.  Kaptan I,

---

[8] Earlier in their brief, Domestics argue along similar lines that Commerce erroneously classified
steel scrap as a "common input" because "there is no obvious use for steel scrap, regardless of its
processing level, except in the production of more steel through remelting."  Domestics' Br. at 14.
[9] As the court noted in Gujarat Fluorochemicals, "the reference in [§ 351.525(b)(6)(iv)] to 'the
downstream product' is not only singular, it is also a reference to a specific product."  617 F. Supp.
3d at 1340.  Thus, even if Domestics' suggested category of "downstream steel products" were not
so broad as to be meaningless, it would at the very least extend impermissibly beyond the singular
"downstream product" at issue in this case: rebar.

633 F. Supp. 3d at 1284 ("Commerce needs to explain further why the input product in question . . . is in fact primarily dedicated to the production of downstream products in this case.  This is especially true considering record evidence that the scrap may have been used for the production of products other than the subject merchandise.").

That is precisely what Commerce did on remand.  Explaining that "unprocessed scrap is a common input among a wide variety of products and industries," Remand Results at 18, Commerce (elsewhere in its redetermination) listed "non-subject rebar, other types of bars, and angle profiles" as examples of products besides the subject rebar that Kaptan uses steel scrap to produce.  Id. at 26–27.  The remand record on which Commerce based these assertions contains Kaptan's representations that "Kaptan Demir manufactures steel billets, reinforcing bars, angles, square bars, flat bars, and round bars in its meltshop and two rolling mills" and that at one of these mills, "hot billets are . . . rolled into various products, including deformed reinforcing bars ranging from 8 mm to 40 mm and other products."  Letter from Kaptan to W. Ross, Sec'y of Com., re: Kaptan Initial Questionnaire Response at 8–9 (July 6, 2020), P.R.R. 88 ("Kaptan Questionnaire Response").  As the Government notes, Commerce cited cases in its Remand Results that involved additional downstream products for which steel scrap can be an input.[10]  Even Domestics acknowledge that "[t]he record here indicates that Kaptan used Nur's scrap to produce downstream steel products, including rebar."  Domestics' Br. at 15.

This variety of downstream outputs constitutes substantial evidence in support of Commerce's determination that rebar is one of many products that can be manufactured from steel scrap, and that the relationship of Nur's steel scrap to Kaptan's rebar is thus unlike the more direct

---

[10] Besides rebar, these products are "cut-to-length plate, cold-rolled steel, oil country tubular goods, and fluid end blocks."  Gov't. Br. at 11 (citing Remand Results at 16).

input-to-output relationship of semolina to pasta. Commerce, furthermore, has adequately

explained the link between this evidence and its findings in the Remand Results.

Domestics next challenge Commerce's statements that "it is significant that there is no

evidence that the scrap provided by Nur was processed in any way prior to selling it to Kaptan

Demir" and that "[w]hether or not scrap is generated or otherwise prepared for downstream

products in the production line is a factor to consider when determining whether an input is

primarily dedicated to the production of a downstream product," Remand Results at 17, as

inadequately explained and unsupported by substantial evidence, see Domestics' Br. at 12, 16.

This argument also fails to identify a legally relevant flaw in Commerce's reasoning.

Commerce made these statements in conjunction with its analysis (discussed in greater

detail above) of whether an input is "not merely a link in the overall production chain." Remand

Results at 17. Commerce's point was simply that any processing of steel scrap by the input

supplier focuses the range of likely downstream applications of that scrap, analogizing the

relationship of input scrap to downstream rebar to the relationships of semolina to pasta and of

stumpage to lumber.[11] Id. According to Commerce, the presence on the record of any evidence

of such processing would support a finding that the input scrap's relationship to Kaptan's rebar

was marginally closer. Id. Commerce did not invoke scrap processing as a determining factor[12]

---

[11] For example, if Nur had processed its steel scrap prior to sale by pressing it in a particular way, and Kaptan's production of rebar required that kind of pressed steel scrap as an input, Commerce might consider that processing as a factor militating in favor of a primary dedication finding. Analogously, the milling of wheat to create semolina might cut toward a finding of primary dedication to downstream pasta production.

[12] The court has previously questioned Commerce's reliance on a distinction between processed and unprocessed steel scrap as the sole basis for a primary dedication determination. See Nucor II, Slip Op. 23-119, at 25–26. The distinction that Commerce referenced here, however, is only

in its "primarily dedicated" analysis; it merely raised the possibility that processing could limit an input's downstream uses and noted that that was not the case here.  Id.

Domestics contest the relevance of Commerce's distinction between processed and unprocessed steel.  Domestics' Br. at 18.  They fail, however, to explain how this purported irrelevance—which Commerce cites as one factor among many—would affect the completeness of Commerce's explanation for its negative primary dedication finding, or the question of whether that finding is supported by substantial evidence.  Domestics also fail to meaningfully contest Commerce's premise that an input supplier's processing of steel scrap might lend support to a finding that that scrap is "merely a link" in downstream production.  Remand Results at 31; see also Gov't Br. at 5.  The court will not remand for Commerce to provide additional explanation where the party seeking remand has failed to engage with the explanation already on the record.

## II.   *Commerce's Analysis of Nur's Business Activity Is Lawful*

Domestics' second main challenge is to Commerce's consideration of the nature of Nur's business activities as a factor in its "primarily dedicated" inquiry.  Domestics' Br. at 18–19.  Domestics argue that Commerce erred[13] in even considering this factor, and also challenge specific

---

one of several bases for Commerce's determination that Nur's steel scrap is not primarily dedicated to Kaptan's rebar.

[13] Domestics do not clearly identify a legal basis for their request for remand on the issue of whether it was proper under § 351.525(b)(6)(iv) for Commerce to consider Nur's business activity as a factor.  Domestics state only that "the agency has inappropriately focused on the nature of Nur's 'business activity' over the record evidence regarding Nur's production of scrap," and that "Commerce has not adequately explained or supported its analysis of Nur's business activity." Domestics' Br. at 12, 23.  This second statement presumably refers to the substantial evidence standard under 19 U.S.C. § 1516a(b)(l)(B)(i) and to Commerce's duty to explain its actions under 19 U.S.C. § 1677f(i)(3)(A).  See NMB Sing., 557 F.3d at 1319.  However, Domestics do not clarify whether these statutory requirements pertain to Commerce's threshold decision to analyze Nur's business activity or to the substance of the analysis that Commerce conducted.  The court thus construes Domestics' regulatory interpretation argument as a request for remand on the basis that

aspects of Commerce's analysis thereunder.  Id.  The court finds neither of these arguments

persuasive.

### A.    *Commerce's Consideration of Nur's Business Activity as a Factor Is Lawful*

Domestics first propose an interpretation of 19 C.F.R. § 351.525(b)(6)(iv) and the

Preamble that would preclude Commerce's analysis of any factor besides the question of "whether

the input is, by its nature, usable only in producing a narrow subset of goods and/or is a primary

input into such goods."  Domestics' Br. at 19–20.  They then argue that Commerce supported its

conflicting interpretation of the regulation, outlined in the Remand Results at 8–13, with citations

to past determinations that are "distinguishable."  Domestics' Br. at 20.

The Government and Kaptan urge this court to uphold Commerce's consideration of Nur's

business activity in its "primarily dedicated" analysis on the basis that Commerce's reading of

§ 351.525(b)(6)(iv) and the Preamble as allowing for such a multifactor analysis is owed judicial

deference.  Gov't Br. at 7; Pl.'s Br. at 8 (citing Chevron U.S.A., Inc. v. Nat. Res. Def. Council,

Inc., 467 U.S. 837, 843 (1984)); see also Kisor v. Wilkie, 139 S. Ct. 2400, 2414–18 (2019)

(discussing the applicability of judicial deference to agency interpretations of agency regulations).

The court need not weigh in on the applicability of Chevron or Kisor to Commerce's interpretation

of § 351.525(b)(6)(iv) and the Preamble,[14] however, as Domestics' proposed alternative

interpretation fails to pass muster in its own right.

---

Commerce's multifactor analysis was "not in accordance with law" under 19 U.S.C. § 1516a(b)(l)(B)(i).

[14] Commerce explained the regulatory underpinning of its business activity analysis as follows:

> Examining a company's business activities helps us assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the Preamble such that the

Domestics offer no support for their suggestion that § 351.525(b)(6)(iv) and the Preamble preclude Commerce's analysis of an input supplier's business activity.  They flatly assert, for example, that "the Preamble does not state that the input supplier's main business activity is a relevant factor" and that the Preamble instead "indicates that the salient issue is whether the input is, by its nature, usable only in producing a narrow subset of goods and/or is a primary input into such goods."  Domestics' Br. at 19.  But Domestics fail to explain why the Preamble should be treated as an exhaustive compendium of all relevant factors, or how the text of the Preamble "indicates" what the "salient issue" is.

Domestics go on to assert that "the Preamble does not use the term 'business activity,' but . . . 'production,' with the focus of that term being the 'production' of the "input' at issue."  Id. at 19.  "[T]he Preamble and regulations," they claim, "are focused on production of the 'input,' and whether the input feeds a higher value-added product, not on the supplier's production of other goods."  Id. at 20.

These statements, too, lack support. Domestics again do not explain why the considerations that Commerce outlined in the Preamble cannot be applied using terms that Commerce did not employ verbatim in the Preamble.  Nor do Domestics explain their position on the issue of where the focus of the word "production" in § 351.525(b)(6)(iv) and the Preamble lies.  It is further unclear why an analysis of Nur's shipbuilding activities is irrelevant to "production of the 'input,' and whether the input feeds a higher value-added product."  Id. at 20.  Nur produces steel scrap, after all, by building ships.  Remand Results at 5.

---

purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products."

Remand Results at 19 (citing Preamble, 63 Fed. Reg. at 65401).

Instead of challenging Commerce's position that "[e]xamining a company's business activities helps us assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the <u>Preamble</u>," <u>id.</u> at 19, Domestics rest their contrary position on a series of bare, conclusory assertions. Insufficiently briefed arguments may not form the basis for disturbing Commerce's interpretation, whether or not the court affords deference to that interpretation.  <u>See</u> <u>United States v. Great Am. Ins. Co. of N.Y.</u>, 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived."); <u>see also</u> <u>SmithKline Beecham Corp. v. Apotex Corp.</u>, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (concluding that "mere statements of disagreement" do not "amount to a developed argument").

More developed, but similarly unavailing, is Domestics' argument that Commerce's references to prior determinations that considered upstream business activity as a factor are "distinguishable, or otherwise underscore the problems with the agency's analysis here." Domestics' Br. at 20.  Domestics take issue with the applicability of three such determinations: <u>Forged Steel Fluid End Blocks from the Federal Republic of Germany: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination</u>, 85 Fed. Reg. 31454 (Dep't Com. May 26, 2020) ("<u>Fluid End Blocks</u>"), <u>Certain Glass Containers from the People's Republic of China: Final Affirmative Countervailing Duty Determination</u>, 85 Fed. Reg. 31141 (Dep't Com. May 22, 2020) ("<u>Glass Containers</u>"), and <u>Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review, 2018</u>, 86 Fed. Reg. 15184 (Dep't Com. Mar. 22, 2021) ("<u>CTL Plate</u>").

With respect to Fluid End Blocks, Domestics argue that "while the agency stated that it considered the suppliers' 'business activities,' its analysis ultimately came down to the 'quantities and types of materials' that the input suppliers provided." Domestics' Br. at 20 (quoting Mem. from J. Maeder to J. Kessler, re: Decision Memorandum for the Preliminary Affirmative Determination of the Countervailing Duty Investigation of Forged Steel Fluid End Blocks from the Federal Republic of Germany § VI(B) (Dep't Com. May 26, 2020)). In that determination, however, Commerce did not indicate any one factor that its analysis "ultimately came down to." Instead, like the Remand Results at issue here, Commerce analyzed the supplier's business activities as one among several factors. Id.

Domestics next argue that Glass Containers is distinguishable because in that case, unlike here, Commerce "considered the supplier's business activities solely in the context of determining whether to employ adverse inferences." Domestics' Br. at 20. That is true, see Mem. from J. Maeder to J. Kessler, re: Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Glass Containers from the People's Republic of China cmt. 12 (Dep't Com. May 11, 2020), but the relevance of the different framing that Domestics identify is unclear. In Glass Containers, Commerce considered whether to apply an adverse inference against a respondent that failed to submit a questionnaire response for an entity that a petitioner claimed was a cross-owned input supplier. Id. The entire inquiry into whether an adverse inference was appropriate hinged on Commerce's determination of whether that entity's production of the input in question was "primarily dedicated" to the respondent's downstream production, and Commerce engaged in substantially the same type of analysis as it did here in the Remand Results. Id.

On CTL Plate, Domestics first note that Commerce's analysis of the supplier's business activities can be discounted because the court initially remanded Commerce's determination for further explanation, and the subsequent remand results were again remanded.  Domestics' Br. at 21 (citing Nucor I, 600 F. Supp. 3d at 1234–38; Nucor II, Slip Op. 23-119).   Domestics suggest that these back-to-back remands lessen the support that CTL Plate lends to the Remand Results in this case on the issue of Commerce's consideration of business activity.  This insinuation is unfounded: in the court's second remand order in Nucor, the court ordered Commerce to reconsider other issues but upheld Commerce's "reasoned analysis" in its remand results as to its "consideration of primary business activities."  Nucor II, Slip Op. 23-119, at 25.

Domestics also note that in the CTL Plate determination, "Commerce also relied on certain other factors [other than business activity] that are not present here."  Domestics' Br. at 21.  As with Fluid End Blocks, however, Commerce merely invoked CTL Plate in the Remand Results as an example of a determination where Commerce considered a respondent's business activities as one factor—not, as Domestics appear to suggest, as the only factor.  Commerce stated in the Remand Results that:

> In [CTL Plate], we considered a range of case-specific factors, including an analysis of the by-product nature of the steel scrap as it relates to an input supplier's overall production process, the fact it was sold through an intermediary, the scope of business of the steel scrap input supplier, and the nature of other services provided by the input supplier in determining whether the materials and inputs provided were primarily dedicated to downstream production.

Remand Results at 31.  CTL Plate and Fluid End Blocks are thus indistinguishable from these Remand Results in that they exemplify Commerce's consideration of an input supplier's business activity alongside other factors in its "primarily dedicated" analysis.  Together with Glass Containers, they constitute analogous precedents that do not identifiably "underscore the problems" with Commerce's analytical approach in this case.  Domestics' Br. at 20.

> **B.      Commerce's Evaluation of Nur's Business Activities Is Supported by Substantial Evidence and Otherwise in Accordance with Law**

Turning to the substance of Commerce's analysis of Nur's business activities in the Remand Results, Domestics argue that Commerce failed to adequately explain its finding that "the production processes involved in [Nur's] shipbuilding are far removed from Kaptan Demir's downstream production processes, especially given the extremely limited transactions between the two companies." Remand Results at 19, 25; see also Domestics' Br. at 22.[15]  Domestics argue as follows:

> Rather than detail the basis upon which the agency concluded that the transactions were "extremely limited," [Commerce] cited generally to Kaptan's comments on the draft remand results, while simultaneously explaining that it was not the volume of scrap supplied by Nur that it found relevant.  Commerce's generalized citation does not elucidate the agency's thinking, given that Kaptan's argument[] [was] that

---

[15] Commerce's explanation is set forth below at greater length:

> Finally, we find that Kaptan Demir's arguments regarding Nur's primary business activity lead us to reconsider our evaluation of Nur's primary business activity as a shipbuilder.  Examining a company's business activities helps us assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the Preamble such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products." As discussed in the Draft Remand, Nur's primary business is shipbuilding, which involves the production of a product that is much further downstream than the downstream products produced by Kaptan Demir, most notably rebar.  Upon a review of Nur's business activities, which consist largely of shipbuilding, we find that the production processes involved in shipbuilding are far removed from Kaptan Demir's downstream production processes, especially given the extremely limited transactions between the two companies.   Therefore, we find that Nur's business activity is not "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the Preamble.   Simply put, the facts on the record do not support the premise that subsidies given to a shipbuilder would be given to "benefit the production of both the input and downstream products."

Remand Results at 19 (footnotes omitted).  Commerce also noted that "the significance of the limited nature of these transactions is not based upon volume, as Kaptan Demir argues, but instead, an analysis of the totality of the facts contained within the transactions between Nur and Kaptan Demir." Id. at 25.

> . . . Nur sold only a "miniscule" amount of scrap to Kaptan.  In other words, the
> only argument that Kaptan made about the "limited" nature of Nur's transactions
> with Kaptan was grounded in the volume of steel scrap that Nur sold to Kaptan—
> the very thing that Commerce says is irrelevant.

Id. at 22–23 (citations omitted). Domestics, in other words, argue that Commerce failed to explain

the apparent contradiction between Commerce's reliance on Kaptan's representation that its

purchases of steel scrap from Nur were "miniscule" in volume, see Kaptan's Cmts. on Draft

Remand Results at 3, and Commerce's disavowal of a volume-based standard for assessing an

input supplier's business activity as a factor in determining whether to cross-attribute subsidies,

see Remand Results at 25.

      The Government and Kaptan both respond that Domestics' argument on this point elides

context which clarifies Commerce's meaning in the Remand Results.  Gov't Br. at 15; Kaptan's

Br. at 9–11.  The Government points out that Commerce did in fact cite to record evidence

supporting a conclusion that Nur's transactions with its corporate affiliates were "limited" in a

non-volume-related sense.  Gov't Br. at 15.  Commerce, the Government argues, cited this

evidence in its summary of Kaptan's comments on the Draft Remand Results: "Nur's tax returns

show most of its affiliated transactions are service and financial related, with no purchase of goods

. . . ."  Gov't Br. at 15 (quoting Remand Results at 21).  Kaptan argues that its comments on the

Draft Remand Results—to which Commerce's statement in the Remand Results that the

"significance of the limited nature of these transactions is not based upon volume" was a

response—clarify that Commerce's statement "is not based upon volume," Remand Results at 25,

is properly interpreted as "is not entirely based on volume," see Kaptan's Br. at 10–11.[16]  This,

---

[16] These comments included a statement that one of Nur's financial statements "shows an
extremely limited amount of commercial good transactions between the affiliates, all of which are
accounted for by this minuscule amount of scrap sold to Kaptan."  Kaptan's Cmts. on Draft
Remand Results at 10.  Commerce, Kaptan argues, meant only to correct Kaptan's notion that

Kaptan argues, resolves any apparent contradiction with Commerce's consideration of Nur's "miniscule" sales of steel scrap.  Kaptan's Br. at 11.

The question here is whether Commerce sufficiently "elucidate[d] [its] thinking," Domestics' Br. at 23, such that "the agency's path may reasonably be discerned."  Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974); see also Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998) ("An explicit explanation is not necessary . . . where the agency's decisional path is reasonably discernible.").

Commerce has met this standard through its explanations in the Remand Results, although not exactly by the means that Kaptan and the Government suggest.  By stating that "the production processes involved in [Nur's] shipbuilding are far removed from Kaptan Demir's downstream production processes, especially given the extremely limited transactions between the two companies," Remand Results at 19, Commerce clearly indicated that the limited nature of transactions between Nur and Kaptan supported a finding that Nur's shipbuilding was its own self-contained enterprise with little connection to Kaptan's production of steel—except, that is, to Kaptan's purchase of Nur's byproduct scrap as an input.  Commerce's subsequent statement that "the significance of the limited nature of these transactions is not based upon volume . . . but instead, an analysis of the totality of the facts contained within the transactions between Nur and Kaptan Demir," Remand Results at 25, thus does not unexplainedly contradict Kaptan's representation that its scrap purchases from Nur were "miniscule."  Kaptan's Cmts. on Draft Remand Results at 3.  Commerce did not merely state that "the limited nature of these transactions is not based on volume," which would imply (as Domestics suggest) that the scrap sales were

_____

sales volume was the sole relevant limitation on the nature of an input supplier's transactions. Kaptan's Br. at 10–11.

somehow limited in a manner other than their volume.  Commerce stated, rather, that "the significance of the limited nature of these transactions is not based upon volume . . . ."  Remand Results at 25 (emphasis added).  In other words, Commerce did not conclude that Nur's shipbuilding activities cut against a finding of primary dedication simply because the amount of steel scrap that Nur sold to Kaptan was small.  As Commerce instead explained, Commerce drew this conclusion because the amount of steel scrap that Nur sold to Kaptan was insignificant as an element within the totality of Nur's complex shipbuilding operations:

> Upon a review of Nur's business activities, which consist largely of shipbuilding, we find that the production processes involved in shipbuilding are far removed from Kaptan Demir's downstream production processes, especially given the extremely limited transactions between the two companies.

Remand Results at 19 (emphasis added).  While Commerce could have dwelt longer on this point, the court's role is not to enforce a standard of "ideal clarity" where Commerce's position is reasonably discernible.  Wheatland Tube, 161 F.3d at 1369–70.

Lastly, Domestics take issue with Commerce's determination that two "similarly-situated affiliates that supplied Kaptan with scrap" are cross-owned input suppliers for the purpose of subsidy attribution.[17]  Domestics' Br. at 16; 19 C.F.R. § 351.525(b)(6)(iv).  Domestics argue that "an examination of the affiliated transactions of non-Nur affiliates underscores the arbitrary nature of Commerce's treatment of Nur" and that "Commerce's failure to acknowledge, much less explain, this disparate treatment . . . supports a remand here."  Domestics' Br. at 23.

As the Government and Kaptan point out, however, this differential treatment can be explained by the fact that Kaptan did not challenge Martas and Aset's treatment as cross-owned input suppliers in the initial agency proceeding or in subsequent litigation.  Gov't Br. at 16;

---

[17] These affiliates are Martas Marmara Ereglisi Liman Tesisleri A.S. ("Martas") and Aset Madencilik A.S. ("Aset").  Domestics' Br. at 16.

Kaptan's Br. at 7.  Kaptan clarifies that this is because neither Matras nor Aset received subsidies that were attributable to Kaptan.  Kaptan's Br. at 7.

Thus, while "inconsistent treatment [by an agency] is inherently significant," DAK Ams. LLC v. United States, 44 CIT __, __, 456 F. Supp. 3d 1340, 1355 (2020), the type of consistency that Domestics insist upon would be practically impossible for any agency to achieve.  Commerce initially determined to treat Nur, Martas, and Aset alike as cross-owned input suppliers.  AR Results, 86 Fed. Reg. at 53280 n.10.  Commerce broke this alignment in the Remand Results only because of Kaptan's necessarily selective challenge to Nur's status.  During the remand proceeding, Commerce was unable to modify any portion of its AR Results that was not subject to challenge by a party—including Commerce's treatment of Martas and Aset.  See Zhaoqing Tifo New Fibre Co. v. United States, 41 CIT __, __, 256 F. Supp. 3d 1314, 1334 (2017) ("What Commerce was not permitted to do on remand was to reopen and re-review the settled issue of the agency's decision in its Final Determination . . . .").  This means that Commerce, upon determining not to treat Nur as a cross-owned input supplier, could not have avoided inconsistency by modifying its treatment of Martas and Aset unless authorized by law.  Here, Commerce was authorized only to review its treatment of Nur.  Kaptan I, 633 F. Supp. 3d at 1285.

By Domestics' reasoning, Commerce could not possibly have determined on remand that Nur was not Kaptan's cross-owned input supplier without acting arbitrarily.  Such a restriction would set a virtually unattainable standard for redeterminations in cases like this one, where the original AR Results contain unchallenged determinations regarding several affiliated suppliers.  It would also inhibit compliance with the court's order that Commerce "further expl[ain] and review . . . Commerce's finding that Nur was a cross-owned input supplier of input products primarily dedicated to the production of downstream products," Kaptan I, 633 F. Supp. 3d at 1285.

As to Domestics' argument that Commerce should at least be required to explain the inconsistency on further remand, the court finds that no explanation Commerce could give on this point would "enable the court to evaluate the agency's rationale at the time of decision" beyond what Commerce has already given in the <u>Remand Results</u>.  <u>Pension Benefit Guar. Corp. v. LTV Corp.</u>, 496 U.S. 633, 654 (1990).  As discussed above, Commerce has met its burden of explanation with respect to its treatment of Nur.  Commerce has faced no challenge to whether it has met this burden with respect to its treatment of Martas and Aset.  And as for Commerce's duty to explain any disparate treatment of the different affiliates (assuming that one exists), a sufficient reason for the disparity is already plain—Commerce could not retroactively revise its treatment of Martas and Aset.

Accordingly, the court sustains Commerce's analysis of Nur's business activity.

## CONCLUSION

In light of the above, the court sustains Commerce's <u>Remand Results</u>.  Judgment will enter accordingly.

**SO ORDERED.**

<u>/s/       Gary S. Katzmann</u>
Judge

Dated: <u>November 27, 2023</u>
           New York, New York